

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 17, 2018

**BY ECF AND EMAIL**
The Honorable Victor Marrero
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re: *United States* v. *Vincent Esposito*, 18 Cr. 14 (VM)

Dear Judge Marrero:

  The Government respectfully submits this letter in support of its appeal of Magistrate Judge Barbara Moses's order setting conditions of pretrial release for Vincent Esposito, the defendant. The defendant is a high-ranking member of the Genovese Organized Crime Family ("the Genovese Family"), who directly participated in and supervised multiple acts of extortion. At the time of his arrest, the FBI seized almost $4 million in U.S. currency hidden in the defendant's residence, along with an unregistered handgun, ammunition, brass knuckles, and lists of made members of the Genovese Family. Further, the defendant lied to Pretrial Services about his assets and possession of a firearm. In light of these and other facts discussed below, the defendant should be detained pending trial to ensure the safety of the community and his appearance at trial.

  **I.**  **Background**

  On January 10, 2018, a ten-count Indictment (the "Indictment") was unsealed charging five defendants with various crimes. Relevant to this letter, the defendant is charged in Count One with participating in a long-running racketeering conspiracy from at least in or about 2001 to in or about October 2017, in violation of Title 18, United States Code, Section 1962(d). Count Two charges the defendant with participating in a Hobbs Act extortion conspiracy from in or about 2001 through in or about 2015, in violation of Title 18, United States Code, Section 1951.

  The defendant was arrested on the same date the Indictment was unsealed, and a bail hearing was held before Magistrate Judge Barbara C. Moses that day. Judge Moses set the following bail conditions for the defendant:
- Home incarceration with electronic monitoring.

- A $6 million bond, co-signed by three financially responsible persons, and secured by the defendant's Upper East Side townhouse (with an estimated value of approximately $12 million).
- No contact with victims or witnesses.
- No contact with co-defendants, except in the presence of counsel.
- Surrender of passport and any other travel documents, and no new applications for such documents.
- Strict pretrial supervision.

Judge Moses further ordered that all bail conditions would have to be satisfied before the defendant was released. At this time, the defendant has not met all conditions set by Judge Moses, and remains detained.

## II. Applicable Law

A district court must detain a defendant pending trial if "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f). The Government bears the "burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community, and by the lesser standard of a preponderance of the evidence that the defendant presents a risk of flight." *United States* v. *English*, 629 F.3d 311, 319 (2d Cir. 2011) (quotations and citation omitted).

In considering applications for bail, courts consider the following factors:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves . . . a controlled substance [or] firearm . . .; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including-- (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

## III. Discussion

The charges against the defendant arise from his leadership role in the Genovese Family, a violent and sophisticated criminal organization with significant financial resources. The danger the defendant poses if bailed, and his incentive to flee the charges against him, stem in large part from the dangerous nature of the Genovese Family, and the crimes the defendant

committed as part of it.  This letter therefore discusses the Genovese Family as a whole and then examines the specific statutory factors as they apply to the defendant.

### A. The Genovese Family

The Genovese Family is part of a nationwide criminal organization of predominantly Italian-American members known by various names, including "La Cosa Nostra" ("LCN") and the "Mafia," that has operated through local organizations known as "Families."  The principal LCN Families that operate in the New York City Area are the so-called "Five Families" of New York:  namely, the Genovese, Gambino, Colombo, Luchese, and Bonanno Families.  Each Family has engaged in a wide variety of criminal activities, including, as applicable in this case, extortion, unlawful kickback payments, and honest services fraud, and used threats of economic harm and potential physical violence to further these activities.

To become a made member of LCN, an individual must be male and Italian.  Originally, LCN families could initiate new members only to replace a deceased member, which ensured that the families maintained their relative sizes and did not dilute their talent pools in an effort to become larger.  Later, these rules were adjusted to allow each family to add a small number of additional members each year even absent the death of an existing member.  Once a new member is proposed, the member's name is circulated to all five families for review and approval.  After the new member is approved, the family holds a secret, ritualistic induction ceremony, after which the newly-inducted member is introduced to other members of the family.

LCN members and associates, including members and associates of the Genovese Family, are apprised of, and are required to abide by, various rules and protocols.  Most fundamentally, LCN is governed by the rule of "omerta," which is Italian for "how a man should act."  Implicit in "omerta" is a rule of silence, prohibiting members from discussing LCN Family activities with people outside of the Family.  A member or associate commits the ultimate violation of this rule if he becomes a "rat," *i.e.*, if he provides information to law enforcement.  Cooperation with the Government is the most serious offense an individual can commit against LCN, and it can be punishable by death.

Members and associates of LCN, including Genovese Family made members and associates, must abide by the rule that the boss (or acting boss) of the Family must sanction significant criminal activities.  In addition to that rule, members and associates must also keep their upper-echelon superior apprised of their criminal activities.  Members and associates generate revenue through unlawful activity and must share that income with their upper-echelon superiors.

### B. Vincent Esposito

1. Nature and Circumstances of the Offense

Count One of the Indictment charges Esposito with participation in the Genovese Family racketeering enterprise, and the predicate acts for that charge include multiple acts of extortion, among other offenses.  One of those acts is the long-running extortion of a union official ("Official-1") for annual tribute payments of over $10,000 (the "Annual Payment Extortion"), which is also charged separately in Count Two as a Hobbs Act extortion conspiracy.  Counts

3

One and Two both constitute "crimes of violence" under § 3142(g), weighing in favor of detention here. *See United States* v. *Ciccone*, 312 F.3d 535, 542 (2d Cir. 2002) (holding that extortion, and racketeering conspiracy charging extortion as a predicate act, are crimes of violence under the Bail Reform Act).

Esposito directed and managed the Annual Payment Extortion, and had a number of lower ranking members of the enterprise, including defendants Vincent D'Acunto and Steve Arena, collect money and convey threats to Official-1 on Esposito's behalf. A number of those demands were secretly recorded. For example, on March 6, 2014, D'Acunto passed along a message to Official-1 that Esposito wanted to know when that year's extortion payment would be made, and warned that Official-1 was "gonna be in for a big surprise" if the payment was not made. In a recording from February 13, 2015, after Official-1 asks D'Acunto "do I get killed, do I get shot, do I get hit" if Official-1 did not make that year's extortion payment, D'Acunto responded "they never say or else."

In another extortion scheme, defendants Steve Arena and Frank Giovinco, acting under the supervision of Esposito, extorted a different union official ("Official-2") and a financial adviser (the "Adviser") for a cut of commissions made from union investments (the "Commission Payment Extortion"). During one covert recording of Official-2 on September 19, 2017, Official-2 (who was not aware he was being recorded) reported to the Adviser that Arena and Giovinco were "threatening my life" and that he was worried because he did not know what Arena and Giovinco were telling the "higher ups" in the Genovese Family.

A wiretap of Esposito's phone also captured him discussing other extortion schemes. For example, on October 6, 2015, another individual informed Esposito that "I really did extort a parking lot in that spot, I want you to know."

Esposito's ability and willingness to follow through on threats of force is confirmed by the weapons found by the FBI in Esposito's residence on the day of his arrest. Specifically, the FBI seized brass knuckles, a knife with a holster, an unregistered handgun, and bullets from Esposito's residence. Those items are depicted in the photograph below[1]:



---
[1] The FBI also seized a starter pistol, which was initially believed to be a firearm.

It should be noted that Esposito lied to pretrial services about whether he possessed a firearm, falsely reporting that he did not own such a weapon.

In addition to organizing and supervising extortion schemes, Esposito's leadership role in the enterprise is demonstrated by two important pieces of evidence that are typically reserved for high-ranking members within La Cosa Nostra.

First, the evidence shows that Esposito is in control of Genovese Family slush funds. Organized crime families of La Cosa Nostra have long maintained slush funds to serve a variety of purposes for the family, including paying for the legal fees of incarcerated members and funding extortionate loans through loansharking. Historically, only individuals in positions of authority have been tasked with maintaining control over such funds. Here, wiretap intercepts of Esposito's cellphone captured him discussing the collection and disbursement of funds with other members of the Genovese Family. For example, on October 17, 2015, Esposito had a call with another individual about providing funds for the legal representation of the former consigliere of the Genovese Family, who was incarcerated. Esposito's role as one of the individuals who holds the purse strings for Genovese Family funds is further confirmed by the fact that the FBI seized approximately $3.8 million in U.S. currency from Esposito's residence.[2] That seized currency is depicted in the photograph below:



Given the illicit nature of the funds held and managed by Esposito for the Genovese Family, it is unsurprising that he lied to Pretrial Services about his assets, and reported only a few hundred thousand dollars in various bank accounts.

Second, the FBI also found two lists of made members of the Genovese Family hidden in Esposito's residence. One of those lists consists of certain made members of the Family based in New Jersey who died within the last 20 years, while another list contains certain living members of the Family, all in one crew, and also based in New Jersey. As discussed above, whether or not LCN families can make new members has traditionally been based, in part, on the number of active and deceased members, and is reserved for individuals at the captain level or higher. The maintenance of such lists tracking living and dead members in a particular area are indicative of an individual responsible for making assessments about the induction of individuals into the Family, and thus having a high rank in the Family.

---

[2] As of the time of Esposito's initial presentment and bail hearing, the search of his residence was still ongoing, and thus Judge Moses was not aware of the full amount of U.S. currency hidden in the residence.

In sum, the offense conduct shows that the defendant is a high-ranking and influential member of the Genovese Family who is willing to use threats of violence to further the enterprise, who has the ability to follow through on those threats, and who maintains a network of criminal associates willing to make threats on his behalf. The defendant would thus pose a clear danger to the community if he were bailed. *See Ciccone*, 312 F.3d at 543 (upholding pretrial detention of head of Gambino crime family "based on his activities as well as the activities of those he supervised and controlled"). Indeed, the Second Circuit has repeatedly "rejected as insufficient various conditions of release proposed in cases involving the pretrial detention of purported leaders of organized crime families shown to be involved in violent criminal activities." *Ciccone*, 312 F.3d at 543 (citing *United States* v. *Ferranti*, 66 F.3d 540, 543-44 (2d Cir. 1995) (rejecting $1 million bail secured by real property); *United States* v. *Orena*, 986 F.2d 628, 632-33 (2d Cir. 1993) (rejecting $1 million bail secured with real property, in-home detention, restricted visitation and telephone calls, and electronic monitoring); *United States* v. *Colombo*, 777 F.2d 96, 97 (2d Cir. 1985) (rejecting $500,000 bail secured with real property)).

The offense conduct also demonstrates that the defendant has significant undeclared financial resources and connections to a wide-ranging and powerful criminal network. In light of these facts, the nature and circumstances of the defendant's offenses demonstrate that, if bailed, the defendant poses a significant risk of flight.

2. The Weight of the Evidence

The evidence against the defendant is strong. The evidence includes, among other things, a cooperating witness (Official-1) who was directly extorted by Esposito; numerous in-person and covert recordings of lower-level members of the enterprise collecting money and conveying threats on behalf of Esposito; a wiretap of Esposito's phone which captured him discussing extortion, the enterprise's finances, and other related enterprise matters; the seizure of a handgun, brass knuckles, and over $3.8 million in U.S. currency from the defendant's residence; and surveillance photographs of the defendant meeting with other members of the Genovese Family.

3. The History and Characteristics of the Defendant

The defendant's history and characteristics also favor detention. As discussed above, the defendant has participated in a number of different acts of extortion, and possessed brass knuckles, a holstered knife, and an unlicensed firearm and ammunition. While the defendant has no criminal record, the evidence in this case indicates that he has engaged in serious criminal conduct from at least 2001 through the present.

The defendant also has access to extensive financial resources, both individually and by virtue of his membership in the Genovese Family. The defendant has an ownership interest in numerous properties, including an Upper East Side townhouse worth an estimated $12 million, a Harlem property worth at least $5 million, and other properties for which he declined to provide addresses in his pretrial interview. As demonstrated by the fruits of the search of the defendant's residence, he maintains massive quantities of cash on hand. Further, the defendant's willingness to lie to Pretrial Services about his financial resources (as well as his possession of a firearm) demonstrates that he cannot be trusted to comply with any conditions of release.

6

4. The Nature and Seriousness of the Danger to Any Person or the Community

The nature and seriousness of the danger the defendant presents is clear: as discussed above, he is a high-ranking and influential member of the Genovese crime family who is willing to use threats of violence to further the enterprise, who has the ability to follow through on those threats, and who maintains a network of criminal associates willing to make threats on his behalf. The defendant would thus pose a clear danger to the community if he were bailed. *See Ciccone*, 312 F.3d at 543.

To the extent the defendant argues that home detention would relieve that threat, he is in error. The Second Circuit has repeatedly held that home detention or incarceration cannot adequately mitigate the risk of violent conduct. *See United States* v. *Orena*, 986 F.2d at 632 (collecting cases); *see also United States* v. *Dono*, 275 F. App'x 35, 37 (2d Cir. 2008) (relying on *Orena*). The Circuit has made these rulings with good reason. Home detention or incarceration is monitored remotely using an electronic system that alerts pretrial services staff who work only during the day. Such minimal oversight would do little to prevent the defendant from traveling to locations to intimidate witnesses, or meeting with other members of the Genovese Family at his home and providing direction that others engage in witness intimidation or retaliation, consistent with Genovese Family's creed against "rats." *See Orena*, 986 F.2d at 633 (noting the limited value of home detention absent "extensive monitoring of homes, telephones, and travel").

IV. Conclusion

For the foregoing reasons, the Government respectfully submits that the defendant poses a danger to the safety of the community and a risk of flight, and should therefore be detained pending trial.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: /s/ Jared Lenow
Jared Lenow
Kimberly Ravener
Jason Swergold
Assistant United States Attorneys
(212) 637-1068

cc: Flora Edwards, Esq. (by electronic mail)
fedwards@fmelawpc.com