LAW OFFICES OF

# JEFFREY LICHTMAN

11 EAST 44™ STREET
SUITE 501
NEW YORK, NEW YORK 10017
www.jeffreylichtman.com

JEFFREY LICHTMAN
JEFFREY EINHORN
PAUL TOWNSEND

PH: (212) 581-1001
FX: (212) 581-4999

February 27, 2018

**BY ECF AND HAND DELIVERY**
Hon. Victor Marrero
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re: <u>United States v. Esposito, et al.</u>, **18 CR 14 (VM) (S.D.N.Y.)**

Dear Judge Marrero:

## A.    INTRODUCTION

I am writing on behalf of defendant Vincent Esposito in opposition to the government's January 17, 2018 Detention Letter ("Detention Letter") and following the January 26, 2018 hearing, wherein the government requested that Your Honor overturn Judge Moses' January 10, 2018 Order granting Mr. Esposito's pretrial release subject to certain conditions. For the reasons stated below, it is respectfully submitted that Mr. Esposito is eminently bailable and the government cannot overcome their burden of demonstrating that no "conditions" exist which will "reasonably assure" Mr. Esposito's "appearance" in court and the "safety" of the "community." See 18 U.S.C. § 3142 (f).

*First*, Mr. Esposito poses zero risk of flight. He is a 50 year old man who has lived in Manhattan with his 83 year-old mother for his entire life and is now her primary caretaker. It is ludicrous to imagine that he would flee the country – and abandon his mother as well as causing the eviction of her and his sister from their family home,[1] especially when the sum total of his entire life of international travel consists of a single trip to Italy for a wedding over a decade ago. Mr. Esposito's anticipated sentencing guidelines of just 57-71 months imprisonment were he to plead guilty to the Indictment today only further this same conclusion, the government's empty threat to supersede with a § 924 (c) charge notwithstanding (the threat growing older by the day).

---

[1] Despite Mr. Esposito's limited ownership stake in the family home, the entire property would be posted for his bail.

*Second*, it cannot be credibly argued that the defendant poses a risk of danger to the community. While there is no denying who Mr. Esposito's father was, the defendant has *zero* criminal history, nor has there been a single allegation that he ever sought to obstruct justice in any manner. Instead, the defendant has lived some 50 years *without ever being arrested or charged with a crime*. And notwithstanding the government's vacillating accounts that Mr. Esposito "has a significant position of influence within the Genovese Family"[2] and is a "person of rank"[3] – the fact remains that they are unable to specify Mr. Esposito's "rank" within the family (id.) despite their supposed network of cooperating witnesses, including one "who had first-hand contact with Mr. Esposito, who's very close with him and ... detailed [for the government] the contacts they had over the years ...." Ex. A, at p. 48. Simply put, the government does not point to Mr. Esposito's specific rank in the Genovese Family or even if he is a member of the Family.

*Third*, in the time since Judge Moses ordered Mr. Esposito's release on bail, the facts supporting the government's detention request have diminished greatly. Specifically, while the government claimed at his initial bail argument that two firearms were recovered during the search of Mr. Esposito's home (AUSA Lenow: "There were two firearms, Your Honor, I believe they were both handguns"),[4] one turned out to be a starter pistol (which does not fire bullets), and the other, a .22 caliber revolver[5] – only slightly larger than a derringer – found in a hallway closet, unloaded, disassembled, and in an area separate from where cash was recovered. Since the first bail hearing nearly two months ago, there has been no allegation that Mr. Esposito's fingerprints or DNA are on the gun or that the weapon has ever even been fired.

Additionally, at the January 10 hearing before Judge Moses, the court was informed that Mr. Esposito owned half of his family's $12M townhouse. Ex. A, at p. 62. As was made clear at the January 26 hearing, however, Mr. Esposito actually owns only *one-sixth* of the property, significantly reducing his approximate net worth. Ex. B, at p. 29. Regardless, since the January 26 bail hearing before this Court, the defendant has provided more details to the Court and

---

[2] See January 10, 2018 Arraignment and Bail Hearing, attached as Exhibit A, at p. 34.

[3] See January 26, 2018 Bail Hearing, attached as Exhibit B, at p. 5.

[4] Ex. A, at p. 37.

[5] The .22 caliber revolver is disassembled with the barrel removed in the photograph provided by the government. See Detention Letter at p. 4. It is unclear whether the weapon was located in this state, or – however unlikely – the government disassembled the revolver for the picture. Weeks ago the defense requested a photograph of the revolver fully assembled if it was in that state when found; we have yet to receive a response.

government on his financial condition (enclosed) then perhaps any defendant charged in an organized crime case _ever_ has. And unlike seemingly every other organized crime defendant, **Mr. Esposito actually has assets in his own name** – for good reason. Nevertheless, as discussed below, after receiving this free financial discovery provided solely in an effort to resolve the bail issue, the government has used this as a fishing expedition to look for evidence of criminality and not an honest attempt to reach a bail resolution. The government's unreasonable requests after receiving this information make clear what it is after; indeed, as Judge Moses indicated at the January 10 bail hearing concerning one of Mr. Esposito's co-defendants, this is not – as much as they would like it to be – an opportunity for the government to depose the defendant as to his business practices. See Ex. A, at p. 24. The government's claim that the defendant lied to pretrial services about his assets in the aftermath of a sudden arrest and 16 hour search of his home does not give it a right to force the defendant to incriminate himself just to receive bail in a non-presumption case.

_Finally_, the government's continued request for Mr. Esposito's detention is especially egregious in light of their recent consent to the release of an objectively _less_ bailable defendant just this past month – the alleged Acting Boss of the Bonanno Family, Joseph Cammarno, Jr. – an individual who unlike Mr. Esposito has a criminal record, and is alleged to have obstructed justice and participated in a murder. See February 5, 2018 Letter of AUSAs Jason Swergold and Jessica Greenwood, attached as Exhibit C.[6]  We are certain that these prosecutors did not insist upon a full, detailed list of every asset of Cammarano, along with a cadre of follow-up questions, before consenting to bail in his case before a different judge in this very building. And Mr. Esposito is also clearly _more_ bailable than the host of seemingly less likely candidates we identify herein who are routinely spared pretrial detention in the Southern and Eastern Districts of New York – including the defendant's father. See United States v. Gigante, 85 F.3d 83, 84 (2d Cir. 1996).

## B.    SUMMARY OF THE CHARGES

Mr. Esposito is charged in Counts One and Two of a ten count Indictment with Racketeering Conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One) and Conspiracy to Commit Extortion, in violation of 18 U.S.C. 1951 (Count Two). The bare bones Indictment is silent as to the specific racketeering acts committed by Mr. Esposito, however, the Detention Letter alleges that Mr. Esposito "directed" an extortion scheme involving payments totaling

---

[6] See also the government's press release: Acting Boss Of Bonanno Organized Crime Family And 9 Other Members Of La Cosa Nostra Charged In Manhattan Federal Court With Racketeering And Related Offenses, United States Attorney's Office, Southern District of New York, available at: https://www.justice.gov/usao-sdny/pr/acting-boss-bonanno-organized-crime-family-and-9-other-members-la-cosa-nostra-charged (last viewed February 21, 2018).

$10,000 per year from a union official, and "supervis[ed]" another scheme for a "cut of commissions made from union investments." Detention Letter at pp. 3-4. The Detention Letter also alleges that Mr. Esposito was involved in a plot, somehow, to extort individuals who ran a parking lot (id. at p. 4) and was in control of "Genovese family slush funds," as demonstrated by a tape recorded discussion that allegedly concerned hiring an attorney for an incarcerated member. Id. at p. 5. Notably, the defendant is not alleged to have committed any acts of violence personally.

## C. THE PROPOSED BAIL PACKAGE

Mr. Esposito proposes that Your Honor adopt the bail package set by Judge Moses at the conclusion of the January 10, 2018 hearing. That package included the following conditions securing the defendant's pretrial release: 1) a $6M personal recognizance bond signed by three financially responsible persons[7] and secured by Mr. Esposito's home; 2) strict pretrial supervision; 3) electronic location monitoring; 4) home incarceration; 5) no contact between Mr. Esposito and his codefendants outside the presence of counsel; 6) no contact between Mr. Esposito and any known victims or witnesses; and 7) the surrender of Mr. Esposito's passport and any other travel documents, and that he not apply for any such documents. See January 10, 2018 Bail Disposition Sheet, attached as Exhibit D.

Additionally, Mr. Esposito would agree to the supplemental conditions required by the government for the release of Joseph Cammarano – the alleged Acting Boss of the Bonanno Crime Family – specifically: 1) a video security system that continuously monitors the front and rear entrances to his home with real time access and footage retained by designated law enforcement; 2) a list of visitors for the government's prior approval – and no visitors permitted to enter or exit the property unless they are on the visitor's list or otherwise approved by the government; and 3) the defendant shall not use any cellular telephone or other electronic communication device.

Finally, we would respectfully request that Mr. Esposito also be permitted to leave his home in order to meet with his attorneys at their Manhattan offices, just 30 blocks down Madison Avenue from Mr. Esposito's home.

---

[7] Three financially responsible persons were interviewed and approved by the government on February 5, 2018.

### D. ARGUMENT

The Supreme Court has noted that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." United States v. Salerno, 481 U.S. 739, 755 (1987). Indeed, "[t]he Bail Reform Act carefully limits the circumstances under which detention may be sought to the most serious of crimes" (id. at 747) and directs the release of the defendant "subject to the least restrictive" conditions determined by the court which will "reasonably assure the appearance of the person" at trial. 18 U.S.C. § 3142(c).

Here, as the government must concede, none of the § 3142(f)(1) factors that trigger the presumption of detention are met. Rather, although the Indictment charges Mr. Esposito with racketeering conspiracy and extortion, crimes of violence that admittedly permit the government to request his detention, there can be no doubt that these are bailable offenses. Accordingly, the government must overcome a substantial burden in proving that Mr. Esposito poses a "serious" flight risk or there exists a "serious" risk that he will seek to obstruct justice in his case, in order for their request for pretrial detention to be granted. 18 U.S.C. §§ 3142(f)(2)(A) and (B). Therefore, Mr. Esposito stands before this Court as both presumptively innocent, see 18 U.S.C. § 3142(j), and presumptively eligible for pretrial release. See, e.g., United States v. Scarpa, 815 F. Supp. 88, 91 (E.D.N.Y. 1993) (pretrial detention "has been and should remain the *exceptional practice*") (emphasis supplied); United States v. Berrios-Berrios, 791 F.2d 246, 250 (2d Cir. 1986) (pretrial detention is a drastic measure, narrowly reserved for "extreme case[s]").

To rebut the latter presumption – that the defendant is eligible for pretrial release – the government must prove that there are no "conditions" which will "reasonably assure" Mr. Esposito's "appearance" and the "safety" of the "community." See 18 U.S.C. § 3142 (f). As shown below, the government has been unable to meet this burden – as Judge Moses previously determined – and his pretrial release should be granted immediately.

#### The Effect of Pretrial Detention on the Presumably Innocent Defendant

Before turning to a more detailed analysis of the relevant facts and legal principles involved, a few observations concerning the practical realities facing a defendant committed to pretrial detention are appropriate.

Certainly, the best exposition of the real consequences of pretrial detention is found in Judge Weinstein's decision in United States v. Gallo, 653 F. Supp. 320, 336-339 (E.D.N.Y. 1986). There, Judge Weinstein explained that being held in pretrial detention involves far more than merely the deprivation of an individual's liberty. Id. at 336. The obstacles and difficulties which are visited upon a defendant and his counsel, as well as their ability to effectively prepare

a defense against serious criminal charges, can be almost empirically measured. Id. at 337. As Judge Weinstein noted:

> [A]ll of these hardships, including deterioration of [the defendant's] morale, demeanor, finances, resources, reputation and quality and thoroughness of legal defense, may combine to disadvantage the defendant at the judgment and sentencing stages of the proceeding. As to judgment, studies have indicated that the tension is likely to increase the chances of conviction at trial.

Id.

In Gallo, Judge Weinstein underscored the need for a careful "balancing" by the trial court. Id. at 338. He urged his brethren to consider the detention equation beyond the perspective of quantifying the amount of information presented by the government. Id. at 338-39. Instead, he emphasized the importance of carefully weighing the less tangible – but surely deleterious – effects of pretrial detention upon an individual's ability to effectively defend himself.

In Scarpa, another decision by Judge Weinstein, he emphasized his concern for this process, stressing that preventive detention on the basis of future dangerousness should be the "exceptional practice." Scarpa, 815 F. Supp. at 91. As the court noted:

> It is well to remember the magnitude of the injury that pre-trial detention inflicts and the departure that it marks from ordinary forms of constitutional government. Executive power to detain an individual is the hallmark of the totalitarian state. Under our Constitution the prohibition against excessive bail, the Due Process Clause of the Fifth Amendment, the presumption of innocence – indeed, the fundamental separation of powers among the legislative, the executive and the judicial branches of government – all militate against the abhorrent practice. Our historical approach eschewing detention prior to trial reflects these concerns.

Id.

As this Court is undoubtedly in a position to observe, applications for preventive detention by the United States Attorney's Office have grown with alarming frequency. Applications seeking to hold an accused without bail have become commonplace. Although

figures are unavailable, it is certainly true that there are hundreds of federal defendants presently housed at the local detention centers throughout New York State.

These issues are raised with the Court for several reasons. First, it is important that the degree of scrutiny brought to a matter as serious as the deprivation of an individual's liberty prior to conviction does not erode because the practice itself has become more commonplace. Second, the effect of pretrial detention upon the accused's ability to defend himself must be considered when evaluating the prosecutor's application. Even if a prosecutor is merely pursuing what he or she perceives to have become an accepted practice, the inescapable conclusion remains that the accused's ability to defend is materially affected.

### It Cannot Be Credibly Argued that Mr. Esposito Poses a Risk of Flight or Danger to the Community

Other than the disassembled miniature .22 caliber revolver and the cash (now in the government's custody) recovered from his home – an entire townhouse shared with members of his family for over 36 years – there is nothing to suggest that Mr. Esposito poses either a risk of flight or danger to the community. While the nature of the charges surely weigh upon this application, the balance of the 18 U.S.C. §3142 (g) factors, examined below, support his release: he has unusually strong family ties and ties to the community, has no criminal record or history of violence, and he has given a detailed accounting of his finances to the government. Finally, the proposed bail package, which includes a $6M bond secured by property, certainly "assure[s] the appearance of" the defendant and the "safety of the community." 18. U.S.C. § 3142(e).

i.  Applicable Law

In determining whether there are conditions of release that will "reasonably assure" the appearance of Mr. Esposito at future court appearances and the safety of the community, the following should be considered:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including--

>> (A) the person's character, physical and mental condition, family
>> ties, employment, financial resources, length of residence in the
>> community, community ties, past conduct, history relating to drug
>> or alcohol abuse, criminal history, and record concerning
>> appearance at court proceedings; and

>> (B) whether, at the time of the current offense or arrest, the person
>> was on probation, on parole, or on other release pending trial,
>> sentencing, appeal, or completion of sentence for an offense under
>> Federal, State, or local law; and

>> (4) the nature and seriousness of the danger to any person or the
>> community that would be posed by the person's release. In
>> considering the conditions of release described in subsection
>> (c)(1)(B)(xi) or (c)(1)(B)(xii) of this section, the judicial officer
>> may upon his own motion, or shall upon the motion of the
>> Government, conduct an inquiry into the source of the property to
>> be designated for potential forfeiture or offered as collateral to
>> secure a bond, and shall decline to accept the designation, or the
>> use as collateral, of property that, because of its source, will not
>> reasonably assure the appearance of the person as required.

18 U.S.C. § 3142 (g). Because the Court is required to examine the § 3142 (g) factors in
considering both the defendant's risk of flight and danger to the community, albeit by differing
legal standards, they will be discussed together in the proceeding sections. See United States v.
Duncan, 897 F. Supp 688, 690-92 (N.D.N.Y. 1995) (18 U.S.C. § 3142 (g) factors are considered
in both danger to the community and risk of flight analyses).

Finally, as this Court is aware, assertions that the defendant poses a risk of flight must be
proven by a preponderance of the evidence, while allegations that the defendant poses a danger to
the community must be proven by clear and convincing evidence. 18 U.S.C. § 3142 (f)(2)(B)
("The facts the judicial officer uses to support a finding pursuant to subsection (e) that no
condition or combination of conditions will reasonably assure the safety of any other person in
the community shall be supported by clear and convincing evidence"); United States v.
Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985) (allegations of flight risk must be supported by a
preponderance of the evidence).

ii.    The Nature of the Charges And Weight of Evidence Against Mr. Esposito

It is difficult to discern the evidence against Mr. Esposito at this stage, before any meaningful discovery has been provided – especially in light of the bare bones Indictment returned by the Grand Jury – however, a review of the Detention Letter reveals that the government believes that Mr. Esposito, an individual of some yet unspecified rank within the Genovese family, "directed" a scheme to extort payments from a union official, identified as "Official-1" in the Detention Letter, and "supervis[ed]" another scheme involving a second union official, identified as "Official-2." Detention Letter at pp. 4-5. While the government points to recorded conversations which support the existence of these extortions, it should be noted that the individual making these tapes who purportedly asked "do I get killed, do I get shot, do I get hit," if he failed to make a payment *was recording these conversations for the government at the time*. Id. at p. 4. These statements therefore obviously cannot be taken at face value as they were clearly designed to elicit an incriminating response from defendants other then Mr. Esposito.

An extortion plot alleged by the government concerning a parking lot fails upon inspection. Specifically, the government alleges in the Detention Letter that an individual was caught on tape telling Mr. Esposito "I really did *extort* a parking lot in that spot, I want you to know that." Id. at p. 4 (emphasis supplied). The government's interpretation of this call strains any accord with common sense. As counsel played for the Court on January 26, the individual on the tape clearly used the word *explore* and not extort. It is simply unthinkable that an extortionist would actually use the word *extortion* – a legal term of art – in describing his own conduct. And the vacant lot at issue was partly owned by Mr. Esposito – why would he have "extort[ed]" himself? Id. Instead, what makes more sense is that Mr. Esposito and his partners *explored* the possibility of building a parking lot on a vacant parcel of land that they owned.[8] Id.

Finally, the government's claim that Mr. Esposito's "willingness to follow through on threats of violence is confirmed by the weapons found by the FBI in [his] residence," likewise rings hollow. Id. First, despite all the talk alleged by the government concerning individuals who collected money for Mr. Esposito, there is not a single act of violence that they can point to in this case. Second, the revolver attributed to Mr. Esposito is a miniature .22 caliber revolver – and as depicted in the photograph provided by the government – was found dissembled and

_____

[8] Of course, at the beginning of the case during the bail proceedings, the government is oftentimes faster and looser with the facts, surely knowing that the defendant is at a disadvantage having not yet received the discovery in the case. Thus government faulty assertions that Mr. Esposito conspired to extort himself, possessed two firearms (which might lead to a § 924(c) charge) and owned half of his residence, all fail upon the slightest inspection.

unloaded.[9] Id. The idea that this diminutive weapon – *smaller than the brass knuckles in the same photograph* – would be chosen to instill fear in the victims of an extortion is laughable. Id. Third, these items were recovered during a day long search of the residence that the defendant has shared with his family for over 36 years – and there has been no evidence tying the knife, brass knuckles, or miniature revolver to Mr. Esposito and not someone else. And fourth, even if they were his items, there has been no evidence presented to establish that Mr. Esposito brandished or ever used them in relation to this conspiracy.

      iii.    The Defendant's Financial Disclosure

      Following the January 26, 2018 hearing, counsel endeavored with the aid of an accountant to create a complete snapshot of the defendant's finances. This included, as the government requested during the hearing: "information about all corporations," "encumbrances," "tax returns," "the value of ... properties" and "any restrictions on the release of assets ...." Ex. B, at p. 54. Conversations with the government following this hearing led counsel to believe that providing these disclosures could result in the creation of an agreed upon bail package – a position recounted in Ms. Macedonio's February 2, 2018 letter to the Court requesting additional time to gather materials and meet with the government. This belief was also based on this same office's agreement – indeed, one of the same *prosecutors* – to release Joseph Cammarano, the alleged Acting Boss of the Bonanno Family – an objectively more dangerous defendant. Unfortunately, this did not proceed as we hoped, despite the detailed picture of Mr. Esposito's assets that was turned over.

      Specifically, on February 9, 2018, defense counsel provided to the government the following information, attached hereto: 1) a complete list of Mr. Esposito's real property, including the ownership breakdown, corporate name, use, occupancy, value and amount of any encumbrances (attached as Exhibit E); 2) Mr. Esposito's state and federal tax returns for 2014-2016 (attached as Exhibit F); and 3) a financial statement from his accountant valuing his net worth          See January 31, 2018 Statement of Financial Condition, attached as Exhibit G. On February 16, after spending an entire week with these materials in their possession, the government indicated to counsel that they were still reviewing the items as well as the materials seized on January 10 from the defendant's home, likely had additional questions – but had not yet formulated them – *and regardless, would not likely agree to Mr. Esposito's release*.

---

    [9] The revolver was also recovered from a hallway closet – and was neither near the cash seized from the home, or readily "available" to be used. See United States v. Lindsay, 985 F.2d 666, 672 (2d Cir. 1993). Therefore, the government's intimations notwithstanding, the viability of any forthcoming § 924(c) charge would be dubious at best. See Ex. B, at p. 16.

Thereafter, on February 19, the government finally responded and demanded that a "formal affirmation" be filed concerning the "accuracy" of the defendant's financials, together with answers and supporting documentation concerning the following:



---

[10] In response to this question, the defendant's family looked through the remaining items in Mr. Esposito's home and located the following: 1) ten Liberty gold coins; 2) one Raymond Weill watch; 3) one E. Madinella watch; 4) one Rolex gold bracelet watch; 5) one Frank Muller

██████████████████████

See February 19, 2018 Email of AUSA Jared Lenow, attached as Exhibit H.

Based on these follow-up questions, there can be no doubt that the government has turned what was supposed to be an "inventory" of the defendant's assets (see Ex. B, at p. 55) for the purpose of determining risk of flight[11] into a fishing expedition in search of incriminating evidence. To be sure, the information provided to the government already – and appended hereto – far exceeds that voluntarily provided by perhaps any individual alleged to be connected with organized crime – and is far greater than that routinely used by Pretrial Services to make recommendations, and for magistrate judges to make determinations as to bail. These snapshots of a defendant's businesses or corporations are not, as Judge Moses rightly concluded, a chance to freely depose the defendant, especially when he is in such a vulnerable position. Ex. A, at p. 24. Here, Mr. Esposito provided a detailed itinerary of his assets, his tax returns and a net worth statement prepared by his accountant with the belief that a good faith effort would be made to come to an agreed upon bail package. Unfortunately, that does not appear to have been the case. Certainly, however, the court is no longer "flying blind" with regard to his net worth, or the size of the bond required to assure his future appearance in court. Ex. B , at p. 12.

In essence, the government is expecting the defense to prove a negative by answering the question of "how do we know this is all of Mr. Esposito's assets?" We cannot prove that. But wealth as a detriment to receiving bail only exists where the government can prove the defendant is a flight risk and in this case they cannot. There is nothing in Mr. Esposito's history which suggests he would not honor a single order from this court and cause the eviction of his mother and sister from their home.

iv.    The Defendant's History and Character

As noted in the Introduction, the defendant has lived with his now 83 year-old mother for nearly his entire life – and at present, is her primary care giver. Prior to his arrest, he had lived with his mother at the Manhattan townhouse they share with his sister, Carmella, for the past 36 years, and his international travel consists of a just single trip to Italy some 12 years ago for a

---

watch; 6) one Ebel gold bracelet watch; and 7) one Cartier stainless steel watch. As much of the defendant's family home is in disarray following the government's exhaustive search, it is possible that additional coins or other valuables may be located as the family continues to clean up the house.

[11] Id. at p. 50 (AUSA Lenow: "The Court cannot make an informed decision about the risk of flight without more information on assets").

friend's wedding. See, e.g., February 5, 2018 Letter of Oscar Cragwell, attached as Exhibit I ("Manhattan is the only home he has ever known"). A graduate of New York University in 1989 and a day trader, project manager, property owner and property manager *with a blemish free criminal record*, he is also perhaps the unlikely son of Vincent Gigante. The letters appended hereto from Mr. Esposito's friends and family members provide a picture of a man who is revered for his dedication to his immediate family and to others, as well as his charity.

To begin, Mr. Esposito's sister, Lucia, explains in her letter to the Court that the defendant is the "primary caretaker" of their mother, and he and his other sister have "dinner every night with [her]." February 5, 2018 Letter of Lucia Esposito, attached as Exhibit J. As Lucia Esposito lauds: "I have never known another adult child who has the level of affection and care that [Vincent] shows to our aging mother." Id.; see also February 4, 2018 Letter of Carmella Esposito, attached as Exhibit K ("immensely dedicated to our ... mother and is her primary care taker"). As Lucia Esposito concludes, it is unthinkable that her brother would flee: "family ... is too important to him and he would not put us in jeopardy nor take the risk of never seeing us again. Ltr. of Lucia Esposito, Ex. J; see also Ltr. of Carmella Esposito, Ex. K ("would not jeopardize our family nor our security for any benefit to him"). This view is corroborated not just by family members, but friends as well, with one writer observing that "Vincent is ... more devoted to his family than anyone I have ever known." February 5, 2018 Letter of Christopher Dillon, D.D.S., attached as Exhibit L; February 4, 2018 Letter of Tony Oroszlany, attached as Exhibit M ("truly cares for his immediate family and hopes to be reunited with them at home").

Importantly, Mr. Esposito is the "point person" with each of his mother's doctors, and he "takes her to each ... medical appointment." Ltr. of Lucia Esposito, Ex. J. A lung cancer survivor, Mr. Esposito's mother needs "continual monitoring," and her medical visits are frequent. Id. As Carmella Esposito explains, the defendant drives their mother "to doctor's appointments and meets with her doctors (pulmonologist, oncologist, cardiologist, orthopedist, neurologist and internist) to discuss her medications, conditions, and restrictions and [any] needed course of action for her to follow." Ltr. of Carmella Esposito, Ex. K; see also February 5, 2018 Letter of Donald N. Summers, M.D., attached as Exhibit N ("most helpful to his mother .... has always responded to phone calls regarding medical issues"); February 6, 2018 Letter of Peter Thayer, attached as Exhibit O ("takes his mother to medical appointments and is intimately involved with her care"). Friend John Cassarini writes that when he and the defendant were looking at a potential real estate investment downtown, Mr. Esposito "suddenly said we have to go uptown," because he needed to take his mother to a doctor's appointment *less than one block from their home.* February 4, 2018 Letter of John Cassarini, attached as Exhibit P. For this reason, Mr. Cassarini believes it would be "impossible ... to imagine any scenario where [Mr. Esposito] would leave his mother." Id.

In addition to his devotion to his family, Mr. Esposito is also known to be deeply involved in his local community and charity. For example, Lucia Esposito notes in her letter that he donates "much needed clothes, sneakers, toiletries and food to All Angles Church," in order to assist the "emergency shelter [of] 50 homeless men and women." Ltr. of Lucia Esposito, Ex. J. Similarly, Carmella Esposito notes that her brother, "on any given week ... delivers cooked meals to homeless individuals[] who sleep on the steps of St. Jean Baptiste Church ...." Ltr. of Carmella Esposito, Ex. K.

Many of the letters submitted on behalf of this application also note the writer's close personal friendships with Mr. Esposito – and the times that he was able to help others in need. Dr. Craig Antell, for example, recalls for the Court a particularly telling account of an older patient who missed her Access-A-Ride home from his office, leading to the defendant – who happened to be in the office as well – conversing with this "nervous elderly lady and offer [her] support" whom he would "likely never s[ee] ... again" for over two hours. February 5, 2018 Letter of Dr. Craig Antell, attached as Exhibit Q. And for himself, Dr. Antell recalls that "the past few years have been extremely difficult," but he can always count on the defendant's "emotional support." Id. Christopher Dillon similarly noted that when his own mother "grew ill and needed to move to a nursing home," that the "empathy and care he showed ... were amazing," and he continually asks how he can help him. Ltr. of Christopher Dillon, Ex. L.

Peter Thayer also provides a poignant account of Mr. Esposito's assistance when his own mother battled terminal cancer, and he notes that he feels undeserving of the "complete and unconditional" "care, concern and friendship," that he has shown to him over the years:

> During my mother's long illness with terminal cancer, Vincent routinely called me to ask how my mother was doing. I was greatly impressed and touched by this because it is an awkward and difficult call to make that takes a certain degree of courage that many people, myself included, cannot always muster. Although other people asked about my mother's health, he was the only friend who called me regularly to specifically ask about her. He was incredibly empathic during this time and after her death in January 2011. He would invite me out and we would discuss what it means to lose a parent. I talked to him freely about the loss, pain, depression I experienced and he offered console and advice. No matter what might be going on his own life or how busy he was, Vincent always found time for me. I am terrible at calling friends and family but that did not dissuade Vincent from calling me daily for many years to say hello and see how I was doing.

Ltr. of Peter Thayer, Ex. O (emphasis supplied). And John Cassarini provides a similar account of the defendant's kindness in dealing with a sick parent, recalling:

> The night my mother called to inform me that my father had entered a terminal coma and would soon pass, Vincent dropped what he was doing and drove over two hours to console my family. He stayed the night, in uncomfortable sleeping arrangements, reliving every photo my mother had of my father and was cheerful and kind during the worst day of our lives. The following day, he came to the hospital to pay his respects and tactfully left an hour before my father passed. Only a person of strong family ties and a responsible loving friend would endure such a depressing chain of events. I will always remember the kindness and love he shared during a very difficult period.

Ltr. of John Cassarini, Ex. P (emphasis supplied).

As the attached letters demonstrate, Mr. Esposito has exceptionally strong ties not just to his immediate family, but to his friends – and he has been a valuable part of his community.

### Many Less Likely Candidates Have Been Released on Bail

Finally, as noted in the Introduction, the government's position with regard to Mr. Esposito's bail appears simply unreasonable in light of their agreement *just this month* to the pretrial release of Joseph Cammarano, the alleged Acting Boss of the Bonanno crime family – an individual with a criminal record, accused of obstructing justice and who is alleged to be involved in a murder. See United States v. Cammarano, et al., 18 CR 15 (AKH). And when pushed as to why Messrs. Esposito and Cammarano should be treated differently, the government shockingly responded to counsel that they faced different realities *with respect to the judge deciding bail in their respective cases* – and not that the individual merits of each defendant dictated their course of action. Indeed, apparently fearing that Judge Hellerstein would grant bail to Mr. Cammarano anyhow, the government caved and consented to his release. Further, the government also agreed to the pretrial release of other defendants charged in the same indictment as Mr. Cammarano, who unlike Mr. Esposito are alleged to have maintained a specified position and rank within their criminal organization – including alleged consigliere Simone Esposito (no relation). See Bail Disposition Sheet, Docket Entry 18, United States v. Cammarano, et al., 18 CR 15 (AKH); Feds: Acting boss of Bonanno crime family among 10 arrested in mob bust, January 12, 2018, ABCNews.Com, available at: http://abc7ny.com/feds-acting-bonanno-boss-among-10-arrested-in-mob-bust/2935111/ (last viewed February 26, 2018) ("[Simone] Esposito was the Consigliere of the Bonanno Family").

And as with aforementioned individuals, many seemingly less suitable candidates are routinely granted bail in the Southern and Eastern Districts of New York – including Mr. Esposito's own father – while he remains incarcerated at the Metropolitan Correctional Center. See, e.g., United States v. Patriarca, 948 F.2d 789, 792 (1st Cir. 1991) (theoretically intimidating and dangerous "Mafia Boss" poses no significant danger because he gained position by "nepotism rather than merit"); United States v. Michael J. Persico, 10 CR 147 (E.D.N.Y. 2010) (son of life-imprisoned mob boss, an allegedly powerful Colombo associate charged with racketeering murder); United States v. Modica, 09 CR 1243 (S.D.N.Y. 2010) (powerful Gambino soldier facing racketeering charges including double murder, jury tampering, assault and extortion); United States v. Agate, 08 CR 076 (E.D.N.Y. 2008) (high ranking gangsters charged with violence); United States v. Cutaia, 08 CR 097 (E.D.N.Y. 2008) (same); United States v. Spero, 99 CR 520 (E.D.N.Y. 1999) (acting Bonanno boss facing four murder charges); United States v. John A. Gotti, 98 CR 042 (S.D.N.Y. 1998) (son of life-imprisoned mob boss, allegedly a Gambino Acting Boss); United States v. Orena, 93 CR 1366 (E.D.N.Y. 1993) (son of Colombo Acting Boss).

Surely if these individuals – and every other defendant charged in this Indictment, including two with prior convictions – could be entrusted with pretrial release, so too can Mr. Esposito, especially considering Mr. Esposito is facing a potentially less than five year sentence if convicted. Would he realistically risk more than doubling his sentence, lose millions in assets and have his elderly mother and sister kicked out of their home in order to escape the charges in this case? It cannot be credibly argued so.

## E. CONCLUSION

For all the foregoing reasons, Mr. Esposito's pretrial release should be granted.

Respectfully submitted,

Jeffrey Lichtman

cc:    Jared Lenow, Esq.
       Kimberly Ravener, Esq.
       Jason Swergold, Esq.
       Assistant United States Attorneys (by ECF and hand delivery)

# EXHIBIT A

1                      UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF NEW YORK

2

3 --------------------------------X
                           :

4 UNITED STATES OF AMERICA      :
                           : 18-CR-00014 (VM)

5                         :

6            v.              : January 10, 2018
                         :

7 VINCENT ESPOSITO, FRANK GIOVINCO, : 500 Pearl Street
  and VINCENT D'ACUNTO JR.    : New York, New York

8                      :
               Defendants.   :

9 --------------------------------X

      TRANSCRIPT OF CRIMINAL CAUSE FOR ARRAIGNMENT AND BAIL
10         BEFORE THE HONORABLE BARBARA C. MOSES
            UNITED STATES MAGISTRATE JUDGE

11

12 APPEARANCES:

13 For the Government:        JARED P. LENOW, ESQ.
                        JASON MICHAEL SWERGOLD, ESQ.
14                    KIMBERLY JANE RAVENER, ESQ.
                        U.S. Attorney's Office
15                    One Saint Andrew's Plaza
                        New York, New York 10007

16

17 For Defendant D'Acunto:    SABRINA SHROFF, ESQ.
                        Federal Defenders of New York
18                    52 Duane Street, 10th Floor
                        New York, New York 10007

19 For Defendant Giovinco:    RICHARD A. LIBRETT, ESQ.
                        Librett Friedland, LLP
20                    1225 Franklin Avenue, Suite 450
                        Garden City, New York 11530

21

22 For Defendant Esposito:    FLORA EDWARDS, ESQ.
                        Flora Edwards, Esq.
23                    115 Broadway, Suite 1505
                        New York, New York 10006

24 Court Transcriber:        SHARI RIEMER, CET-805
                        TypeWrite Word Processing Service
25                    211 N. Milton Road
                        Saratoga Springs, New York 12866

Proceedings recorded by electronic sound recording,
transcript produced by transcription service

```
 1              THE CLERK:  United States of America v. Frank
 2   Giovinco, Vincent Esposito, Vincent D'Acunto, Junior.
 3              Counsel, state your name for the record.
 4              MR. LENOW:  Good evening, Your Honor; Jared Lenow
 5   for the Government, and with me at counsel table are my
 6   colleagues, Jason Swergold and Kimberly Ravener.
 7              THE COURT:  Welcome, be seated.
 8              Let's start to my far left, Ms. Shroff.
 9              MS. SHROFF:  Hi.  Good evening, Your Honor.  On
10   behalf of Mr. Vincent D'Acunto, who is seated to my right,
11   Federal Defenders of New York by Sabrina Shroff.  Your Honor,
12   our client -- because he informs me that he's most likely
13   going to retain, and if he choose not to do so before the next
14   court appearance we'll submit a financial affidavit.
15              THE COURT:  So I will likely appoint you for this
16   evening only.
17              MS. SHROFF:  Certainly, Your Honor.
18              THE COURT:  All right.  Thank you.  Welcome.  Be
19   seated.
20              MR. LIBRETT:  For defendant Frank Giovinco, Richard
21   Librett, 1225 Franklin Avenue, Garden City, New York.
22              THE COURT:  Welcome.  Be seated.
23              MS. EDWARDS:  Good evening, Your Honor; Flora
24   Edwards for Vincent Esposito, who is to my right, and I am
25   retained so there is no financial affidavit.
```

1          THE COURT:  Okay.  Thank you very much, counsel.
2     You may all be seated.
3          Gentlemen, you all speak and read English, correct?
4     All right.  May I have the date and time of the arrests,
5     please?
6          MR. LENOW:  Yes, Your Honor.  All three of the
7     defendants were arrested early this morning at very -- at
8     various locations in the Southern and Eastern Districts of New
9     York.
10          THE COURT:  They like us to be a little more
11     specific than early this morning.  Can you be a little more
12     specific?
13          MR. LENOW:  I believe it was between approximately
14     6:00 a.m. and 8:00 a.m.  Your Honor, they're [inaudible].
15     Your Honor, 6:00 to 6:30 is our best estimate, Your Honor.
16          THE COURT:  All right.
17          MR. LENOW:  [Inaudible] so I don't have a specific
18     exact time for each individual defendant.  In that half-hour
19     is what we believe was the arrest time.
20          THE COURT:  All right.  We'll go with that.  Thank
21     you, counsel.
22          Gentlemen, I'm Judge Moses.  The purpose of this
23     evening's proceeding is to advise you of certain rights that
24     you have, to inform you of the charges against you, to
25     consider whether counsel shall be appointed for you, and to

1   decide under what conditions, if any, you shall be released

2   pending trial.

3         I'm going to begin by explaining certain

4   constitutional rights that each of you have.  You have the

5   right to remain silent.  You are not required to make any

6   statements.  Even if you've already made statements to the

7   authorities, you need not make any further statements.  Any

8   statements that you do make can be used against you.

9         You have the right to be released either

10  conditionally or unconditionally pending trial unless I find

11  that there are no conditions which would reasonably assure

12  your presence in court when required and the safety of the

13  community.

14        If you are a foreign national you have the right to

15  request that a consular officer from your country of origin be

16  notified of your arrest.  In some cases, a treaty or other

17  agreement may require the U.S. Government to give that notice

18  whether you ask for it or not.

19        You have the right to be represented by an attorney

20  during all court proceedings, including this one, and during

21  all questioning by the authorities.  If you cannot afford an

22  attorney, I will appoint one to represent you.

23        Now I understand that Mr. Esposito and Mr. Giovinco

24  have retained counsel and are not making an application and

25  that Mr. D'Acunto requests counsel for this evening's

1  presentment only, and I will appoint the Federal Defenders for

2  that limited purpose.

3          MS. SHROFF:  Your Honor, could you approve us for --

4  so that we remain until Judge Marrero's court appearance?  I

5  ask that because I'm sure the Government will say that the

6  agreed upon bail package, the remaining conditions should be

7  met and to do so we would [inaudible] --

8          THE COURT:  Well, skipping ahead a little bit, when

9  is the first conference before the district judge?

10         MR. LENOW:  Your Honor, we have an initial

11 conference on January 26th at 11:15 in the morning.

12         THE COURT:  Does the -- does the Government have any

13 objection to the appointment of the Federal Defenders until

14 that date with the -- without an affidavit being presented?

15         MR. LENOW:  No, Your Honor.

16         THE COURT:  All right.  You're appointed through

17 January 26th, Federal Defenders.

18         MS. SHROFF:  Thank you.

19         THE COURT:  All right.  Gentlemen, I have a copy of

20 the indictment in your case, the indictment being the document

21 containing the formal legal charges against you.  I see that

22 in Count I of the indictment each of you is charged with a

23 racketeering conspiracy in violation of 18 U.S.C. Section

24 1962(d).

25         I also see that in Count II of the indictment, Mr.

1  Esposito and Mr. D'Acunto are charged with an extortion

2  conspiracy in connection with annual payments in violation of

3  18 U.S.C. Section 1951(a).

4          I will ask counsel, again beginning to my left, Ms.

5  Shroff, if you have received a copy of the indictment and have

6  had an opportunity to review it with your client.

7          MS. SHROFF:  We did receive a copy of the

8  indictment, Your Honor, and my client has reviewed it.  I note

9  for the Court that he's charged in Counts I and II of the

10  indictment, and he waives the public reading of the document.

11          THE COURT:  Okay.  Thank you.  That's consistent

12  with what I said, right?

13          MS. SHROFF:  It is, Your Honor.

14          THE COURT:  All right.  And Mr. Librett.

15          MR. LIBRETT:  Yes, Your Honor.  My client has

16  received a copy.  I've received a copy.  We have had an

17  opportunity to review it.  My client is charged with Count I

18  in the complaint.

19          THE COURT:  Which I think is what I said.  And do

20  you waive its public reading?

21          MR. LIBRETT:  We do.

22          THE COURT:  All right.  And Ms. Edwards.

23          MS. EDWARDS:  Yes, Your Honor.  We have received a

24  copy of the indictment.  I have reviewed it with Mr. Esposito.

25  He understands that he is charged with Count I and II of the

1  indictment, and we would waive the reading of the [inaudible].

2       THE COURT:  All right.  Thank you very much.  The

3  matter is referred for presentment and bail only, not for

4  arraignment.  Is that correct?

5       MR. LENOW:  Also for -- also for arraignment, Your

6  Honor.

7       THE COURT:  Very well.  Since the matter has been

8  referred for arraignment, I will now ask each of the

9  defendants, beginning with Mr. D'Acunto, if you are prepared

10  to enter a plea to the indictment at this point.

11       Mr. D'Acunto.

12       DEFENDANT D'ACUNTO:  Yes, not guilty.

13       THE COURT:  A plea of not guilty will be entered for

14  Mr. D'Acunto, and the record should reflect that he

15  [inaudible].

16       Mr. Giovinco.

17       DEFENDANT GIOVINCO:  Not guilty.

18       THE COURT:  A plea of not guilty will be entered for

19  Mr. Giovinco and the record should reflect that he has been

20  arraigned as well.

21       Mr. Esposito.

22       DEFENDANT ESPOSITO:  Mr. Esposito has pleaded not

23  guilty, and the record should reflect that all three

24  defendants have now been arraigned.

25       Let us turn to the question of conditions for

pretrial release.  It is my understanding that an agreement

has been reached -- I'm not sure whether in whole or in part.

But it is my understanding that an agreement has been reached

with respect to Mr. D'Acunto.

Mr. Lenow, do you want to -- or who is it, Ms.

Ravener?

MR. LENOW:  My colleague, Mr. Swergold, will go over

the conditions.

THE COURT:  Mr. Swergold.

MR. SWERGOLD:  Yes.  Thank you, Your Honor.  And we

do have an agreed-upon bail package with Mr. D'Acunto and for

Your Honor's consideration.  A $500,000 personal recognizance

bond co-signed by three financially responsible persons,

surrender of the defendant's passport to pretrial services by

tomorrow, travel is restricted to the Southern and Eastern

Districts of New York, no new applications for passports or

any travel documents, no contact with any of the co-defendants

without the presence of counsel, no contact with any victims

or any witnesses known to the defendant.  We under -- no

firearms, and we understand the defendant does possess

firearms, and so he is to turn those firearms in to his local

precinct by tomorrow and turn the licenses to those firearms

to pretrial services by the end of the week.  And finally,

that the defendant is barred from going to the Union Office

where he works and pretrial supervision as directed by

1  pretrial services.

2      THE COURT:  All right.  Let me make sure that I

3  understand all of those proposed conditions.  The defendant

4  D'Acunto will be released on a $500,000 personal recognizance

5  bond co-signed by three financially responsible persons

6  acceptable to the U.S. Attorney's Office.  His travel will be

7  restricted to the Southern and Eastern Districts of New York.

8  He will surrender his passport and any similar travel

9  documents that he possesses by close of business tomorrow and

10  will not make any new application for passports or similar

11  travel documents so long as he is on pretrial release.

12      He will be subject to pretrial supervision as

13  directed by our pretrial services department.  He is not to

14  possess any firearms, destructive devices, or other weapons.

15  His existing firearms are to be physically surrendered to the

16  nearest NYPD precinct -- well, it doesn't have to be the

17  nearest one -- surrendered to a NYPD precinct by close of

18  business tomorrow.  And his firearm license or licenses are to

19  be surrendered to pretrial services by close of business on

20  Friday, the 12th.  He is to have no contact with his

21  co-defendants in this action except in the presence of

22  counsel.  No contact with known victims or witnesses to the

23  offenses alleged in the indictment.  And is not to enter the

24  Union Office where he has worked.  Are those the proposed

25  terms?

1          MR. SWERGOLD:  Yes, Your Honor.  Thank you.

2          THE COURT:  And --

3          MR. SWERGOLD:  Oh -- and just to note that the

4    defendant has one week to meet the conditions and that the

5    Government is fine with the defendant being released this

6    evening.

7          THE COURT:  So the defendant would be released on

8    his own signature this evening and with the exception of the

9    matters that have shorter time frames that I've already

10   mentioned, the remaining cosigners on the bond are to be met

11   by next Wednesday, which is the 17th.  Is that correct?

12         MR. SWERGOLD:  That's correct.  Thank you, Your

13   Honor.

14         THE COURT:  Ms. Shroff.

15         MS. SHROFF:  Those conditions are fine and

16   acceptable to the defense.  I just ask the Government if they

17   wish to elaborate or who the victim/witnesses are it makes it

18   easier to follow conditions of release.  [Inaudible]

19         THE COURT:  Mr. Swergold.

20         MR. SWERGOLD:  No, Your Honor.  We're not -- the

21   Government is not prepared to do that at this time.  The

22   defendant will know from the discovery, from the charges, who

23   the individuals are that he should not be contacting.  And of

24   course, were the defendant to contact any one of them, it

25   would be the Government's burden at his bail revocation

1 hearing to prove that he should have known or knew that they

2 were known victims or witnesses.

3        THE COURT:  All right.  Because they are not named

4 in the indictment, correct.

5        MR. SWERGOLD:  That's correct.  We don't name them

6 in the indictment.

7        THE COURT:  All right.  And I understand why you

8 don't do that, but as you correctly point out, that places the

9 burden on the Government in the event of a dispute in the

10 future to establish that these victims and/or witnesses were

11 or should have been known to the defendant as such.

12        All right.  So with that said, based on my review of

13 the file in this matter, including the pretrial services

14 report, and the representations and agreements of counsel this

15 evening, I will accept the recommendation.  Those are the

16 terms on which you will be released this evening on your own

17 signature.  Mr. D'Acunto, I remind you that you must surrender

18 your passport and your guns by close of business tomorrow.

19 You must surrender your firearm licenses by close of business

20 on Friday.  And you must obtain three financially responsible

21 person co-signers and get them to co-sign the bond by the

22 17th, which is a week from today.  Do you understand those

23 conditions?

24        DEFENDANT D'ACUNTO:  I do.

25        THE COURT:  All right.  Let me -- excuse me.  Let me

warn you, sir, that if you fail to appear in court when due or if you violate any of the conditions of your release, large or small, the following things will happen.  First, a warrant will be issued for your arrest.  Next, you and anyone who signed the bond will each be responsible for paying its full amount, that is in this case the full $500,000.  It doesn't get split up.  And third, you can be charged with a separate crime known as bail jumping.  In addition, if you were to commit a new criminal offense while on pretrial release in this matter, then in addition to the sentence ordinarily prescribed for that new crime you'll be sentenced to an additional term of up to 10 years in prison if the new offense is a felony, up to one year if the new offense is a misdemeanor, and this additional term will be executed after any other sentence of imprisonment is completed.  Do you understand what I have said?

DEFENDANT D'ACUNTO:  Yes.

THE COURT:  Ms. Shroff, what date shall I set for a preliminary hearing for Mr. D'Acunto?

MS. SHROFF:  Your Honor, he's indicted.

THE COURT:  Oh, I take it back.  You're indicted. Never mind.  But I will ask there is a conference you told me on the 26th?

MR. LENOW:  26, Your Honor.

THE COURT:  Is there an application to exclude time?

1          MR. LENOW:  There is, Your Honor.  The Government

2     will be producing it during the argument on discovery.

3     [inaudible] recordings [inaudible] some personal recordings

4     and other materials.  We'll be producing that and we believe

5     [inaudible] initial conference.  So in order to allow that

6     process and allow the defense to review discovery we would

7     request the exclusion of time.

8          THE COURT:  Mr. Shroff.

9          MS. SHROFF:  It's fine, Your Honor.  We don't have

10    an objection.  And I'm just noting for the record that I have

11    my client's passport.  I'm going to turn it into pretrial

12    services.

13         THE COURT:  All right.  As long as we're talking

14    about conference dates and excluding time, the application is

15    to exclude time with respect to all three defendants, correct?

16         MR. LENOW:  Yes, Your Honor.

17         THE COURT:  Any objection from any of the defense

18    counsel?  All right.  At the request of the Government and

19    with no objection from the defendants I will exclude time

20    through January the 26th for each of these defendants, and I

21    find that the ends of justice served by taking such action

22    outweigh the interest of the public and these defendants in a

23    speedy trial.

24         So let me turn now to Mr. Giovinco.  Is there

25    agreement on all or a part of a bail package for him?

1        MS. RAVENER:  Your Honor, I believe we have partial

2    agreement on the bail package, and I can set for the

3    Government's proposal and --

4        THE COURT:  All right.  Go ahead, Ms. Ravener, and

5    tell me which parts you think are agreed to and which parts

6    are not.

7        MS. RAVENER:  I will, Your Honor.  The Government

8    proposes a personal recognizance bond in the amount of

9    $500,000 to be co-signed by three financially responsible

10   persons and secured by Mr. Giovinco's home.  I believe we have

11   agreement with defense counsel as to that portion of the

12   application.

13       THE COURT:  And that is the home in Syosset?

14       MS. RAVENER:  Yes, Your Honor.

15       THE COURT:  Thank you.

16       MS. RAVENER:  The three financially responsible

17   persons would have to be identified and approved by the

18   Government within one week, and the paperwork to secure the

19   home would have to be completed within two weeks.  I believe

20   the parties also agree to pretrial services supervision as

21   directed, the surrender of travel documents with no new

22   applications, travel restricted to Eastern and Southern

23   Districts, no contact with victims or witnesses, and from

24   contact with co-defendants unless in the presence of counsel.

25       The area where we have disagreement, Your Honor, is

with respect to home detention or incarceration. I believe

that Mr. Giovinco is willing to consent to electronic

monitoring but seeks home detention. The Government's

position is that home incarceration enforced by electronic

monitoring is appropriate for this defendant, and I can set

forth the reasons why.

THE COURT: All right. So just to be clear, the

Government wants home incarceration. And, Mr. Librett, you

are going to argue in a moment, not right this second, for

home detention. Is that correct?

MR. LIBRETT: The detention [inaudible].

THE COURT: All right. The difference between those

two things essentially being that home incarceration means you

can't go out of the house, generally speaking. And home

detention means that you can come and go for approved purposes

which typically include work.

So, Ms. Ravener, tell me why you don't want him to

be able to work.

MS. RAVENER: Your Honor, Mr. Giovinco has

identified his employment as being self-employed at an LLC

bearing his own name.

THE COURT: Right, where he brokers paper or

something like that, right?

MS. RAVENER: Correct. He's described his business

as involving waste carting, essentially, brokering used

1  clothes and waste paper, and he has claimed that he earns 10-

2  to $12,000 per month performing that work for himself.  We

3  have evidence indicating that Mr. Giovinco's involvement in

4  precisely that kind of work is part of the charged crimes in

5  this case, namely, his involvement in a racketeering

6  enterprise charged in the indictment and in various extortion

7  schemes.  We believe that his business, as he describes it, is

8  actually a mechanism to generate money to benefit the Genovese

9  family.

10  THE COURT:  Well, most jobs are a mechanism to

11  generate money.  That doesn't make it illegal.  Be a little

12  more specific.

13  MS. RAVENER:  Well, we believe that the money he

14  makes is to -- for the benefit of the criminal enterprise

15  charged here, namely the Genovese family, and I can explain

16  why.  Wire taps and emails show that Mr. Giovinco was steering

17  funds associated with precisely this kind of waste carting

18  business to Mr. Esposito, his co-defendant, through a shell

19  company LLC and to an address that matches Mr. Esposito's

20  residence.  Wire tapes demonstrate that Mr. Giovinco didn't

21  even really know the name of his company or what it did.

22  THE COURT:  The name of which company, his own

23  company?

24  MS. RAVENER:  The shell company that he was

25  funneling money from the waste carting business to Mr.

1   Esposito's [inaudible].  And in describing his contacts who

2   would send this money along describes putting money on that

3   amounts to no more than like a dollar or to per ton as quote

4   "commission."  We believe that that's code for a kickback

5   payment, a tribute payment, a [inaudible] --

6           THE COURT:  I'm sorry.  I'm not following you.  A

7   dollar or two per ton going from who to who?

8           MS. RAVENER:  From companies that are carting wastes

9   such as used clothing or paper and moving it through the

10   tristate area.  And it -- while they do that they send money

11   to Mr. Giovinco -- not for performing real work but so that

12   Mr. Giovinco can pay up to the Genovese family.

13           THE COURT:  All right.  So what you're suggesting to

14   me I think is that Mr. Giovinco's business is not in fact a

15   legitimate business but instead is a method of extorting or

16   skimming money from waste haulers for the benefit of the

17   alleged crime family?

18           MS. RAVENER:  We believe that that is at least a

19   component of this purported business, Your Honor.

20           THE COURT:  All right.

21           MS. RAVENER:  In addition, we have other evidence

22   that corroborates Mr. Giovinco's role in extorting other

23   individuals which matches this kind of conduct.  We have

24   recordings in which he's caught shaking down a witness for a

25   cut of proceeds on a union deal, a kind of financial

1  transaction for a union in which he has no legitimate role

2  either at the union or in this financial transaction.  Mr.

3  Giovinco took money amounting to several thousand dollars as a

4  purported, again, commission or cut of that transaction in

5  which he had no legitimate role.  Another individual was

6  recorded describing how Mr. Giovinco and others were

7  threatening that individual's life over failing to pay the

8  enterprise in connection with union financial transactions.

9        We believe for all of those reasons Mr. Giovinco

10 poses a danger to the community and that any allowance to have

11 -- to allow him to travel around the tristate area or even

12 around Long Island in order to quote "work" may very well

13 entail him contacting purported customers as means to extract

14 extortion payments, kickback payments, or other illicit funds

15 in order to pay up to the Genovese family.

16       THE COURT:  Well, he'll still have a phone, right,

17 even if he's on home incarceration?

18       MS. RAVENER:  Yes, Your Honor.  And --

19       THE COURT:  And there's not any practical way that

20 you can prevent those kinds of contacts.

21       MS. RAVENER:  I think that's difficult, Your Honor.

22 We're not taking that position right now.  We think for the

23 safety of the community, in particular -- particularly people

24 who are doing business with Mr. Giovinco or who may be his

25 victims that there's no need for him to meet -- to travel

1   around meeting with such contacts.  I'll note two other

2   things, Your Honor.  We would also ask for one more condition,

3   which is that Mr. Giovinco not be allowed to obtain or possess

4   a firearm during the pendency of this case, again, in relation

5   to the alleged threats involved in the conduct.  I will note

6   that Mr. Giovinco's prior conviction for racketeering or

7   attempted racketeering involved exactly the same kind of

8   conduct that I'm setting forth here.  It was he was involved

9   in the waste carting industry many years ago --

10          THE COURT:  You're referring to the 1995 conviction

11  when he was 28 years old?

12          MS. RAVENER:  Yes.

13          THE COURT:  All right.

14          MS. RAVENER:  And he was involved in a racketeering

15  enterprise at that time which was exploiting the waste carting

16  industry in New York.  We believe he is continuing to do

17  exactly that kind of criminal activity today, and so we don't

18  think that to the extent home detention is accommodation for a

19  person's employment that that's appropriate or necessary here.

20  And as a result, home incarceration, of course by electronic

21  monitoring, would be the more appropriate condition.

22          THE COURT:  All right.  Let me talk to you about

23  timing for a moment.  You told me that the Government proposes

24  one week for the co-signers to sign and two weeks for the home

25  to be put up as security.  Would you otherwise, assuming we

1  can reach agreement on what kind of -- how close he has to

2  stick to home, you would otherwise have him released on his

3  own signature this evening, or would you recommend that he

4  remain in the custody of the United States until pretrial

5  services can make a home visit and set up the electronic

6  monitoring that generally takes a day, as you know?

7          MS. RAVENER:  We would recommend that he remain in

8  custody until the condition of location monitoring can be set

9  up and placed.

10         THE COURT:  All right.  So let me hear from defense

11 counsel.

12         MR. LIBRETT:  Your Honor, I'm listening to this in

13 somewhat of amazement.  Mr. Giovinco [inaudible] he supports

14 three children.  He lives with his wife.

15         THE COURT:  How old are the kids?

16         MR. LIBRETT:  19, 16, and 12, one of them is in

17 college.  He pays for college.  He supports himself and his

18 wife works, but he supports the family through this business.

19 I mean this is a legitimate business --

20         THE COURT:  What does it do?  What is it -- what is

21 a brokerage business in this industry?

22         MR. LIBRETT:  He brokers clothing and papers.

23         THE COURT:  What does that mean he brokers?

24         MR. LIBRETT:  He used clothing which he sells.  He

25 collects used clothing and he --

1          THE COURT:  He goes around physically himself and

2     picks it up.

3          MR. LIBRETT:  No, there are boxes that -- he has

4     another business where he maintains parking lots.  In these

5     parking lots there are boxes, bins, that people --

6          THE COURT:  Where people can put used clothing?

7          MR. LIBRETT:  -- put used clothing.  He -- and then

8     he sells used clothing.

9          THE COURT:  I don't understand then.  He apparently

10    told pretrial services not that he is himself in the waste

11    carting or used clothes business but that he is quote "in the

12    business of brokering used clothes and waste papers."

13         MR. LIBRETT:  Judge --

14         THE COURT:  That's the part I'm not clear on.

15         MR. LIBRETT:  He does do that, Judge.  He brokers

16    and sells it.

17         THE COURT:  What does that mean brokers it?  That

18    means he sells it someone else?

19         MR. LIBRETT:  Yes.

20         THE COURT:  It doesn't mean that he arranges for

21    other people to do that?  He does it himself?  He picks up --

22         MR. LIBRETT:  He does -- he does that too.  But the

23    --

24         THE COURT:  Tell me about that part, please.

25         MR. LIBRETT:  He gets the locations where the boxes

1 can be placed, he pays the rent at the locations.  They

2 collect it for him and then they sell them.

3        THE COURT:  And then they pay him for the work that

4 he did in finding the locations and so forth and that's the

5 commission?

6        MR. LIBRETT:  Real commission.

7        THE COURT:  Where I take it you're going to tell me

8 it's a legitimate business payment.

9        MR. LIBRETT:  Yes, I am.

10        THE COURT:  All right.  And that's where the 10- to

11 $12,000 a month comes from, the commissions?  Or does it come

12 from selling the used clothes?

13        MR. LIBRETT:  It comes from selling the used clothes

14 and from commissions.

15        THE COURT:  Do you have any -- does your client have

16 any employees?

17        MR. LIBRETT:  No employees, Your Honor.  He has one

18 client.

19        THE COURT:  He has one client?

20        MR. LIBRETT:  Yes.

21        THE COURT:  What does the client do?

22        MR. LIBRETT:  Picks up the clothes and sells them

23 and he gets commissions.

24        THE COURT:  All right.  Let me ask the question a

25 different way because I'm a little confused now about what

1   this business actually consists of.  What does your client

2   have to do physically that he can't do from the house on the

3   phone in order to --

4          DEFENDANT GIOVINCO:  [Inaudible]

5          THE COURT:  One at a -- wait for me to answer [sic]

6   the question because we're making a transcript here and

7   otherwise it won't be intelligible.  What does he have to do

8   physically out of the house in order to maintain his income?

9          MR. LIBRETT:  He physically has to go to each

10  location, checks the location, makes sure they're clean, make

11  sure the boxes are functioning, and that's what he has to do.

12  He does that every day.

13         THE COURT:  All right.  The client doesn't do that?

14         MR. LIBRETT:  No.  We're not asking -- we're not

15  asking for travel in the tristate area, Your Honor.  We

16  consent to --

17         THE COURT:  How many locations?

18         MR. LIBRETT:  Nassau and Suffolk County.

19         THE COURT:  No, how many [inaudible].

20         MR. LIBRETT:  30 or so, approximately 30.

21         THE COURT:  So what are you telling me that every

22  day he leaves the house, gets in his car, and drives to

23  approximately 30 locations where there are boxes of clothes

24  and deals with them?

25         MR. LIBRETT:  Not every day.  Not every day.  He

1   doesn't go to every location every day.  He tends to -- he

2   tends to negotiate leases to new locations and put boxes into

3   other places.

4            THE COURT:  All right.

5            MR. LIBRETT:  It's not every day all day each place.

6            THE COURT:  Are there any other points of

7   disagreement with the Government's proposal beyond this?

8            MR. LIBRETT:  No, Your Honor.  Not really.

9            THE COURT:  Okay.  Anything further from the

10  Government?

11           MS. RAVENER:  Your Honor, we would ask who is the

12  one client that Mr. Giovinco purports to have for this

13  business and what these boxes in parking lots represent or

14  purport to be, how they're labeled, what they -- what they

15  claim is happening when people drop off their used clothing.

16           MR. LIBRETT:  Your Honor --

17           THE COURT:  Well, I will give defense counsel an

18  opportunity to address that but given that this is not a

19  discovery deposition I'm not going to require him to answer

20  your questions.

21           Is there anything you would like to tell me further?

22           MR. LIBRETT:  No, Your Honor, other than the fact

23  that [inaudible] a reasonable way to make a living.  He pays

24  his taxes.  He pays for his children.  He pays for college.  I

25  mean I just don't understand the Government's position at this

1    point.  I think it's far afield.

2         MS. RAVENER:  Your Honor, given defense counsel's

3    unwillingness to provide that information we reiterate our

4    concern that the nature of Mr. Giovinco's business is to quote

5    "get locations and negotiate terms that he can secure areas of

6    parking lots" that he's doing that for illegal means,

7    potentially extortion of victims, and that this is not a

8    legitimate enterprise.  In addition, most people when they are

9    donating their clothing, for example, believe that that is

10   going to charity.  Instead, it appears Mr. Giovinco is setting

11   up these locations through relationships he develops, either

12   through threats or other means, in order to take those for a

13   for-profit business.  He does not need to drive around to have

14   contact with these -- with these people in order to try to

15   persuade to put his boxes in their parking lots.  That is a

16   recipe for sending Mr. Giovinco out into the streets so that

17   he can harass victims.

18        THE COURT:  All right.  But I do have one more

19   question for defense counsel.  And again, I'm not taking your

20   deposition so I'm not going to force you to give me a detail

21   that would not be in your client's best interest at this time.

22   But I do have to make a bail decision based on what I know

23   this evening and whether what you've told me this evening

24   satisfies me that your client is engaged in legitimate and

25   lawful income-producing activities as opposed to illegitimate

1   and unlawful income-producing activities.

2          MR. LIBRETT:  I understand.  I understand.

3          THE COURT:  So I'm a little confused about how

4   maintaining approximately 30 boxes where people throw their

5   old clothes could possibly generate the kind of income that

6   we're talking about.

7          MR. LIBRETT:  Your Honor, it's a legitimate

8   business.  He pays taxes.  Everything is -- everything is

9   above board.

10         THE COURT:  Who --

11         MR. LIBRETT:  Actually, I don't know the essence of

12   the business but I certainly think that the U.S. Attorney --

13   there's nothing illegal about the business per se.  I mean her

14   remarks that she's making about what people think and where --

15   I mean I just -- I just don't think that's relevant at this

16   point and I think it's going far afield.  I mean there's no

17   allegation that -- there's no provable allegation that there's

18   anything illegal about this business.  And I just -- I just

19   don't get their --

20         THE COURT:  Well, the Government doesn't have to

21   prove that the business is illegal at this stage for me to

22   take it into consideration as part of a bail argument.

23         MR. LIBRETT:  I understand but that's what they're

24   saying. I mean that's what they're -- that's what they're

25   referring to.

1          THE COURT:  All right.  Anything further?

2          MS. RAVENER:  Nothing.

3          MR. LIBRETT:  No.  Well, I mean, as far as what the

4    people think when they -- when they put their clothes in the

5    bins --

6          THE COURT:  I'm not concerned about that end of it.

7    But anything further?

8          MR. LIBRETT:  No, Judge.

9          THE COURT:  All right.  So as I said I'm not

10   concerned about the question of what the people who put the

11   clothes in the bin are thinking.  I am concerned about whether

12   this defendant's rounds, if you will, the activities outside

13   of the house that he wishes to engage in are genuinely

14   necessary for him to generate a lawful income for himself and

15   his family or are not which is really the question for me.

16   It's not so much whether they're illegal or not.  It's whether

17   they are reasonable and necessary for him to generate a lawful

18   income which is what he claims to have been doing, and the

19   conversation this evening, I have to tell you, has left me

20   more confused than satisfied on that point.  I am not clear on

21   what this job consists of.  I am not clear on how it could

22   possibly generate 10- to 20- -- excuse me, 10- to $12,000 a

23   month.  I am not clear on who pays him that money and if so,

24   for what services.

25          MR. LIBRETT:  If you are, we'll allow it, and I'll

1   have my client explain it.

2           THE COURT:  That's your call.

3           MR. LIBRETT:  That's fine, Judge.  I think that -- I

4   think that -- yeah.  I think so.  Whatever [inaudible] to make

5   it to pretrial.  It is there.  He has tax returns.  He pays

6   taxes.  And I don't really understand what the issue.  I mean

7   if the issue is how much money he makes, you know, if the

8   Government has an issue with that then they can take issue

9   with that at a later date.

10          THE COURT:  No, the issue is whether what he's doing

11  when he's out of the house present a danger to -- a danger to

12  the community.

13          MR. LIBRETT:  I understand that, but there isn't --

14  but there's no danger to the community in him going around and

15  checking boxes and driving a truck and picking them up if he

16  has to on occasion.  I mean I just -- I just don't get it.  I

17  understand what they're alleging.  He's not doing anything

18  that's illegal.  He's not doing anything -- if they have

19  something -- if they have a charge it's not in the indictment.

20          THE COURT:  All right.  Do you have any more facts

21  that you want to give me facts?

22          MR. LIBRETT:  [Inaudible]

23          THE COURT:  Do you have any more facts that you want

24  to proffer?

25          MS. RAVENER:  No, Your Honor.

1          THE COURT:  Okay.  So, Mr. Giovinco, you will be

2    released on the following conditions.  You will sign a bond in

3    the amount of $500,000 which will be co-signed by three

4    financially responsible persons who are acceptable to the U.S.

5    Attorney's Office.  The bond will be secured by a pledge of

6    your home in Syosset.  Your travel will be restricted to the

7    Southern and Eastern Districts of New York.  You will

8    surrender your passport, if you have one, and any other travel

9    documents that you possess.  You will not make any new travel

10   applications.  You will not possess any firearms, destructive

11   devices, or other weapons.  You will have no contact with your

12   co-defendants except through counsel or in the presence of

13   counsel, and you will not have any contact with known victims

14   or witnesses with respect to the events alleged in the

15   indictment.

16          You will be subject to home detention, and therefore

17   you will be subject to strict pretrial services supervision as

18   -- strict supervision by the pretrial services department.

19   The home detention will be backed up electronic monitoring.

20   It will be up to pretrial services to determine when and for

21   what purposes you may leave the home.  You are to be released

22   upon your signature and the establishment of the electronic

23   monitoring by pretrial services which probably means tomorrow,

24   although I cannot make that promise.  The remaining conditions

25   will be met as follows.  You will have one week to turn in

1  your travel documents and to obtain the signatures of the

2  necessary financially responsible persons.  And you will have

3  to two weeks, which is to say until the 24th, to arrange for

4  the pledge of your home [inaudible] the bond.

5           Did I miss any conditions, Ms. Ravener?

6           MS. RAVENER:  No, Your Honor.  I don't believe so.

7           THE COURT:  Mr. Librett, did I --

8           MR. LIBRETT:  No, Your Honor.  The only issue --

9           THE COURT:  -- miss anything?

10          MR. LIBRETT:  -- I think he has a passport that's

11 expired.

12          THE COURT:  Well, he's got to turn that one in too.

13          MR. LIBRETT:  I don't know if he knows where it is.

14 That's the problem.  So --

15          THE COURT:  Well --

16          MR. LIBRETT:  -- we'll have to deal with that.

17          THE COURT:  He'll take a look for it.

18          MR. LIBRETT:  Yes.

19          THE COURT:  And hopefully he will find it.  All

20 right.

21          MS. RAVENER:  Your Honor, we would just ask that

22 given Your Honor's determination that home detention's

23 appropriate that to the extent the purpose of that is for Mr.

24 Giovinco to work, that information be supplied to pretrial

25 services about what clients Mr. Giovinco is purportedly going

1  to [inaudible].

2  THE COURT:  So I'm going to leave that to pretrial

3  services as part of their strict supervision of this

4  defendant.  I want to be mindful and respectful of the

5  defendant Fifth Amendment rights.  He also needs to understand

6  that if he cannot satisfy pretrial services that it is

7  legitimate and lawful employment there may be consequences to

8  that.  So I will leave it there this evening.

9  MS. RAVENER:  Thank you.

10  THE COURT:  Let us turn to Mr. Esposito.  Are there

11  any points of -- oh, before I do that, I'm sorry.

12  Mr. Giovinco, do you understand the bail conditions

13  that I have just articulated?

14  DEFENDANT GIOVINCO:  Yes, Your Honor.

15  THE COURT:  All right.  Let me warn you, as I

16  previously warned Mr. D'Acunto, that if you fail to appear in

17  court when due if you fail to appear in court when due or if

18  you violate any of the conditions of your release a warrant

19  will be issued for your arrest.  You and anyone who signed the

20  bond will each be responsible for pay its full amount and you

21  may be charged with the separate crime of bail jumping.  In

22  addition, if you commit a new criminal offense while you are

23  on pretrial release in this matter, then in addition to the

24  sentence ordinarily prescribed for that offense you'll be

25  sentenced to an additional term of imprisonment which can be

1  up to 10 years if the new offense is a felony.  It can be up

2  to one year if the new offense is a misdemeanor.  And that

3  additional term will be executed after any other sentence of

4  imprisonment is completed.  Do you understand?

5          DEFENDANT GIOVINCO:  Yes, Your Honor.

6          THE COURT:  All right.  Turning to Mr. Esposito, and

7  that is -- that's Mr. Lenow's call?

8          MR. LENOW:  Yes, Your Honor.

9          THE COURT:  All right.  Are there any points of

10  agreement?

11          MR. LENOW:  I don't think so, Your Honor.  We have

12  had preliminary discussions.  The Government seeks detention.

13          THE COURT:  Ah.

14          MR. LENOW:  I understand that the defense has a

15  package they're going to propose, so there's a disagreement.

16          THE COURT:  All right.  Why does the Government seek

17  detention?  Are you going on danger to the community, on

18  flight risk, or both?  And is this a presumption case?

19          MR. LENOW:  Your Honor, we are seeking detention

20  based on multiple you articulated.  I don't believe this is a

21  presumption case.  So, Your Honor, there are a couple reasons.

22  Some of them relate to both flight and dangerous.  So I'll

23  just list them briefly first and then I'll kind of go into a

24  little more detail if that's acceptable to the Court.

25          THE COURT:  Sure.

1          MR. LENOW:  We -- I think the factors that I'd

2    highlight for the Court's attention are Mr. Esposito's

3    position of significant influence in the charged organization,

4    the racketeering organization; the nature of the offense here,

5    including extortion, multiple acts of extortion within the

6    racketeering organization; the fact that multiple firearms

7    were found within Mr. Esposito's residence today following a

8    search warrant execution; and that --

9          THE COURT:  That's the house on East 77th Street?

10         MR. LENOW:  Yes, Your Honor.  The fact that there

11   was a large amount of cash found in the apartment.  And we're

12   still counting, but it appears it's in excess of a

13   half-a-million dollars.  And the fact that it appears Mr.

14   Esposito has made false, untrue statements to the Court in the

15   form of a pretrial services report and that's specifically

16   relating to his assets -- his cash assets in particular,

17   including the U.S. currency I just mentioned a second ago as

18   well as the firearm and the lack of firearm ownership.  So I

19   could go through those in a little more detail, and some of

20   these are obviously connected.

21         But the position Mr. Esposito holds in the alleged

22   organization and the nature of the offense, I'll start with

23   that.  As Your Honor can see, there's several counts here

24   related to extortion.  There's the Count I, the racketeering

25   offense of which extortion of one of several predicate

1   offenses and Count II which is extortion of [inaudible].

2   These are long-running schemes that involve threats, both

3   economic and the possibility of physical retaliation.  And Mr.

4   Esposito, based on an investigation, has a significant

5   position of influence within the Genovese family and its

6   orbit.  There are numerous reports position of authority that

7   he is, you know, not a low-ranking individual but money is

8   kicked up to him, he makes calls, he has been reported meeting

9   in secret meetings with other high-ranking members of the

10  organization.  So for all those reasons -- and it's not just

11  that Mr. Esposito -- he does have, as I noted, have weapons in

12  his house including the firearms and brass knuckles.

13          The nature of these organizations is that there are

14  organizations in which people have different roles.  And the

15  higher roles are in direct control of people who are lowered

16  -- lower in the organization.  Here we have numerous threats

17  reported, threats concerning -- it's not just their jobs and

18  so forth but their physical well-being.  And so we really do

19  believe that Mr. Esposito does pose a danger to the community.

20  The nature of this entire primary aspect of the charged

21  schemes is the notion of extortion.  So we really do believe

22  there's a threat of tampering in this case.  And --

23          THE COURT:  A threat of tampering with witnesses?

24          MR. LENOW:  Yes, Your Honor, witnesses and victims.

25  And I don't think that any sort of home detention of home

1    incarceration condition would really address those concerns.

2    Just simply -- especially in a modern age like today there's

3    too much of an ability to find ways to get around the watchful

4    eye of law enforcement through cell phones, other means,

5    through having [inaudible] people come to the house.  And so I

6    think having Mr. Esposito detained is the most -- is the only

7    way the Court could be confident that danger will not manifest

8    itself in the real world.  Now moving along to the cash found

9    in the apartment, as well as the firearms --

10              THE COURT:  How much cash was found?

11              MR. LENOW:  So I think it's actually up to -- it's

12    now up to $700,000, Your Honor.

13              THE COURT:  In United States currency?

14              MR. LENOW:  In United States currency.  So there's a

15    couple points about this.  The first point is that it

16    obviously presents a severe risk of flight.  When you're

17    talking about that quantity of cash in one's residence, it's

18    -- frankly, I'd suggest when it comes to what the charges are

19    here it likely is the only tip of the iceberg.  This is only

20    one location in his residence.  This is an organization that

21    has a lot of arms.  So we're talking about an individual and

22    organization with significant resources and he simply clearly

23    has the ability to flee if he wants to flee.

24              And a related fact here is that Mr. Esposito in his

25    limited time being charged in this case has been dishonest

1  with the Court, and I think this is really important for a

2  couple reasons.  I think it shows the Court cannot place its

3  faith in Mr. Esposito to obey the conditions the Court sets.

4         THE COURT:  Well, he has no prior criminal history,

5  correct?

6         MR. LENOW:  Your Honor, he has no criminal history

7  since he has no convictions, but as alleged in the indictment

8  this is a -- a grand jury's found that he was involved in a

9  long-running --

10        THE COURT:  No, no, I understand that.  But he has

11 no prior charges or convictions meaning that he also has no

12 history of complying or not complying with judicial

13 supervision, correct?

14        MR. LENOW:  There are no prior convictions, Your

15 Honor.

16        THE COURT:  All right.

17        MR. LENOW:  But it has been only -- I think we're

18 now -- we're -- it's been 12 hours.  Mr. Esposito, when he was

19 interviewed by pretrial services, he reported his financial

20 assets to include only I believe $700,000 in checking and

21 savings account, some unknown retirement funds, and so forth.

22 And this is a man who actually has $700,000 in cash in his

23 home along with other valuable objects so it's frankly a

24 significant and [inaudible] misstatement to the Court.  And an

25 individual who's going to lie about that sort of thing -- and

1  I believe Mr. Esposito knew his house was searched at the time

2  or shortly after his arrest, and to make that sort of glaring

3  lie, I don't think the Court can put their trust in Mr.

4  Esposito.  And it's not just cash.  We also have weapons that

5  were found.

6          THE COURT:  What weapons were found?

7          MR. LENOW:  There were two firearms, Your Honor, I

8  believe they were both handguns, as well as brass knuckles.

9  And I think the context of the charges here involving

10  extortion and other organized crime offenses, the fact that

11  this individual has multiple firearms and brass knuckles in

12  their -- in their apartment --

13          THE COURT:  And I take it no license or do you not

14  know yet?

15          MR. LENOW:  No license for the guns, Your Honor.

16  And I was just handed a note.  I finally have a cash count.

17  It was over a million dollars.  Your Honor, if I could just

18  have one moment, please?

19          THE COURT:  Uh-huh.

20                  [Pause in proceedings.]

21          MR. LENOW:  Your Honor, so we continue to search Mr.

22  Esposito's house, and I learned that the FBI has just found

23  another large cache of money in his basement.  The figure now

24  from the entire house I think is now at the point where it's

25  over a million dollars.  So we'll see what happens as the

1    night progresses.  But these sorts of assets, you know,

2    hoarded away like this, Your Honor, I respectfully submit that

3    they are hoarded away for [inaudible] purposes.

4         THE COURT:  Well, look, the currency goes primarily

5    to the issue of flight risk.  The weapons go primarily to the

6    issue of danger.

7         MR. LENOW:  Yes, Your Honor.  That -- I think that's

8    accurate.  So ultimately, I think in light of the dishonesty

9    in the pretrial report --

10        THE COURT:  And the dishonesty in the pretrial

11   report consists of not saying I have a million dollars in cash

12   in my house?

13        MR. LENOW:  Well, essentially, that -- yes, Your

14   Honor.  Also [inaudible] --

15        THE COURT:  All right.

16        MR. LENOW:  -- which -- and I know these are two

17   material facts.  There's a pretrial report for a bail

18   determination.  Obviously, having a million dollars of cash in

19   your -- in your house is a [inaudible] issue of flight.  And

20   having firearms go to dangerousness.  So I think both those

21   facts to go show that this individual is willing to be

22   dishonest, [inaudible] himself, cannot be properly supervised.

23   I'll just close by asserting all the facts.  The pretrial

24   report does mention international travel, a passport.  This

25   defendant is not married and has no kids.

1        And so when you have someone with a million dollars

2   in their basement and they're being charged with being an

3   influential member of an organized crime organization and the

4   charges include extortion of multiple victims, Your Honor, I

5   would respectfully submit this is a recipe for flight and a

6   recipe for someone who really should not be trusted to be at

7   liberty to intimidate witnesses either himself of through

8   other members of the organization.

9        THE COURT:  Can you point in the indictment, please,

10  to the allegations concerning force or threats of force?

11       MR. LENOW:  Yes, Your Honor.  So like Count II of

12  the indictment alleges the extortion.  Count that's charged

13  substantively --

14       THE COURT:  Correct.

15       MR. LENOW:  -- that's on page 5 to 6, and there's a

16  two-way clause at the end that refers to coercing an

17  individual by threat of force or violence against an

18  individual -- against that victim, and that causes victim to

19  fear injury and economic harm.  So that's the two-way clause

20  in Count II.

21       THE COURT:  All right.

22       MR. LENOW:  That's on page 6 of the charging

23  document.

24       THE COURT:  I see that.  And that's it for this

25  defendant in terms of allegations involving force or threats

1  of force?

2  MR. LENOW:  Your Honor, there are -- as part of the

3  racketeering -- the racketeering scheme there are other acts

4  of extortion.  [Inaudible] Count II extortion scheme --

5  THE COURT:  But he's not charged personally in the

6  other counts, correct?

7  MR. LENOW:  Well, Your Honor, there -- there's

8  actually only -- the racketeering conspiracy includes numerous

9  counts that are not charged separately.

10  THE COURT:  Okay.

11  MR. LENOW:  They're predicate acts but --

12  THE COURT:  Right.

13  MR. LENOW:  -- in light of his position in the

14  organization, the modus operandi in the sort of organization

15  discussed in the indictment, Mr. Esposito has a number of

16  workers under him.  As I mentioned, he's a person of influence

17  in this organization.  And those other individuals have made

18  threats of violence, including a threat to frankly kill

19  someone unless money was paid, and that is a separate

20  extortion that is -- than the one that's recounted in Count

21  II.

22  THE COURT:  All right.  And in your view, you've

23  used words like, you know, high-up, position of

24  responsibility, where is this defendant in the organization in

25  the Government's view?

1      MR. LENOW:  Your Honor, in our view, based on

2  recordings with a number of other individuals, there appear to

3  be at least several layers of lower-level workers who have

4  collected money and conveyed demands on behalf of Mr.

5  Esposito.  And so the nature of these organizations, they are

6  quite secretive.  But based on recordings, at least, people

7  are -- made numerous references to his high position, the fact

8  that there are people that are doing his bidding, and frankly,

9  there are money payments made, for example, they at times pass

10  through multiple workers and then they go up to Esposito.  So

11  in other words, the money travels in these organizations up

12  the chain, and Mr. Esposito is high enough that he had other

13  people collecting money for him.

14      THE COURT:  And you can't be more specific than

15  that?

16      MR. LENOW:  If I can have one moment, Your Honor?

17            [Pause in proceedings.]

18      MR. LENOW:  Your Honor, if I could -- so in terms of

19  specificity, Your Honor --

20      THE COURT:  Yeah.

21      MR. LENOW:  -- what I pointed out, the fact that Mr.

22  Esposito had other individuals collecting money for him and

23  serving as those would actually be the ones on the ground

24  conveying threats and making demands, that is one piece of

25  evidence.  In the search that was conducted today at Mr.

1  Esposito's residence, FBI agents found hidden in various
2  locations a list of individuals who are known made members of
3  Cosa Nostra.  Having these sorts of lists are -- it's not the
4  sort of thing that if you were a low-ranking person in this
5  organization you would be privy to or have knowledge of those
6  lists.  And a number of individuals on recordings made
7  reference generally to Mr. Esposito's high position.  So
8  that's the proffer I would make at this time concerning Mr.
9  Esposito's role in the charged racketeering conspiracy.
10         THE COURT:  All right.  Let me ask you a technical
11  question.  What is the applicable predicate listed in Section
12  3142(f)(1) for the request that he be detained without bail?
13         MR. LENOW:  I'm sorry, Your Honor.  If Your Honor
14  can just -- I'm not sure I understand the question.
15         THE COURT:  Right.  So if you take a look at 18
16  U.S.C. Section 3142(f), detention hearing, it says that upon
17  motion of the attorney for the Government in a case that
18  involves (a) (b) (c) (d) (e), I can detain.  Where do you fall
19  in that?
20         MR. LENOW:  Your Honor, I don't have the statute in
21  front of me.  My -- [inaudible] right now.  If I can just have
22  one moment, Your Honor.
23         THE COURT:  Sure.
24         MR. LENOW:  I want to respond directly to your
25  question.

1                    [Pause in proceedings.]

2          THE COURT:  I mean what you may want to tell me is

3    that you're going under (f)(2) and not under (f)(1) at all.

4          MR. LENOW:  Your Honor, I would -- I had a moment,

5    but I --

6          THE COURT:  Take a moment.

7          MR. LENOW:  -- I'll credit Your Honor's

8    recommendation.  But I'm sure it's correct if I could just

9    have a second to read --

10         THE COURT:  Well, (f)(2) is the provision dealing

11   with a serious risk or flight or obstruction.

12         MR. LENOW:  Yes, Your Honor.  So thank you.  I did

13   not have that section.  I assure Your Honor I will next time.

14   And as I mentioned at the beginning of my argument, we do

15   believe that Mr. Esposito [inaudible], demonstrates both a

16   risk of flight and a danger to the community.  And under the

17   statutory section that Your Honor cited we believe that those

18   would [inaudible] to provide [inaudible] and a ground for

19   detention [inaudible] both met here and so the Court should

20   issue a detention order based on a finding that both of those

21   -- both of those conditions are [inaudible].

22         THE COURT:  All right.  Let me hear from the

23   defendant's counsel.

24         MS. EDWARDS:  Thank you, Your Honor.  Mr. Esposito

25   is 50 years old.  He has practically no record of any arrest.

In fact, he doesn't even have any driving infractions which I think is kind of remarkable.  The fact that he has lived at the same address for the past 30 years.  He lives with his mother, who is 84 years old, and with his sister.  They own the home.  They are willing, both his mother and both of their -- both of his sisters are willing to put up their homes and sign the bond.  The fact that Mr. Esposito had been accumulating cash in whatever amount certainly does not presuppose that he is a risk of flight, that he had any intention to flee.  He certainly didn't try to evade arrest when he -- agents came this morning.  He cooperated and went with them without any problem.  So the suggestion that cash in the home is -- leads to the obvious conclusion that he is a risk of flight I think is spurious to say the very least.

Just following up on that, talk about what he represented or did not represent at pretrial detention.  Mr. Esposito's contact with the criminal justice system began at 6:00 a.m. this morning.  He has never been arrested before. He found himself in, what I would consider for anybody, an unnerving situation.  Quite frankly, Your Honor, if you'd talked to me in a situation under high stress and ask me to recall off the top of my head exactly what assets I had and where they were I'm not sure I could give you an accurate reply.

THE COURT:  Maybe, but I'd remember if I had

1   $100,000, much less a million, under the mattress.

2        MS. EDWARDS:  He said he had approximately $750,000,

3   and again, we haven't verified that count.  Certainly, he knew

4   that the house was being searched.  I just think under that

5   kind of a stressful situation that is not an obvious

6   misrepresentation to the Court.

7        In terms of the nature of the offense, he's charged

8   in Counts I and II along with every single other defendant

9   who, based on exactly the same charges on exactly -- on the

10  same evidence, apparently will be eligible for bail.  I've

11  been doing this a very, very long time.  This is the first

12  time that the Government has alleged that someone is a person

13  of significant influence in this kind of an organization and

14  has been unable to specify exactly what position the person

15  purportedly held.  This is the first time Mr. Esposito has

16  ever been alleged to have a position of influence or no

17  influence or some influence of -- in any family other than the

18  family with his mother and his two sisters.

19       In terms of the firearms, the firearms were seized.

20  He's certainly not the only defendant here who had firearms

21  and who was considered eligible for bail.  There are certainly

22  no intention in terms of travel and passport.  He has a

23  passport.  He left the country once 12 years ago to go on

24  vacation.  That's not exactly extensive foreign travel.  He

25  certainly would not subject his mother and his two sisters

over the loss of their home by fleeing. And there is no
reason to believe that he would flee.

He would consent to home detention or even home
incarceration if that were necessary. He would consent to a
bail package that is even somewhat higher than the $500,000.
But it would be grossly unfair to deny him bail when there are
perfectly reasonable conditions for him to be granted bail and
to [inaudible].

THE COURT: Let me ask the Government. What do you
know about the equity in that house on East 77th Street? Does
the bank own it or does Mr. Esposito as a practical matter own
it?

MR. LENOW: I believe Mr. Esposito owns it outright,
Your Honor.

THE COURT: Okay. And what else do you want to tell
me?

MR. LENOW: Your Honor, just a few points. In terms
of the firearms, there's one other defendant here, to my
knowledge, who has declared -- they're aware of having a
firearm. He has a permit for it, Mr. D'Acunto, and he
declared to agents -- there was no search of Mr. D'Acunto's
house, that he literally informed pretrial services and the
Government of that gun which is the exact opposite of what
occurred with Mr. Esposito. He denied having any weapons, and
they were only found -- unregistered and he has no license for

1 them. is my understanding.  They were only found because of

2 the search warrant.  So again, this goes to the dishonesty and

3 it goes to the dangerousness of the -- it's the exact opposite

4 of the other defendant in this case who had a gun.

5        And look, Your Honor, there are five defendants on

6 this indictment.  We're only asking for detention as to one of

7 them and there's a reason for it.  The facts that I enumerated

8 earlier.  No one else has a million dollars in their basement.

9 No one else had undeclared guns.  No one else to my knowledge

10 lied blatantly to the pretrial services officer.  And for the

11 other reasons I mentioned.  And also, I've been hearing about

12 that list, that secret list, hidden in the defendant's --

13 hidden in the cologne box of some other made members of the

14 Cosa Nostra that the defendant had.  So, Your Honor, I

15 respectfully submit that Mr. Esposito really is singular in

16 this respect, and for those reasons it is the Government's

17 recommendation he be detained.

18        THE COURT:  One thing you haven't told me much

19 about, Mr. Lenow, which is something that I need to take into

20 consideration, as you know, on an application for detention is

21 the weight of the evidence.  Other than a list of other made

22 members of the Cosa Nostra, is there anything you want to tell

23 me?

24        MR. LENOW:  Your Honor, I would say that the

25 evidence in this case, we submit that it's strong.  It

1  includes wire taps of Mr. Esposito's phone.  There's close to

2  I believe five or six months of wire taps on multiple phones.

3  They're discussing various businesses with his co-defendants.

4          THE COURT:  All right.  You need to be more specific

5  with me.

6          MR. LENOW:  Okay.  I could go through some of the

7  calls.  There's also -- they [inaudible], Your Honor, so the

8  most significant evidence in this case includes a cooperating

9  witness who had first-hand contact with Mr. Esposito, who's

10  very close with him and details -- in very detailed the

11  contacts they had over the years, direct contacts and others

12  coming and demanding payments for this union position as is

13  specified in the complaint.  There are corroborating wire tap,

14  recording in-person recordings made by multiple witnesses

15  where other members of the enterprise repeatedly referenced

16  Mr. Esposito's significant role in the organization, including

17  some of the individuals that are sitting here at this table.

18  They speak of Mr. Esposito very detailed and reverence for

19  him.  There's law enforcement surveillance in conjunction with

20  these recordings showing that they -- that the involvement of

21  local [inaudible] schemes.

22          And so -- and we also have [inaudible] wire tap

23  evidence where, for example, Mr. Giovinco and Mr. Esposito

24  discuss their involvement together in this sort of detail that

25  was discussed earlier and in greater depth by my colleague,

1  Ms. Ravener, concerning the waste business [inaudible].  The

2  same type of [inaudible] that Ms. Ravener.  But at the -- at

3  the end of the day we have someone who's very close with the

4  defendant who's a part of his family who we expect to testify

5  against him at trial and corroborated by months and months of

6  -- several years of recordings where people talk about Mr.

7  Esposito, and as I mentioned earlier there are wire taps of

8  Mr. Esposito's phone himself where he discusses various

9  business that we believe are associated within this crime

10 family along with surveillance [inaudible].  So we're talking

11 about recordings here.  We're not talking about just one or

12 two witnesses, Your Honor, who are corroborated -- the

13 corroboration here we submit is quite significant.

14        THE COURT:  And what are the potential penalties for

15 the two counts he's on?

16        MR. LENOW:  The potential -- yeah, the potential

17 penalties are 20 years for each on the counts.  In terms of

18 the guidelines calculation, we -- our position is that this

19 individual had a significant leadership role directing others

20 and so his exposure on the guidelines would also be

21 significant.  And also [inaudible] the corroboration --

22        THE COURT:  But with no criminal history, right?

23        MR. LENOW:  That's correct, Your Honor.  And I would

24 emphasize again that -- right.  Your Honor, and this may sound

25 counterintuitive but frankly, the fact of the nature of these

organizations is that those who are most high up often have others do their bidding for them.  And it is oftentimes the lower individuals who get arrested because they are most exposed.  The charged conspiracy here dates from 2001.  So we obviously agree that there is no record of criminal history in terms of a rap sheet but we submit this individual has been engaging in criminal conduct for over 15 years.  And also the corroboration -- the nature of Cosa Nostra and the Genovese crime family, it is a -- in many ways a family business.  All this information is corroborated by other [inaudible].  Mr. Esposito's father was Vincent the "Chin" Gigante who was the head of the Genovese crime family for member years, and I don't think that's a disputed fact.

MS. EDWARDS:  Your Honor, certainly, we can't -- I can't speak to what the Government alleges is their evidence including [inaudible] and the indictment as it is worded [inaudible].  Suggesting that Mr. Esposito be detained based on his paternity seems to be a [inaudible] which I think is somewhat inappropriate to say the very, very least.  More importantly --

THE COURT:  Are you referring to the identity of his father?

MS. EDWARDS:  Yes.

THE COURT:  I am not taking that into consideration.

MS. EDWARDS:  What?

1      THE COURT:  I am not taking that into consideration
2 as a factor.
3      MS. EDWARDS:  Thank you, Your Honor.  The fact that
4 Mr. Esposito has not been arrested, convicted, charged with,
5 alleged to have been engaged in any criminal activity for his
6 entire life, to suggest the fact proves that he is somehow a
7 criminal, again, is a bit more than counterintuitive.  The
8 suggestion that the people who are supposed to be the leaders
9 of these various, as you call them, crime families tend not to
10 be indicted has been disproved multiple times.  And if you
11 just look at the history of any of these families, you can see
12 that it is generally the people at the top and they make the
13 headlines and they're the ones who end up getting indicted and
14 end up with very, very long sentences.  So the notion that he
15 has somehow been shielded and nobody can actually articulate
16 what role he's supposed to have in these families to me is
17 just not a reasonable allegation.
18      He is not charged, there is no allegation, that the
19 -- any act was committed with those firearms.  There's no
20 allegation that the firearms had anything to do with the
21 criminal activity that is alleged in the indictment.  And I
22 honestly do not believe that it is fair to say that there are
23 no reasonable conditions that can be set.  Mr. Esposito would
24 actually agree to house incarceration and would agree to very,
25 very strict monitoring, electronic monitoring, whatever sounds

1   reasonable.  And in terms of flight, I'd just like to

2   reiterate, he's been in the same past for the past 30 years

3   living with his mother and his sister.  The fact that he would

4   have these people turned out in the street by fleeing the

5   jurisdiction is absolutely outrageous.

6           THE COURT:  Let me ask the Government.  If I were to

7   grant pretrial release to this defendant and if one of the

8   conditions were home incarceration with electronic monitoring,

9   would the Government make a request that the defendant pay all

10  or part of the cost of that monitoring?

11          MR. LENOW:  Yes, Your Honor.  That would be fair.

12  And to the extent the Court is considering conditions along

13  those lines, we would at the very least ask that those

14  conditions be fully satisfied before Mr. Esposito is released.

15          THE COURT:  Right.

16          MS. EDWARDS:  And we have no objection, Your Honor.

17          THE COURT:  All right.  So I think -- I think I'm

18  ready to make a ruling.  I thank counsel for their

19  presentations and their very able arguments.

20          Mr. Esposito, I am required under the law to release

21  you either with or without conditions imposed unless I

22  determine that there are no conditions that will reasonably

23  assure your appearance in court as required and the safety of

24  the community.  In this case, as you just heard, the

25  Government has asked that you be detained without bail.  The

1  Government is entitled to make this request under Section

2  3142(f)(2) because the Government contends that you present a

3  serious risk of flight or obstruction of justice.  I don't

4  think the Government is entitled to make the request under

5  Section 3142(f)(1), but they only need one basis on which to

6  make the request.  So we will proceed from there.

7          I, therefore, must determine whether there is any

8  condition or combination of conditions that will adequately

9  protect the safety of the community and reasonably assure your

10 appearance in trial -- at trial.  I am required to consider a

11 number of factors, including the nature and circumstances of

12 the offense charged, the weight of the evidence against you,

13 your history and characteristics, any history that you have of

14 violating parole or probation or similar judicial supervision

15 in the past, and the nature and seriousness of the danger to

16 any person or to the community that would posed in this case

17 by your release.  This is not a so-called presumption case.

18 The Government bears the burden of establishing by clear and

19 convincing evidence that you are a dangerous to the community

20 or establishing by a preponderance of the evidence that you

21 are a flight risk.

22          I have listened carefully to the arguments of both

23 sides, and I am satisfied ultimately that there are conditions

24 that I can impose that will in combination reasonably assure

25 your appearance at trial and the safety of other person in the

community.  I note parenthetically that the presence of the
firearms in the residence do raise some issue of danger to the
community, but since there is no evidence that they have been
used and certainly they cannot be used in the future since I
assume they are now in the custody of the United States
Government, that does not satisfy the Government's burden.
The cash, as we previously discussed, goes to the issue of
flight risk, but that cash is now also in the Government's
possession, I assume, and there are other financial conditions
I can set that will ameliorate that risk in my judgment.

I am somewhat concerned in light of the nature of
the charges here and the nature of the allegations against
this defendant, particularly extortion.  I am, of course,
concerned about the defendant's ability to tamper with or
intimidate witnesses.  But again, I think there are conditions
I can impose that will at least reasonably mitigate that
danger, and I am also mindful that even detention does not
absolutely present -- or prevent, I should say, the risk of
that kind of tampering if, as the Government alleges, this
defendant is high up in a racketeering organization
[inaudible] bidding.  So it is not a sure-fire fix to the
concern that the Government has expressed.

On balance, I am going to release this defendant on
the following conditions.  Mr. Esposito, you will put up a
bond in the amount of $750,000.  It will be co-signed by three

financially responsible persons.  It will be secured by a
pledge of your home on East 77th Street.  You will surrender
your passport, if you have one, and any other travel
documents.  You will not make any new application for travel
documents.  You will be subject to strict pretrial supervision
but our pretrial services department, and you will be subject
to home incarceration which means as a practical matter that
you will not be leaving your home for all but the most urgent
and extreme circumstances.  And your home incarceration will
be monitored by electronic monitoring.  I will also order the
defendant to pay for all or part of the cost of location
monitoring as determined by pretrial services after examining
the defendant's finances.

You will not be released until all of these
conditions are met, including the pledge of the home, the
three financially responsible co-signers, and the setup of the
electronic monitoring in the home.  You will not possess any
firearms, destructive devices, or other weapons.  You will
have no contact with your co-defendants except in the presence
of counsel, and you will have no contact with known victims or
witnesses.  Do you understand the conditions that I have just
described?

DEFENDANT ESPOSITO:  Yes.

THE COURT:  Let me warn you -- I know you've heard
this before, but I will now warn you as well.  If you fail to

appear in court when due or if you violate any of the
conditions of your release, a warrant will be issued for your
arrest.  You and anyone who signed the bond will each be
responsible for paying its full amount, $750,000, and you may
be charged with a separate crime called bail jumping.  On top
of that, if you were to commit a new offense while you are on
pretrial release, including, for example, any witness
tampering or attempted witness tampering, then in addition to
the sentence prescribed for the new offense you will be
sentenced to an additional term of imprisonment of up to 10
years if the new offense is a felony, up to one year if it is
a misdemeanor.  That term of imprisonment will be executed
after and on top of any other sentence of imprisonment is
completed.

        MR. LENOW:  Your Honor, if I may --

        THE COURT:  Yes.

        MR. LENOW:  We just -- if I could make one
recommendation to the Court in terms of those conditions.  We
would ask for a higher bond amount, and I specifically want to
kind of pick up on the comments defense counsel made that Mr.
Esposito wouldn't flee and therefore put his family out on the
street.  I frankly think that [inaudible] with kind of the
sentence structure that we should have in place here.  We have
a $12 million home.  To the extent Mr. Esposito did flee in
the current conditions, a $750,000 bond is -- it's not

1  [inaudible].

2         THE COURT:  I take your point.  So --

3         MR. LENOW:  -- [inaudible] a $12 million bond.

4         THE COURT:  Well, wait a minute.  That's a big jump

5  from 750- to 12 million.  I take your point, and I did not

6  realize or I had overlooked until you brought it my attention

7  the value of the house.  But how much of that is equity and

8  how much of that is owned by the bank and what can you tell me

9  about other assets that this defendant owns?  I understand

10 there may be some rental properties.

11        MR. LENOW:  Yes, Your Honor.  So excuse me.  Your

12 Honor, I didn't mean to give the Court -- I did not mean to

13 give the Curt sticker shock.  But I do want to -- actually

14 this has a [inaudible] --

15        THE COURT:  It's Manhattan.  It's an expensive town.

16        MR. LENOW:  Right.  And I do want to emphasize that

17 I really do think that sort of number is a reasonable number.

18 I know [inaudible] when I say that and also to answer Your

19 Honor's question at the same time.  So first of all, in terms

20 of the overall assets, there's $12 million in equity in that

21 residence.

22        THE COURT:  In equity.

23        MR. LENOW:  Is our -- is our understanding.  There

24 are four rental properties.  Mr. Esposito could not remember

25 the name of the addresses of those properties according to

1  pretrial.  As Your Honor mentioned, Manhattan, [inaudible],

2  Brooklyn, and Queens are also expensive town these days.  And

3  we're also talking about potentially significantly more

4  assets.  I just can't speak for the value because Mr. Esposito

5  himself has not informed the Court about them.  There is a

6  million dollars in cash which [inaudible] -- which has been

7  seized.

8        THE COURT:  Which you now have, you, the Government.

9  But you're concerned there may be more cash other places.

10       MR. LENOW:  I'm sorry.  Can you repeat that, Your

11 Honor?

12       THE COURT:  You have the million or whatever it

13 turns out to be, but you're concerned that there's more

14 currency elsewhere?

15       MR. LENOW:  Your Honor, exactly.  And I -- the

16 racketeering organization charged in this indictment goes all

17 the way back to the 1930s.  This is a long-run organization

18 with many individuals in it, and we just hit one house and got

19 a million dollars in that one house.  We do have substantial

20 concern there is similar caches of cash elsewhere.  And so --

21 and there's $200,000 in the checking account, and that was

22 mentioned in the pretrial report.  Respectfully, Your Honor,

23 in light of --

24       THE COURT:  All right.  I --

25       MR. LENOW:  -- [inaudible].

1          THE COURT:  I take your point.

2          MR. LENOW:  So -- I'm sorry, Your Honor.

3          THE COURT:  But what I'm also taking away from it is

4    that other than the bank accounts and the house on East 77th,

5    which I understand is co-owned by other family members, as

6    well, you can't detail for me at present the defendant's other

7    assets, correct?

8          MR. LENOW:  That is correct.  And just to kind of --

9    the last point I'd make -- I'm sorry.  Hold on a second, Your

10   Honor.  Your Honor, I have been informed by my colleague we

11   have also -- there is additional evidence of the defendant's

12   ownership of another property with a value of approximately $5

13   million or at least $5 million.

14         THE COURT:  What other property is that?

15         MR. LENOW:  It's a property [inaudible], I believe.

16   There are email exchanges where Mr. Esposito is offered $5

17   million for this property and turns it down.  So if you add

18   that to the pot we've already kind of [inaudible], we're

19   talking about $17 million.  And, Your Honor, when I proposed

20   that $12 million figure, the reality is the way that our bond

21   system works in federal court is the only difference between a

22   $1 million and a $12 million bond isn't obviously -- what --

23   it's not cash has to be put down.

24         THE COURT:  Well, but the difference is who's going

25   to co-sign on it and whether anyone is financially capable of

1  co-signing on it.

2          MR. LENOW:  Well, Your Honor, at the very least it

3  sounds like the family members that Mr. Esposito -- Mr.

4  Esposito's family member live with him, I understood there to

5  be a statement about that building to be co-owned, would also

6  have -- also have ownership interest [inaudible] in a

7  residence.

8          THE COURT:  So they may qualify as financially

9  responsible.

10          MR. LENOW:  Yes, Your Honor.  In this kind of

11  situation, you know, ultimately, typically, it'd have to be

12  [inaudible].  And so if someone makes substitutional assets I

13  think people are going to be -- if it's a $1 million bond

14  versus a $12 million bond, the whole point of the bond system

15  is that it's going to hurt someone financially, even devastate

16  them, if someone flees, and that's the whole point.  That's

17  the --

18          THE COURT:  I understand.  It's a preventative.

19  It's not a punishment.

20          MR. LENOW:  Yes, Your Honor.

21          THE COURT:  It's a preventative.  So let me ask Ms.

22  Edwards, and I'm seriously considering the Government's point

23  on this.  I think 750- is low if the house that we know about

24  is worth $12 million, so what do you want to tell me?

25          MS. EDWARDS:  Yes, I don't know that the house is

1    worth $12 million.  I don't [inaudible].

2          THE COURT:  Well, I saw a picture of it when I

3    signed the warrant.  It looked pretty nice to me.

4          MS. EDWARDS:  I've not seen the house and I don't

5    know that it is worth $12 million.

6          THE COURT:  But it's a -- it's a rowhouse on East

7    77th Street in Manhattan.

8          MS. EDWARDS:  It is, Your Honor.  Yes.

9          THE COURT:  Right?

10          MS. EDWARDS:  Yes, Your Honor.

11          THE COURT:  And there's no mortgage on it?

12          MS. EDWARDS:  But there's a differences between $8

13    million and $12 million.  I think the problem here is -- and

14    actually, I'm suffering from sticker shock.  I heard from

15    [inaudible] --

16          THE COURT:  Is there a mortgage on it?

17          MS. EDWARDS:  Huh?

18          THE COURT:  Is there a mortgage on it?

19          MS. EDWARDS:  There's no mortgage on it.

20          THE COURT:  And who owns it?

21          MS. EDWARDS:  And they've had it for about 30 years.

22    Half of it belongs to Mr. Esposito.  His mother and the -- Mr.

23    Esposito and his two sisters share in the -- in the other half

24    -- the other half.  So they each have a third of the other

25    half.

1          THE COURT:  Okay.

2          MS. EDWARDS:  Certainly, we would agree to a bond

3     that would be higher than $750,000.  But once we start talking

4     about 10 million, 12 million, we're talking -- we're not

5     talking about numbers that could realistically, I believe, be

6     met by his mother and his two sisters.  I mean they're the co-

7     signers.

8          THE COURT:  Well, if the mom owns half the house

9     she's going to be -- she's going to be deemed financially

10    responsible up to a significant sum.

11         MS. EDWARDS:  Sure, but not -- A, I don't know that

12    the house is worth $12 million.  And, B, I don't -- you know,

13    if she has half of that that's $6 million.  That's not the 12

14    million.

15         THE COURT:  Right.  But as -- but as the prosecutor

16    pointed out, look, the point of setting a high bond isn't to

17    bankrupt anybody when they sign the bond because it doesn't

18    cost them anything to sign the bond.  The purpose is to make

19    sure that the penalty to the cosigners if the defendant, God

20    forbid, should flee is significant enough that he would not

21    want to inflict that on them.

22         MS. EDWARDS:  And I understand completely, Your

23    Honor.

24         THE COURT:  Right.

25         MS. EDWARDS:  And I would just ask the Court,

1   there's a big difference between 750,000 and 12 million, and I

2   would hope that the Court would look at something that is

3   fairly reasonable.

4           THE COURT:  All right.  So here's what I'm going to

5   do.  Understanding that we are all dealing with imprecise

6   information at present about the full extent of the

7   defendant's assets and financial capability and also

8   understanding that applications can be made by either the

9   defendant or the Government to modify the release conditions

10  if additional information comes to light, I am going to set

11  the amount of the bond at $6 million, which is half the value

12  of the house according to the Government and therefore,

13  coincidentally, the value of the portion of the house owned by

14  the defendant's mother.  The other conditions I mentioned

15  earlier will remain the same.

16          Is there anything further this evening?

17          MS. EDWARDS:  No, thank you, Your Honor.

18          MR. LENOW:  No, thank you, Your Honor.

19          THE COURT:  All right.  Thank you, ladies and

20  gentlemen.

21          Ah, I thought there was nothing further.  Sir.

22          MALE VOICE:  I understand that you wanted the

23  electronic monitoring set up [inaudible].  My understanding is

24  that there's [inaudible] available.  That he's going to be

25  monitored by the Eastern District, and in order for them go

1 and wire his house, [inaudible].  It takes seven days.  I'm

2 asking if there's a way, Your Honor, [inaudible] signature,

3 have him in his house until it's wired and monitor

4 [inaudible].

5 　　　　　THE COURT:  No, I think he's just going to have to

6 wait until it's wired.  Anything further?

7 　　　　　MS. RAVENER:  No, Your Honor.

8 　　　　　THE COURT:  Thank you, ladies and gentlemen.

9

10 　　　　　　　　　　* * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5   _____

6                                    Shari Riemer, CET-805

7   Dated:  January 12, 2017

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

1    I1QZZESPC
     UNITED STATES DISTRICT COURT
2    SOUTHERN DISTRICT OF NEW YORK
     ------------------------------x
3
     UNITED STATES OF AMERICA,
4
                v.                          18 CR. 0014
5
     VINCENT ESPOSITO,
6
                    Defendant.              Conference
7
     ------------------------------x
8
                                        New York, N.Y.
9                                       January 26, 2018
                                        2:10 p.m.
10

11   Before:

12                     HON. VICTOR MARRERO,

13                                       District Judge

14
                           APPEARANCES
15
     GEOFFREY S. BERMAN
16        Interim United States Attorney for the
          Southern District of New York
17   JARED LENOW
     JASON SWERGOLD
18   KIMBERLY J. RAVENER
          Assistant United States Attorneys
19
     ELIZABETH E. MACEDONIO
20        Attorney for Defendant

21

22

23

24

25

1          THE COURT:  In the matter of the *United States v.*

2     *Esposito,* Docket No. 18 CR 0014.

3          Counsel, please enter your appearances for the record.

4          MR. LENOW:  Good afternoon, your Honor.  Jared Lenow,

5     Kimberly Jane Ravener, and Jason Michael Swergold for the

6     government.  At the front table with us is Jonathan Lettieri

7     from the pretrial services office.

8          THE COURT:  Good afternoon.

9          MS. RAVENER:  Good afternoon.

10         MR. LENOW:  Good afternoon.

11         MS. MACEDONIO:  Good afternoon, your Honor.  Elizabeth

12    Macedonio, with Flora Edwards, for Mr. Esposito.  Also, with

13    the Court's permission, I have seated at counsel table a

14    paralegal from my office, Linda Mahawer.

15         THE COURT:  Welcome.

16         The Court scheduled this proceeding on motion of the

17    government seeking appeal of the decision by Magistrate Judge

18    Barbara Moses approving conditions of pretrial release for the

19    defendant.

20         The Court has received a government submission.  The

21    Court has reviewed as well the transcript of the proceeding

22    before Magistrate Judge Moses, and I have received a letter

23    dated January 25, 2018, from the defendant setting forth a

24    response to the government's letter dated January 17.

25         Mr. Lenow, has the government received and reviewed

1    the letter from the defendant dated January 25?

2              MR. LENOW:  Yes, your Honor.

3              THE COURT:  Is the government ready to proceed?

4              MR. LENOW:  We are, your Honor.

5              THE COURT:  Then you may proceed.

6              MR. LENOW:  Thank you, Judge.  We appreciate the

7    Court's willingness to hear us orally on this point.

8              I would start by noting that this is a de novo review

9    at this point in time, and there are a number of new facts in

10   this case that Judge Moses did not have a chance to consider,

11   and there are some additional facts that we don't think she

12   properly considered or understood the full import of those.

13   That is the reason for the appeal.

14             The government believes that Mr. Esposito poses both a

15   danger to the community and also a risk of flight.  I'd like to

16   start by addressing the dangerousness aspect, then I'll move to

17   risk of flight right after that.

18             In terms of dangerousness, I think it's important to

19   start with the enterprise charged here, the Genovese crime

20   family of La Cosa Nostra, otherwise known as the mafia.

21             As I'm sure the Court is aware, the Genovese crime

22   family has a long and notorious history in this city.  There is

23   a history of witness intimidation and retaliation in mafia

24   cases and in Genovese crime family cases, and multiple members

25   of the Genovese family have been charged and convicted in this

1    courthouse of a wide variety of offenses, extortion, murder,

2    and others.  That is the lens through which I submit the Court

3    needs to consider the facts that we're going to get into.

4         Where does the defendant fit in this enterprise?  We

5    submit that the facts show that defendant is a person of

6    significant influence and had a high rank within the

7    organization.  The evidence shows that he directed and

8    supervised multiple acts of extortion, which are crimes of

9    violence; that he controlled a Genovese family slush fund

10   consisting of millions upon millions of dollars; that he

11   maintained lists of made members, both deceased and living,

12   which based on the experience of law enforcement over the

13   years, the only people who maintain these sorts of risks are

14   very high-ranking members of La Cosa Nostra.

15        He is, of course, the son of the former boss of the

16   Genovese crime family, Vincent Gigante.  There is a significant

17   amount of evidence that this person is a person of significant

18   power and influence and rank within the Genovese family.

19        Turning specifically to the acts of extortion charged

20   here, which I note are crimes of violence under the federal

21   code, there's no dispute that serious threats of extortion were

22   made.  Those threats are memorialized by witnesses in various

23   recordings that we referenced in our written submission.  There

24   were threats to physical safety and threats of death.

25        The only dispute, I think the defense says in some of

1  these recordings, the ones we referenced that Mr. Esposito

2  isn't recorded on those several recordings when those threats

3  were made, that's because he is a person of rank.  He is not a

4  person who is sent to make the threats, to directly collect the

5  money, but his name is invoked repeatedly -- repeatedly year

6  after year -- on these recordings.

7        Now, Judge Moses did recognize a risk of witness

8  intimidation and tampering in this case, and she was concerned

9  about it.

10       THE COURT:  Mr. Lenow, you mentioned that his name was

11 invoked.  In what context was it invoked?

12       MR. LENOW:  The context was along the lines of

13 statements -- may I have one moment?

14       Your Honor, the threats were made to an individual

15 whose invocation was along the lines of, Your uncle is

16 demanding this money.  Your uncle needs this money this year.

17       The person who has made the threats to their uncle is

18 Vincent Esposito.  It was an extortion of another member of the

19 family, and the words invoked in those conversations with were

20 either "Vinny," "Vincent," or "your uncle,"  all explicit

21 references to the defendant, Vincent Esposito.

22       As I mentioned, Judge Moses did not dispute that there

23 was a risk of intimidation here, but she thought that, she

24 advised that she thought that it could be addressed by home

25 confinement, but the Second Circuit has spoken of this issue

1 repeatedly and has said time and time again home confinement

2 does not address risk of dangerousness in these sorts of cases,

3 especially when you're talking about individuals who have

4 positions of influence and their modus operandi is to send

5 others to engage in the acts of violence, in the threats, in

6 the money collection, and that sort of thing.

7 Here, the home incarceration, by the way, would be at

8 the defendant's base of operations for the past 15-plus years.

9 The state of play would not be adjusted at all.  He was able to

10 organize his extortions from his current residence, and to put

11 him back in that same position is not going, we submit, to

12 reduce the risk of violence in this case.  The Second Circuit

13 has said that time and time again, and I don't think that was

14 fully appreciated by Judge Moses when she was making her

15 ruling.

16 Again, when you have home incarceration or home

17 confinement, it doesn't limit one's ability to have cell

18 phones, to have burner phones, to have visitors, or have people

19 in the home who can convey messages.  The only way to do that

20 reasonably effectively is through having someone incarcerated

21 pending trial, and that's Second Circuit law.

22 Another fact supporting the dangerousness in this case

23 is the weapons that were seized by the FBI from the defendant's

24 residence where he proposes to be confined.  First, I'd point

25 out there is no innocent explanation that's been offered for

1 his firearm. The firearm, the brass knuckles, the dagger, and

2 the ammunition that were recovered, and I think they were

3 produced in discovery, so we'll be getting to that soon. I

4 don't think they might have appreciated this from our letter,

5 but several boxes of ammunition were, in fact, found.

6 I think the defense submission notes the absence of

7 ammunition. I think that's because discovery hasn't been fully

8 produced, but there were two boxes of bullets found, .22

9 caliber ammunition and .38 caliber ammunition. This is

10 important for a couple of reasons. It shows, one, the gun that

11 was recovered is not some sort of decoration or memento, but

12 you have bullets with the gun when you intend to use the

13 bullets. The gun seized was a .22 caliber. We never recovered

14 the .38 caliber.

15 First of all, that evidence submits that there's a .38

16 caliber gun that the defendant has that was not announced. He

17 was interviewed by pretrial at this point, and he lied and he

18 said he didn't possess a firearm.

19 That lie is relevant for a number of reasons. One, it

20 buttresses this notion that there there's no legitimate reason

21 for having this gun, because if there were, the defendant

22 wouldn't have felt the need to lie to pretrial services, which

23 is an arm of the Court. This is information that is relied on

24 by the Court. I would submit that is a relevant and important

25 and a significant falsehood that Mr. Esposito has already

1    foisted on this Court about a very relevant fact with respect

2    to bail.

3            So one, it shows that there's no legitimate purpose

4    for the gun, otherwise it would have been announced, and

5    another defendant in this case, D'Acunto, when he was arrested,

6    willingly said, I have a gun.  I'm happy to turn it in.  That

7    was accomplished.

8            I believe Esposito is the exact opposite.  He lied and

9    said, I had no firearm in the home, none was recovered.  It

10   also goes to whether this Court can put its trust in

11   Mr. Esposito.  He's already lied to pretrial services once

12   about weapons.  I don't think under those circumstances this

13   Court can put its faith in Mr. Esposito to not go out and

14   rearm.

15           THE COURT:  Was any other defendant, other than

16   Mr. D'Acunto, possessing firearms?

17           MR. LENOW:  No.  Mr. Esposito is the only one.

18           Pardon me.  One second.

19           Your Honor, there is one other defendant,

20   Mr. Cognetta, who had a firearm.  My understanding is it was

21   licensed, and Mr. Cognetta announced his ownership of that gun

22   and offered to turn it in.  D'Acunto and Cognetta both had

23   licenses, and no search was done of their houses, but they

24   nonetheless volunteered the existence of those guns and were

25   willing to turn them over to law enforcement, whereas Esposito

1    is the exact opposite situation.

2              THE COURT:  Was cash recovered during the searches of

3    those other defendants?

4              MR. LENOW:  Judge, we understand that -- I think one

5    of the other defendants might have had several thousand dollars

6    of cash on them, but nowhere near what Mr. Esposito was found

7    in possession of.

8              I want to turn to the cash now, but what I've

9    discussed so far, are the facts that the government submits

10   support a finding of dangerousness here.  The fact that this is

11   a Genovese family case involving someone, we submit, of high

12   rank in that family, who oversaw multiple acts of crimes of

13   violence under the federal code, crimes of extortion or death

14   threats and other threats that were made, I think it's

15   undisputed that they were made, and we've typed out the actual

16   words used, they're pretty shocking, and they are stark

17   examples of serious threats, especially in the context of a mob

18   case.

19             THE COURT:  Mr. Lenow, what specific evidence is there

20   on the record that you have that Mr. Esposito actually

21   supervised the individuals -- let me back up.

22             Who actually carried out those threats?

23             MR. LENOW:  Your Honor, we understand that

24   Mr. Esposito's underlings carried out those threats.  The

25   evidence of this is as follows:  First, there is a cooperating

1  witness who was close to and had direct interactions with

2  Mr. Esposito.  They have a relationship going back a long time;

3  it's a family relationship, and that witness has informed the

4  government and would be prepared to testify about the direct

5  demands that Mr. Esposito made of him.

6      Subsequent to that, underlings of Mr. Esposito, a

7  number of them, different ones, came to the victim and in

8  person made threats over the course of many years.  A number of

9  those threats are recorded, and on those recordings explicit

10 references are made that "Vinny" or "Vin" or "your uncle" is

11 the one who is making those demands and is the source of the

12 extortion and thus the threats.

13     It's a cooperating witness with firsthand knowledge.

14 It was the victim at least to one of the extortion plots.

15 Also, recordings corroborate that.  I would also put on --

16 there's not just one extortion here, Judge.  There's one

17 charged separately, but there's at least one other extortion

18 that forms the basis for the racketeering enterprise.  We

19 recount it in our letter.  That's when two other underlings to

20 Mr. Esposito went and made threats to another person, and those

21 are recounted, again, in the letter where there are threats of

22 bodily harm and a threat of death that were conveyed.

23     For those reasons, we think there is, I think,

24 significant risk of dangerousness in this case.

25     Turning now to flight, this is one of the cases

1    where -- sometimes a case cries out it's really more of a

2    flight case or it's really more of a dangerousness case.  I

3    would submit that on both counts, there is a very strong body

4    of evidence to support, either one on their own, the need for

5    detention.

6         In terms of flight, the critical fact here is

7    Mr. Esposito's financial and family resource.  I mean "family"

8    both in terms of his actual blood family, and in fact, also his

9    organized crime family.  I frankly submit there is overlap

10   there as well.

11        The first fact is the $3.8 million in cash that was

12   recovered from the defendant's residence by the FBI.  We're not

13   talking about one safe in the basement with a neatly packed

14   pile of $4 million with receipts for a bank showing that it was

15   cleanly kept.  This is sacks of cash in old ammunition boxes,

16   in sacks, in shoe boxes, stuffed in corner after corner of the

17   residence -- in envelopes.  The very packaging itself suggests

18   it's illicit in nature, and the defendant didn't say anything

19   about this cash in his pretrial interview.  It's another very

20   powerful piece of evidence in and of itself that the defendant

21   lied about his financial resources here again.

22        I think the defense submission on this references

23   currency being found.  It's not just currency, Judge.  It's

24   $3.8 million in cash, also gold coins, valuable jewelry.  It is

25   clear evidence of the defendant having substantial resources

1    and extremely fluid resources too, resources that could easily

2    be stuffed in a trunk.  You can drive away.  If you have $3.8

3    million, Judge, it's very easy to flee.

4           In recent memory, Judge, I can't remember a case in

5    this district, an organized crime case at least, where you've

6    had this amount of money seized.  It really is extraordinary

7    and the defense, frankly, ignores this.  There's no explanation

8    for what this cash relates to, and critically, I would submit

9    it's just the tip of the iceberg.

10          We have been reviewing a document seized from

11   Mr. Esposito's residence and there is evidence of multiple,

12   multiple companies, shell companies, large amounts of money

13   being arbitrarily transferred from one to another, and

14   Mr. Esposito has numerous other houses and residences and

15   buildings, businesses.  The FBI hit just one and found $3.8

16   million.  I would submit, Judge, it is a very reasonable

17   inference to draw that the Genovese family doesn't put all of

18   its slush fund, eggs in one basket.  All of this was

19   undisclosed at pretrial.

20          The second critical point here I'd make is not only

21   was all this money seized and not only is there evidence that

22   there is other money out there, but the Court is completely

23   flying blind here because there's been no honest disclosure of

24   the defendant's assets.  If you look at a pretrial report,

25   there are several checking accounts mentioned and some other

1  investment-type accounts in the hundreds of thousands of dollar

2  range.  The Court, I submit, cannot reliably make any sort of

3  finding about the defendant's current assets.  It can't rely on

4  the pretrial report, because I don't think there's any dispute

5  the defendant lied on it.

6       We do know that there's a network of shady

7  corporations, multiple ones that have listed his residence as

8  the business location, a lot of cash transactions and money in

9  envelopes, shoe boxes, ammunition boxes, that I would submit

10  are highly relevant and indicative of an illicit entity and an

11  illicit business.

12       When you put all these facts together, the Court

13  really just can't make any finding that would be based on any

14  evidence or logic apart from the defendant has a ton of money,

15  it's very easily obtained and fluid, and if he wanted to flee,

16  he would certainly have the resources.

17       Your Honor, this ties into an issue of also the

18  strength of the evidence.  I mentioned some of the evidence

19  already in my submission to the court.  It's not just the

20  seizure of the cash.  There's also the seizure of the weapons,

21  the list of made members of the Genovese family, both living

22  and dead, which as we submit in our letter, there's a reason

23  for this.  There are rules of La Cosa Nostra where the

24  expansion of each family is limited so that one family doesn't

25  gain an upper hand on the other.  There's a controlled growth

1  rate.  Generally, for someone to be a made member of the

2  family, to be made, someone else has to die.  Higher ranking

3  members of the family maintain lists of individuals who have

4  passed away and are still living.

5         Here Mr. Esposito had a list of dead members of a

6  New Jersey Genovese crew, along with living members from a

7  Jersey Genovese crew indicating he is someone of that high rank

8  who is tracking living/dead members of the relatives' side of

9  the family, compared to other organized crime syndicates.

10         These are these seizures, which are powerful evidence.

11  There a corroborating witnesses, members of the defendant's own

12  family who dealings with him as part of an extortion scheme for

13  over a decade.  There are years of recordings where numerous

14  other individuals expressed that they're acting on behalf of

15  Mr. Esposito and making demands, extortion demands, people who

16  obviously did not know they were being recorded, but repeatedly

17  invoke his name.  There's a wealth of surveillance photos and

18  evidence and wire tap recordings showing the defendant

19  communicating with, meeting with other individuals known to be

20  made members and associates of the Genovese crime family.

21         THE COURT:  Mr. Lenow, turning to your statement about

22  the lists of the members of the family in New Jersey.  Is it

23  your theory that the defendant here is a member of a New Jersey

24  family, New York family?  What is the relevance of the fact

25  that he had lists of the New Jersey family members?

1              MR. LENOW:  Well, the relevance, Judge, the way that

2    families are traditionally structured, in particular the

3    Genovese family, there are often times, lines of control such

4    that certain high-ranking members of the family control certain

5    geographic areas or industries.  The lists of New Jersey

6    families would be indicative of someone who had control and

7    authority over that geographic region of the Genovese family's

8    influence.  In other words, and typically, as we say in our

9    submission -- so our understanding, historically the Genovese

10   family has had a captain-level rank who is in control of the

11   Jersey activities, the New Jersey activities of the Genovese

12   crime family, and so having these lists of the living and dead

13   members of the New Jersey crew is indicative of someone who at

14   sometime was either the acting or full-time captain or

15   similarly ranking person of authority who had control over that

16   wing of the Genovese crime family.

17              Judge, again, to reiterate a point I made earlier in

18   terms of control and authority, in addition to what I mentioned

19   about the lists, when you're talking about having large

20   quantities of funds, crime family slush funds, it's also

21   traditionally the case that those that are entrusted to

22   maintain those large stores of cash are also very high-ranking

23   individuals.

24              We mentioned several wiretap calls in our submission.

25   We gave one as an example showing the defendant holding the

1     purse strings.  Another individual called the defendant about

2     providing legal funds for an incarcerated consigliere of the

3     Genovese crime family.

4          One of the reasons they have a slush fund is, A, it's

5     "get out of Dodge" money, in case someone needs to flee, in

6     case of a threat, or frankly, a legal prosecution such as this

7     one.  It's also to fund legal defenses of people who

8     are incarcerated and also to fund loan shark and other

9     operations on the street.  Again, these facts are true only of

10    individuals who have that very high position of influence.

11         Judge, we submit that the evidence here is quite

12    strong.  It's not just one witness with a couple of

13    photographs.  It's a witness plus other witnesses and years of

14    recordings, wiretaps, photographs corroborating the existence

15    of the enterprise, the defendant meeting and speaking with

16    multiple other made members of the enterprise, and so forth.

17         The last fact I point to with respect to the risk of

18    flight here is the penalties here are substantial.  Based on

19    the charges, the offenses alone, the defendants are looking at

20    a guidelines range between five and six years, and based on the

21    seizure of the firearm, there's the potential for additional

22    charges, including a 924(c), the firearm charge, which could

23    add another five years on top of that sentence.  Based on the

24    facts right now, the defendant is reasonably looking at a

25    possible sentence in the 10-plus year range.

1      I'm sure this is mentioned in the defendant's

2  submission, and I'm sure defense counsel pointed out as well,

3  he has no criminal record, which means he has never done time

4  in jail, and I would submit that someone who has never faced

5  any sort of jail term, to have their first case be a federal

6  case, a wiretap case, with cooperating witnesses, with

7  consensual recordings, seizures of $4 million that would be put

8  before a jury, guns, brass knuckles, a dagger, a reasonable

9  mind, frankly, would look at that evidence and look at that

10  situation and say, I am not sticking around.

11      The final point I'd make here, Judge -- that's what

12  I'd submit on flight.

13      Just a few closing thoughts, Judge.  The defense is

14  proposing home incarceration with the Court.  I've already

15  spoken a little about the Second Circuit's warnings about how

16  home incarceration really doesn't address dangerousness.  I

17  would also point out it doesn't address the risk of flight when

18  you're talking about someone who has significant financial

19  resources and has the desire to flee.  Even if one had cameras

20  that were looking at the front door 24/7, and an ankle monitor,

21  all that would do -- no one is going to be looking at those

22  cameras 24 hours a day.  At most, law enforcement would likely

23  find out probably 10, 16 hours after the defendant flew the

24  coop if he chose to do that, that that Esposito is gone.

25  Judge, if someone with this kind of resources, this kind of

1  influence, this kind of cash, has a 12 to 16 hour lead on law

2  enforcement, he's gone, and you're not going to see him in this

3  courtroom again.

4          THE COURT:  Mr. Lenow, the conditions that Judge Moses

5  imposed included posting of the defendant's home on 77th Street

6  on the East Side of Manhattan.  Who is on the deed of that

7  home?  Is it only the defendant, or there's some indications

8  that his mother and sister live there as well?

9          MR. LENOW:  Yes, Judge.  Our understanding from

10  defense counsel at the bail argument is that Mr. Esposito owns

11  half that residence, and I guess his sister and his mother own

12  another part of it.

13          THE COURT:  When you say, "own another part of it,"

14  what does that mean?  It's just one.  Is it like a brownstone

15  of sorts.

16          MR. LENOW:  I'm a renter.  My knowledge of this area

17  is pretty limited.  I think defense counsel can address that

18  fact.

19          One point, in light of your Honor's question on that,

20  we have been reviewing the documents seized from the residence,

21  and there is indication that other members of Mr. Esposito's

22  family, including his sister, were involved in managing books.

23          Also, I'd point out I have some photos, if I can hand

24  them up to the Court of the cash.  Anyone in that residence who

25  is in there for five minutes or more is going to see what would

1  have been able to see and find the cash stored in various

2  locations would have been aware of the weapons.

3       Also the business records seized from the house

4  indicate that, as I said, again, Mr. Esposito's sister appears

5  to have been involved in helping him transfer money.  We have

6  serious concerns that other members of Mr. Esposito's family

7  either, A, certainly knew about this conduct, or B, frankly,

8  may have been active participants in it.  In terms of

9  cosigners, we are very concerned that, frankly, some of those

10 family members would not be appropriate cosigners.

11      And I would also note that while there is that one

12 building that your Honor mentioned, we are aware of a number of

13 other buildings that have substantial value.  There's one

14 building that Mr. Esposito recently rejected a $5 million offer

15 on.  He told pretrial that he had a number of properties, but

16 he didn't specify the locations, and so there are a number of

17 properties, which may be quite valuable, that were not -- that

18 we just don't have details about, frankly, at this point in

19 time.

20      If I can hand these photos up to the Court.

21      THE COURT:  A couple of initial questions.  The record

22 suggests that the market value placed on that residence on East

23 77th Street is something in the order of  $12 million.  What is

24 that based on?

25      MR. LENOW:  Your Honor, there are a number of Internet

1   sites that provide estimates of valuation.  I think that was

2   based on one of the most common, I think Zillow, which is a

3   commonly used tool that estimates the value of Manhattan real

4   estates.

5           THE COURT:  Turning now to your indications that the

6   defendant has properties in other locations, do you have any

7   means of determining what those properties are or otherwise

8   verifying exactly what properties the defendant possesses?

9           MR. LENOW:  Judge, we have some ability, and this kind

10  of goes to the root problem, because Mr. Esposito was not

11  truthful with pretrial services, I don't know if there's any

12  way to really determine the full extent of his holdings, his

13  real estate holdings, or his financial holdings, and that's

14  another reason why we can't be sure, because the seized

15  documents from this one residence indicate the existence of

16  what appear to be shell corporations and money being

17  transferred around multiple companies, some possibly

18  legitimate, but others that appear to be having large transfers

19  of cash that can't be explained based on the current record.

20          We're still looking into it, but the short story is,

21  we are trying.  I think we will learn more as we go forward,

22  but we just don't know.  Defense counsel, I'm sure, will be

23  able to make some proffer on these points, but their

24  information is only as good as what their client is telling

25  them, and because Mr. Esposito is, frankly, so dishonest with

1   pretrial services about having a firearm and about his

2   representing himself to have modest savings of a couple hundred

3   thousand dollars, I just don't think we're ever going to know

4   for sure.

5           When you have holding companies, when you have shell

6   corporations, when you're dealing with the Genovese crime

7   families, where there's a lot of cash, which we've seen a part

8   of, and a lot of wealth that's illicitly obtained, if the FBI

9   and the federal government have been trying for over 40, 50

10  years to try to trace the Genovese family's wealth and

11  holdings -- and we are doing our best -- but at the end of the

12  day, the name of the game is to launder money and conceal

13  assets.  So I don't think we're ever going to, frankly, be able

14  to get to the bottom of it for your Honor's bail consideration,

15  because that's part of the nature of the enterprise.

16          THE COURT:  Thank you.

17          MR. LENOW:  Judge, if I could just hand up these

18  photographs of the money.  I provided copies to defense

19  counsel.

20          THE COURT:  All right.

21          MR. LENOW:  Judge, I would just add one point.

22          I know that I said twice already, I understand -- I

23  conferred with defense counsel in advance of this bail

24  conference, and they informed me that they have a proposed

25  transcript of one of the wiretap calls.  This is the October 6,

1    2015 call where someone else, the government submits, informed

2    Mr. Esposito about an extortion. They have an alternative

3    reading of this.

4            Frankly, we listened to it again and we think we're

5    right; they think they're right. There's a dispute about the

6    meaning of the call, and I'm happy to kind of go into that

7    more, and maybe in response to the defense's submission.

8            Judge, what we pointed to and what I've referenced in

9    this bail argument, this one call is, frankly, a very small

10   piece, and it's related to someone else's extortion. Even if

11   you want to put that aside -- and I think you should consider

12   it and consider the fact that, frankly, we believe it reports

13   on a Genovese associate discussing an extortion that he

14   performed with Esposito. Even if you want to put that aside,

15   the defense doesn't seem to challenge the other recordings, the

16   seizure of the $4 million, the brass knuckles, etc., etc.

17   You'll hear argument on this. We think we're right. Even if

18   you want to put it aside, Judge, I think the case for

19   dangerousness and the case for flight here are both quite

20   strong.

21           THE COURT: Is there a dispute about the text of the

22   transcript?

23           MR. LENOW: Yes, your Honor. The defense contends the

24   words, which we believe is "extort," they believe it is

25   "explore." I'm happy to go into why we believe we are correct.

1          First of all, if you listen to it, which I think

2    there's a copy here if you'd like to hear it, we think it says

3    "extort," but second of all, we think the context supports that

4    reading.  I don't want to get into it if your Honor is not

5    prepared to kind of hear that level of detail at this point.

6          THE COURT:  Ms. Macedonio.

7          MS. MACEDONIO:  Thank you, Judge.

8          First, I'd like to point out that this is not a

9    presumption case.  Both pretrial services and Judge Moses

10   recommend that Mr. Esposito be released with certain conditions

11   in place.  The question for the Court, quite frankly is, is

12   there a combination of conditions that would reasonably

13   assure --

14         THE COURT:  Ms. Macedonio, let me stop you for a

15   moment and come back to Mr. Lenow.

16         Just one more question concerning the 3.8 million. As

17   I understand it, at the time that Judge Moses was imposing the

18   conditions of release, the FBI was in the middle of doing the

19   search of the homes.  They did not know at that point how much

20   cash there was.  The government at some point in the proceeding

21   indicated that it was something in the order of a million

22   dollars.

23         MR. LENOW:  Yes, Judge.

24         I think during the proceeding, we estimated to Judge

25   Moses that it was somewhere between a half million and a

1   million dollars.  We were literally getting some live update as

2   the bail argument was proceeding.  The final cash amount is

3   approximately four times what Judge Moses understood it to be,

4   which I ,frankly, would submit is a significant difference.

5           THE COURT:  Subsequently, at the time that she issued

6   the initial determination, the amount that she imposed was

7   $750,000.  Subsequently, that was increased by up to 6 million.

8   The government had requested 12; is that correct?

9           MR. LENOW:  Yes, Judge.

10          We had requested detention and I think what our

11  request was, based on what Judge Moses was going to do, which

12  was bail the defendant, we submitted that at the very least, in

13  light of the value of the property and the cash found, $750,000

14  would be woefully inadequate.  Our position was if the court is

15  going to do this, and we don't think the court should, at the

16  very least should be a bond number that is equal to the value

17  of that one property.

18          THE COURT:  At the time the magistrate judge increased

19  the amount of 6 million, did she have knowledge of the full

20  amount of the cash that was found in the home?

21          MR. LENOW:  She did not, Judge.  I think at most the

22  amount that was proffered to her would have been around $1

23  million in cash.

24          THE COURT:  Thank you.

25          Proceed, Ms. Macedonio.

1        MS. MACEDONIO:  May I have one moment, please?

2        May I proceed from here, Judge?

3        THE COURT:  Yes.

4        MS. MACEDONIO:  As I started to say, this is not a

5    presumption case.  Both pretrial services and Judge Moses

6    recommend that Mr. Esposito be released, that there is a

7    combination of conditions that would reasonably assure both his

8    return to court when necessary and the safety of the community.

9    Quite frankly, I think what the government is seeking is a

10   guarantee of that, and if that were the standard, then no one

11   would ever be released on bail.

12       I'm a little baffled, to say the least, because the

13   government stood up in its opening presentation and went into a

14   litany of crimes that they allege are committed by the Genovese

15   crime family and that they advance as part of the indictment in

16   this case.  Specifically extortions, but there are five

17   defendants charged in this case.

18       This is the only defendant who they are seeking

19   detention for.  All four of the other defendants are charged in

20   the racketeering conspiracy.  All four of those defendants are

21   charged with extortive behavior, yet this is the only defendant

22   who they are seeking detention for.

23       Two of those defendants that have been released with

24   the consent of the government have prior arrests, prior

25   convictions. Two of those defendants are intercepted on the

1  very phone calls or conversations that the government claims

2  are the people that the government claims are the people making

3  the threats; not Mr. Esposito but the other defendants in the

4  case who the government has agreed should be released on bail.

5      One of those defendants earlier today had his bail

6  enlarged to include the state of New Jersey.  Yesterday, with

7  the consent of the government, one of those defendants is being

8  permitted to go to Disney World.

9      I think just given that, it's almost laughable that

10  the government is going to stand here and say that this is such

11  a violent organization that this one particular defendant has

12  to be detained.  There certainly is a combination of conditions

13  that can guarantee that he comes back to court and ensures the

14  safety of the community.

15      The government talks in its bail memo to the Court

16  about interceptions of conversations.  Three of these tapes do

17  not contain Mr. Esposito's voice at all.  In fact, there are

18  other defendants who are contained on them, but again, those

19  people have been released on bail.

20      The government says that in one of the conversations,

21  that the cooperating witness references, his uncle.  Well, I

22  think I know who that cooperating witness is, and that

23  cooperating witness has five uncles, not just one.

24      They claim that "Vin" or "Vincent" is referenced

25  within that conversation.  Yet both of the parties

1    participating in that conversation are named Vincent.

2          Ordinarily, in a bail proceeding, the government,

3    after doing a long-term investigation and having years to go

4    through its evidence, figures out what they want to argue to

5    the court and during bail puts forward the best of the best.

6    The real zinger is to make sure that the defendant is going to

7    be detained, and this is what we're left with, other people

8    talking about Vin.

9          There is one conversation where Mr. Esposito is

10   recorded.  The government claims -- this is the disputed

11   conversation; I can hand up the transcript of it if your Honor

12   would like -- that the other participant in the conversation is

13   discussing with Mr. Esposito an extortion.

14         I have two points to make about that.  First of all,

15   in my experience, when members of organized crime or alleged

16   members of organized crime or criminals in general are talking

17   about getting funding or funds from people who they're not

18   entitled to, they never say, I checked out that extortion.

19   They never talk about an extortion.  Extortion is a term of

20   art.  It's a legal term.  Street people don't speak that way.

21   Then directly after they talk about an extortion, they don't

22   say things like, And then I went to the building department to

23   check it out.

24         With your Honor's permission, we'd like to play just

25   that clip.  It's highlighted on the second page.

1                    MR. LENOW:  Can we play the entire recording?

2                    MS. MACEDONIO:  Sure.

3                    MR. LENOW:  Is this the beginning?

4                    MR. SWERGOLD:  Your Honor, I think we'd like it played

5       from the beginning of what's on the transcript, which starts

6       with this -- why don't we begin with --

7                    THE COURT:  Start from the very beginning of what's in

8       the transcript, please.

9                    (Audio played)

10                   MS. MACEDONIO:  Judge, in this conversation you hear

11      two people discussing the renovation of a building and an empty

12      lot that's next door.  We're not talking about an extortion of

13      an empty lot.  He's talking about exploring the parking lot

14      next door and, "I went down to the building department and it

15      didn't work out."  That's one conversation that the government

16      refers to in its detention memo, and it's just clearly wrong.

17      It's just clearly wrong.

18                   The second conversation that they talk about, that

19      they refer to, discusses an individual who's in custody and is

20      needing some legal assistance.  Mr. Esposito's cousin calls him

21      and they talk about the idea of maybe getting a lawyer to help

22      him.  Part of that conversation includes a reference that no

23      one has the means to do it.  No one has the money to do it.

24      There's no indication that there was ever a lawyer hired for

25      this person.  In fact, I know that there wasn't, so whatever

1    the conversation was about, it clearly didn't happen, and

2    Mr. Esposito did not give funding for this purpose.  But his

3    cousin called and asked him, and I don't think that's unusual,

4    nor do I think that that's illegal.

5           So we have five defendants in the case.  Four of them

6    have been released on conditions with the consent of the

7    government.  So what's different about this defendant?  His

8    paternity.  Quite frankly, that's not something that the bail

9    statute considers.  This defendant should not be held in

10   custody simply because of who his father was.  That's not the

11   law.

12          With regard to the items that were found in

13   Mr. Esposito's family residence, I'd like to clear that up

14   right away.  The residence, the family has lived there for the

15   past 35 years.  This is not a residence that he himself

16   purchased.  His 83 year-old mother is -- he is the primary

17   caregiver for her and she lives in that residence with him.  So

18   does his sister.  His two sisters are present in the courtroom

19   today, along with a very close personal friend of his, for

20   support.

21          The ownership of that residence is as follows.

22          His mother is a 50 percent owner in the home.  The

23   additional 50 percent is split between Mr. Esposito and his two

24   sisters, so in essence, he owns one-sixth of the residence, but

25   that residence is available to be posted for a bond.  Given the

1  fact that it is the family residence, the residence where his

2  83-year-old mother lives, the residence where his sister lives,

3  the residence where he has lived for the last 35 years, I find

4  it insurmountable to believe that he is going to flee, evict

5  his 83 year-old mother and sister from the residence, despite

6  the fact that he may have interest in other properties.

7          THE COURT:  All the owners, Ms. Macedonio, are

8  prepared to sign the appropriate documents?

9          MS. MACEDONIO:  Yes, they are, your Honor.  Yes, they

10 are.

11         With regard to the items that were found in that

12 house.  We talked a little bit before about what impression

13 Magistrate Judge Moses was under when she determined bail.  At

14 that time, Magistrate Moses was told that there were two

15 firearms found in the house.  That's not true.  There was a

16 starter pistol that was found in the house and an inoperable,

17 unloaded .22 caliber gun.  That weapon was in pieces.

18 Moreover, from what I can tell from the inventory, there are no

19 bullets found from that gun.

20         On one floor there was a .22, unloaded, inoperable gun

21 that was found and on another floor there were bullets for a

22 .38 caliber gun.  There is no indication that this weapon was

23 ever fired.  There is no indication that this weapon was ever

24 brandished.  There is no indication that this weapon was ever

25 carried.  In fact, through the years of the government's

1   investigation, there's no indication that Mr. Esposito ever

2   carried a gun, that he ever brandished it, that he ever carried

3   those brass knuckles, or that he ever carried that knife.

4   These are items that are simply found in a home where this

5   family has lived for the last 35 years.

6          Most importantly, despite the fact that the

7   allegations in this indictment go on for well over a decade,

8   there's no allegation of actual violence.  While I understand

9   that extortion is a crime of violence by definition, there's no

10  allegation that anybody, any victim in this case, was ever

11  injured, other than perhaps financially.

12         With regard to the list of names, I don't know where

13  that list came from.  Judge, all I can tell you is they're not

14  going to find Mr. Esposito's fingerprints on it.  It's not in

15  his handwriting.  We have no idea how long it was there.  We

16  don't know what it means.  It's simply just a list of names.

17  The government really can't give you any clear explanation as

18  to what it would mean for Mr. Esposito to have that list of

19  names, even when your Honor pressed him for it.

20         There's a large amount of money that's found in the

21  house.  There's no denying that.  While I understand that cash

22  is a four-letter word, there's nothing illegal about having

23  cash.  Should he have told pretrial services about it?  Sure,

24  he should have.  Should he be required to give pretrial

25  services a more detailed accounting of his holdings?

1    Absolutely.  We will be prepared to do that.

2          THE COURT:  Stop there for a moment Ms. Macedonio.

3          The government made reference to other properties that

4    it believes Mr. Esposito possesses or owns.  Do you have such a

5    list of inventory or a statement of assets of Mr. Esposito?

6          MS. MACEDONIO:  I don't have an statement of the net

7    worth of them, but I can give your Honor an overview of what

8    they are.

9          THE COURT:  Let's not talk about overview.  If you're

10   going to go down that road, the government and the Court would

11   want documentation.  The government makes reference to

12   corporations for which moneys are being funneled or

13   transferred.  Do you know what those corporations are and what

14   role Mr. Esposito has in them?

15         MS. MACEDONIO:  Judge, I don't have a list of all the

16   corporations, and indeed, the government hasn't proffered them,

17   and instead what they simply said was that they're shady

18   corporations. I beg to differ.  These are corporations that are

19   publicly filed.  These are corporations that file tax returns.

20   These are corporations in which the Esposito family holds these

21   properties. This is the way they make legitimate money and pay

22   taxes on it.  They're not shady corporations that are just

23   funneling money from one institution to the next.  They just

24   don't understand what they are.

25         They executed a search, they got a bunch of documents,

1  and of course everything that this defendant does is illicit.

2  That's simply not the case.

3           THE COURT:  If you know what these corporations are or

4  what Mr. Esposito's role in or control of them may be, then

5  that should be documented in some form.

6           MS. MACEDONIO:  Absolutely.  I have no problem doing

7  that.

8           THE COURT:  Would you be prepared to provide such

9  documentation?

10          MS. MACEDONIO:  We would be prepared to do that.

11          THE COURT:  By when?

12          MS. MACEDONIO:  Monday.  I can meet with Mr. Esposito

13  over the course of the weekend, or Monday, and get that

14  together.

15          THE COURT:  All right.

16          MS. MACEDONIO:  May I continue, your Honor?

17          THE COURT:  Well, let's put some more details on that.

18  What we're interested in is not only the corporations, whatever

19  assets the corporation may have, the worth, what Mr. Esposito's

20  role is in those corporations, and to what extent his role is

21  controlling them.

22          MS. MACEDONIO:  Very well, your Honor.

23          THE COURT:  And who else may have interests in those

24  corporations.

25          MS. MACEDONIO:  We'll be happy to provide that

1  information, Judge.

2          THE COURT:  All right.

3          MS. MACEDONIO:  Judge, I think I outlined very clearly

4  in our letter to the Court this defendant's individual

5  characteristics.  He's 50 years old.  He's a man who's lived in

6  New York City his entire life.  He went to Loyola High School

7  and then New York University, where he earned his bachelor's

8  degree.

9          He has had no contact with the criminal justice

10  system.  While the government in this proceeding would like to

11  turn that on its head and say that gives him an incentive to

12  flee, if he had had contact with the criminal justice system,

13  they would have used that too.  Quite frankly, I think that's a

14  disingenuous argument on their part.

15          He is willing to post the family residence, as we've

16  discussed.  He is the primary caregiver of his 83-year-old

17  mother.  He has no history of drug abuse or alcohol abuse.  He

18  has no history of travel.  He last traveled outside the United

19  States 12 years ago to attend a friend's wedding.

20          Part of what we would propose is that his mother and

21  his sisters also surrender their passports.  We think that

22  gives him another incentive not to flee.

23          In addition to posting the home, we have proposed, but

24  it has been rejected by the government, that we set up external

25  video surveillance that the government can tap into whenever

1  they wanted.  Again, we would be willing -- or we will, rather,

2  give a more fulsome financial accounting.

3        (Counsel and defendant conferred)

4        MS. MACEDONIO:  What I think Mr. Esposito is trying to

5  convey to me is his tax returns give a more fulsome accounting

6  of his properties and we would be willing to give those to the

7  government as well.

8        THE COURT:  Ms. Macedonio, you made reference to your

9  offer of having videos of the home and the government rejected

10  that.  What are the particulars of that?

11        MS. MACEDONIO:  We would set up video surveillance

12  outside the entrance of the home that would be a 24-hour

13  monitor.  That feed would be stored, saved, so that if the

14  government wanted it and at some additional point, they would

15  have it.  We could also set up a system where the government

16  would be able to tap into at any particular moment if they

17  wanted to.  Those are things, given the technology of today,

18  that are easy to accomplish.

19        The government talks about the idea that Mr. Esposito

20  would be able to disappear and no one would know for 12 hours.

21  I beg to differ.  I've had cases where I have had clients on

22  electronic monitoring and pretrial services knows immediately

23  if they're outside the area, where they're supposed to be.

24        I just think, Judge, given the idea that the

25  government in this same case with the same allegations with

1   four other defendants has consented to a much less restrictive

2   bail, I think that bail should be granted in this case.  I

3   firmly believe that there is a combination of conditions that

4   would reasonably assure this defendant's appearance in court

5   and the safety of the community, and I just don't believe that

6   the government has provided clear and convincing evidence to

7   the contrary, your Honor.

8       I would ask that bail be set with all of the

9   conditions set by Judge Moses, which include home

10  incarceration.  He would not be permitted to leave his home

11  unless he were coming to counsel's office.  He would not have

12  any contact with any of his codefendants.  The reality of it is

13  no one other than the immediate family goes into the Esposito

14  home, but if the government wanted to give us a list of people

15  to exclude, we'd be happy to accommodate them.  There's just no

16  reason not to.  Those, I think, are reasonable conditions,

17  Judge.  There's never a guarantee, but that's not the standard.

18      THE COURT:  Ms. Macedonio, what is the status of the

19  defendant's compliance with the terms set by Judge Moses as of

20  today?

21      MS. MACEDONIO:  Once this appeal was taken, we focused

22  in on responding to that, and we haven't followed through on

23  the conditions, but we can do that promptly.

24      THE COURT:  Theoretically, you've not met the

25  conditions?

1          MS. MACEDONIO:  Not because we can't, but because we

2     haven't tried.

3          THE COURT:  Anything else?

4          MS. MACEDONIO:  I think that the package that we have

5     proposed is certainly much more expansive than the one pretrial

6     services recommends.  It certainly is much more expansive than

7     the one that Magistrate Judge Moses imposed.  I think it's a

8     reasonable package that satisfies the statute.

9          Just one other point, your Honor.

10         May I have a moment?

11         THE COURT:  Yes.

12         MS. MACEDONIO:  Thank you, Judge.

13         MR. LENOW:  Judge, may I?

14         THE COURT:  Mr. Lenow, yes.

15         MR. LENOW:  Thank you, Judge.

16         Defense counsel's proposition is that the Court can

17    trust that Mr. Esposito will not flee if the conditions were

18    such that he is under 24/7 surveillance, if there are

19    limitations who he can see at what point in time, if there's

20    monitoring of his whereabouts on a continuous basis.

21         Judge, that's the MCC.  There is no way to have the

22    defendant be out and have him being monitored on a relatively

23    continuous basis.  The reality is when pretrial -- I'm sure

24    your Honor has experienced this.  When we learn that someone

25    has fled or left their apartment, what happens next is usually

1  an AUSA will meet with a marshal.  We'll try to find the recent

2  phone that we can get a tracking warrant on.  Friends will

3  start to be interviewed.  In almost all cases, friends and

4  families lie about the whereabouts of their family members.  It

5  usually takes a process of at least a couple of days or weeks

6  if you have a good lead -- for example, a Facebook page or a

7  phone line or something like that.

8        Also, my understanding is that pretrial does not

9  monitor electronic monitoring overnight.  The FBI and U.S.

10 Attorney's Office don't have the resources to sit in front of a

11 camera for 24 hours a day and monitor Mr. Esposito.

12       These things sound good.  They have the ring of

13 providing security to the Court, but these types of things that

14 Ms. Macedonio mentioned, it seems that there was a concession

15 that those conditions are necessary and the only real way to

16 actually implement them is to have the defendant detained.

17 Frankly, I would submit that this proposal has the ring of

18 something that would sound attractive and like a middle ground

19 but in practice is going to be ineffectual.

20       A couple other points.  There's a discussion about

21 other defendants.  Each of these defendants is unique and

22 there's a reason we consented.  We found a set of conditions we

23 are comfortable for the other ones.

24       Mr. Arena, for example, has severe health problems.

25 Frankly, we would have sought detention but for those health

1  problems.

2      The other defendants are in a very different situation

3  financially.  The millions and millions of dollars of cash,

4  that's just Mr. Esposito.  The lying and seizure of firearms,

5  just Mr. Esposito.  The brass knuckles, the dagger, just

6  Mr. Esposito, and that high rank, just Mr. Esposito.  He really

7  is a singular defendant, and we don't approach these situations

8  arbitrarily.

9      There's a reason why he's the only one that we sought

10  detention for, and frankly, I would submit there's a bit of a

11  concession from defense, in light of these conditions we're

12  proposing, that there are real risks of flight and

13  dangerousness in this case.  Mr. Esposito is singular and

14  different.  That's why we're here and that's why we're talking

15  about the unique facts as applied to him.

16      A couple other, smaller points too, just to respond.

17  The New Jersey list, the deadman list and the list of live made

18  members in New Jersey, some of those individuals have been made

19  relatively recently or have died recently, after, for example,

20  the death of the defendant's father.  The notion that this is

21  just inherited and left over, for example, from a time of

22  bygone days when his father was the boss, we submit, doesn't

23  hold water.

24      Again, we will produce discovery.  We're producing it

25  very soon.  We think Ms. Macedonio doesn't have the inventory

1  and the photographs, but the gun was, I believe, from speaking

2  with the FBI -- they told me it was found assembled.  There

3  hasn't been an operability test on it.  I know of no reason why

4  it wouldn't be operable.  It has a firing pin.  We don't know

5  one way or the other, so I can't represent if he ever fired it.

6  I don't think we know at this point.  There was .22 caliber

7  ammunition found and it's a .22 caliber gun.  There is

8  ammunition for that gun.

9         Some people keep Civil War guns on the mantle place.

10  They usually don't have musket balls because they don't intend

11  to fire the musket.  That's when you have an ornamental gun.

12  When you actually have ammunition for a gun, it's because it's

13  meant to be used.

14         There is a point about a mention of violence and the

15  absence of violence in this particular extortion conspiracy.

16  The Genovese family has made clear over the last couple of

17  decades when they want to use violence, they can.  Here, the

18  extortion payments were paid until the FBI made approaches and

19  people became aware that the FBI was looking into this.  There

20  was an additional guarantee of that, but payments were made for

21  many, many years.  That's why, Judge --

22         THE COURT:  Let me just pursue some of this point.

23  The actual threats and the messages that were carried out of

24  extortion, which the government contends were directed by

25  Mr. Esposito, they were carried out by the other defendants,

1    presumably?

2            MR. LENOW:  Yes, your Honor.

3            THE COURT:  From that perspective, aren't those other

4    defendants threats to the community?  If they're the ones who

5    actually carried out the extortion, then it doesn't matter

6    whether the message of extortion came from Mr. Esposito or

7    somebody else in the family.

8            MR. LENOW:  Your Honor, two points on this.

9            One is that it's the fact that the threat is coming

10   with the backing of Mr. Esposito and his organization, is what

11   makes it a real threat.  It's kind of like if an insurance

12   adjuster comes up to you in front of your house and says,

13   That's a great house; it would be shame if anything would

14   happen to it.  You'd infer one thing.

15           If someone you know is representing a ranking member

16   of the Genovese family comes up and says, That's a really nice

17   house; it would be a shame if something happened to it, it has

18   an entirely different meaning and it's the organization and the

19   pull and the power of the person you know that threat is coming

20   from that makes it a real and credible threat.

21           In this case Mr. Esposito used a number of different

22   individuals, not just individuals charged in this case.  There

23   are others that are still under investigation that conveyed

24   these threats on his behalf as well.  A number of those other

25   individuals have not yet been arrested and are at liberty.

1          THE COURT:  Let me stop you there.  Presumably

2     Mr. Esposito is not a free agent within the family.

3          MR. LENOW:  I'm sorry, Judge.

4          THE COURT:  Presumably Mr. Esposito is not a free

5     agent within the family.  If he was conveying threats through

6     Mr. Arena or Mr. Giovinco, and Mr. Esposito is incapacitated,

7     do you think that Mr. Arena and Mr. Giovinco have no way of

8     carrying out the threats that they were carrying out up to this

9     point?

10          MR. LENOW:  Your Honor, with respect to those

11     individuals, Judge, we believe that they're a lower rank in the

12     organization.

13          THE COURT:  They were carrying out threats and now

14     they are free.  The question is, is it possible that they could

15     be dangerous to the community because they'll be carrying out

16     threats, out there free, on behalf of some other member of the

17     family?

18          MR. LENOW:  Judge, the answer is yes.  In every

19     situation and every proceeding, frankly, we have to make

20     decisions based on a number of things involving individuals'

21     health and current family situation about where the threat

22     level lies and how serious it is.

23          We do have serious concerns about Mr. Arena.  We do

24     have serious concerns about Mr. Giovinco, but in light of

25     Mr. Arena's age and health condition, we believed that,

1  frankly, it made incarceration a different calculus than

2  Mr. Esposito, who is a person who is quite healthy, and also

3  Mr. Esposito sits above them in the organization.

4       Really at the end of the day, when you're talking

5  about low-level individuals who are making threats, to some

6  extent some of them are pawns.  Some are high-ranking pawns.

7  Some are low-ranking pawns.  The point is, it is the individual

8  who is higher up and pulling the strings who is making the

9  calls.

10      Look, Judge, we agree that there are other

11  high-ranking individuals in addition to Esposito, but he does

12  hold, as our submissions make clear, great authority.  He does

13  have autonomy.  Judge, the history in this district, the

14  reality is that in these cases witness intimidation and

15  retaliation are very real threats.

16      THE COURT:  Let's talk a moment, then, about history

17  in this district.

18      Do you have any indication that in the history of this

19  district, once a member of the crime family is put in the MCC,

20  there's no way to control or send messages or to exercise the

21  same kind of supervisory role that they had before?

22      MR. LENOW:  Judge, the answer to that is that their

23  ability is diminished.  Unfortunately, the reality is --

24      THE COURT:  Diminished.  Diminished can be from 100 to

25  90.

1          MR. LENOW:  Judge, what I'd say is this.  In the

2     modern world, in terms of conveying if you're a higher-up in an

3     organization and you want to convey threats, there's two ways

4     you can do it, cell phone or in person.  The reality is there's

5     no way we're going to be able to control having cell phones

6     snuck into the residence, and frankly, I think it also would be

7     possible if people are able to come and go freely,

8     Mr. Esposito's family members could convey messages to and from

9     him.

10          But it's really the risk of cell phones.  I do think

11     that when you're talking about prisons, the MCC and the MDC,

12     the reality is sometimes people do sneak phones in, but I

13     think, frankly, they're very, very successful in keeping the

14     majority of phones out.  I won't go into the details.  I've

15     done a tour of the MCC.  They have shown me the metal

16     detectors.  They really do look everywhere.

17          When you're talking about someone's own residence,

18     where the family members are coming and going, and a prison, if

19     you're a higher-up in a criminal organization, there's no

20     question that Mr. Esposito is going to have of ready access to

21     cell phones and other devices to communicate at his residence.

22          Also, there's that flight concern, Judge.  Prison is

23     the only way to really limit his access to communication

24     devices and to ensure that he's not going to within frankly 12

25     to 18 hours at least of lead time say, You know what?  I don't

1    want to face 10 years in jail.  I'm out of here.

2              Judge, if I could just address two other points.

3              With respect to the transcript, a couple things.  One

4    is, you heard the audio.  We respectfully submit the word used

5    was "extortion."  We think it's clear.

6              Defense counsel says our interpretation doesn't make

7    sense.  We think it does.  If you look at the transcript that

8    defense has written, I think we disagree with some parts, but

9    there are some things we agree about.  For example, in the

10   first paragraph, there's a discussion about, "Why don't you

11   give anybody any work?" I would point out that is, I think, on

12   its face incriminating for the reason that one of the ways that

13   crime families traditionally share that large influence is by

14   throwing work in someone's direction, for example, a no-show

15   job, other sorts of income that are not deserved but are given.

16   I think that expression in and of itself is a common phrase

17   used in that type of arrangement.

18              Also what follows that interaction --

19              THE COURT:  The "work" portion?

20              MR. LENOW:  Judge, it can be used in multiple ways.

21   In the drug business, "work" oftentimes does mean heroin,

22   cocaine.  Here, you'll note that after the exchanges were

23   counted, Mr. Esposito talks about, "this guy almost falling on

24   the floor.  He paid for his drink and ran out."  In other

25   words, there's interaction here where Mr. Esposito is talking

1   about how some guy is not holding up his end by giving people

2   work, he's confronted by Mr. Esposito, and the other guy runs

3   out of the bar, or whatever the location is, because he's

4   intimidated by Mr. Esposito because of his reputation.

5        Also in terms of the extortion.  Again, the word

6   "extortion," we believe, is used in the transcript.  We submit

7   that that is the word used.  But even after that, it talks

8   about going to the building department.  We respectfully submit

9   that's simply an attempt to continue the extortion.  It is

10  actually, unfortunately, common that at low levels of municipal

11  government, there are attempts to bribe individuals for various

12  reasons, and frankly, that can be the case here.

13       Also, Judge, the other thing that doesn't make any

14  sense, in the defendant's interpretation, Mr. Esposito says --

15  and this is the second line after the 120 mark -- he

16  says, "that didn't work," which doesn't make any sense if

17  you're saying, I went over to explore the parking lot, saying,

18  "that didn't work."  What makes sense is he tried to do an

19  extortion and the extortion didn't work out.

20       There is this talk that people don't use words like

21  "extortion."  There's another recording in this case with

22  Mr. D'Acunto where the word "extortion" is used.  The other

23  part of the conversation says, Yes, this is the extortion.

24  That's the reality of it, something along those lines.  That

25  word is a word that's used in conversations in this case.

1          Judge, also back to the transcript for a second,

2     you'll notice after the word "extortion" is used, Mr. Esposito

3     seems to kind of quickly get off the phone.  He's sensitive to

4     the notion that that word has been used.  He said, All right.

5     I'm getting off the phone.  I'll talk to you later.

6          There's other reports in this case, Mr. Giovinco, for

7     example, says, "don't trust these phones."  A number of

8     organized crime cases have been broken up by wiretap, numerous,

9     so there is a sensitivity to talking on the phone.

10    Mr. Esposito hears this word and he gets off right away.

11         One moment, your Honor.

12         I understand, Judge, that you had some questions about

13    the other defendants.  Look, we do have concerns about the

14    dangerousness risk of those defendants.  There were very

15    stringent conditions imposed upon them, but no weapons were

16    seized from them, with the exception that some of them declared

17    openly that they had weapons.  They were honest about the

18    weapons they had.  They didn't lie about it.

19         They are lower ranking, and also the flight issue,

20    frankly, is not as present with respect to them.  Those are not

21    people who, frankly, are facing a potential 924(c) five-year

22    charge in light of a seizure of a firearm.  These are not

23    people who would likely be getting all the leadership

24    enhancements under the guidelines.  They face lesser sentences.

25         There really are things that distinguish them.

1    Mr. Esposito is higher ranking.  I won't go through all the

2    factors again.  Your Honor has heard our submission on that

3    point.

4         One other correction.  The standard for flight is

5    preponderance.  It's not clear and convincing.  That is only

6    with respect to violence.  I just wanted to make that clear,

7    because I think defense counsel mentioned the standard across

8    the board.  It wasn't clear there is a difference of standard.

9    The standard for flight is preponderance of the evidence.  It's

10   a lower standard.

11        The last point I'd make, Judge, there was a statement

12   made at the initial bail conference, and at the end of this

13   bail conference that the government is indicting or going after

14   Mr. Esposito because of his paternity.  It's not a crime to be

15   someone's son, Judge, 100 percent correct, and never for a

16   second have we alleged that that's the case.

17        It is relevant, Judge, though, in a case of organized

18   crime case, where family is oftentimes intertwined with the

19   enterprise, that someone is the son of a very, very powerful,

20   some might have said one of the most powerful or the most

21   powerful mob boss of his time, that gives you access and it

22   gives you a possibility of gaining influence, that,, frankly, a

23   man off the street just doesn't have.  It is relevant when what

24   Mr. Esposito is charged with is his crimes, his extortions.

25   His father is not the one who has $4 million in the house,

years after his father passed away, bills that are relatively

recent vintage, I would point out.  You have a photograph of

them.  These are 100-dollar bills that have been printed in

relatively recent time.  His father is not the one who has

brass knuckles, a gun, .28 caliber ammunition, .22 caliber

ammunition.  The father wasn't the one controlling the purse

strings of the family in the last few years.  The father isn't

the one who lied at pretrial.

It's a nice sound byte.  This isn't about the father.

This is about the son, and respectfully, Judge, the son is

dangerous and he poses a significant risk of flight.

THE COURT:  One other question, coming back to

Ms. Macedonio's reference to surveillance cameras, indicating

that the government had rejected that offer, what is your view

of the feasibility of surveillance cameras in and out of the

house and also posting round-the-clock security?

MR. LENOW:  Judge, I will admit that I have not had

personal experience with that.  What I can say is, look, our

office and the FBI don't have the resources to devote 24/7

surveillance.

THE COURT:  Even if somebody else pays for it?

MR. LENOW:  Judge, look, here's what I would submit.

Defense counsel has made some proposals and has stated there

will be more information forthcoming about Mr. Esposito's

finances, because obviously initial information provided to

1    pretrial was not accurate.  I don't think anyone's disputing

2    that those were lies.  We are in a position now where, again,

3    we're flying blind, as I said.

4         What I would suggest is that if defense counsel wants

5    to put together, A, a complete summary and accurate summary of

6    the defendant's finances, and B, wants to come up with a right

7    proposal that involves people manning cameras 24/7 and limiting

8    interactions and finding a way for cell phones not to go in and

9    out of the house, or at least suggesting ways, let's consider

10   that when that happens.

11        I really think as of now we're talking in theory.

12   Practically speaking, for the reason I said earlier, if you

13   want to watch someone 24 hours a day, know who they're meeting

14   with and record their calls, the only way to do that is to have

15   them be incarcerated pending trial.

16        If defense counsel can come up with a proposal, we'll

17   certainly evaluate it the Court can evaluate it.  Right now

18   we're operating in the world of theory.  Technology is great,

19   but let's see if it can do everything that defense counsel

20   hopes it can, but then let's deal with it at the time.

21        Right now, based on the facts the Court has at his

22   fingertips, I would submit we're flying blind.  The Court

23   cannot make an informed decision about the risk of flight

24   without more information on assets.  The Court does know, I

25   would submit, that this individual is a dangerous person and

1    should be detained on those grounds.  If we're going to get

2    into this world of possibly putting video cameras and having

3    armed security at the door, maybe that's a possibility.  We'll

4    see what the proposal is.  We just don't know right now.

5              THE COURT:  Thank you.

6              Ms. Macedonio, you've heard what the government

7    indicated.  Is this a direction that you think might lead to

8    some feasible proposal that the defense may be able to adopt?

9              MS. MACEDONIO:  Judge, I think we should set bail

10   today.  I am perfectly willing to continue to talk with the

11   government to make sure that whatever I proffer as far as the

12   security systems actually is in effect, but I think that your

13   Honor has heard enough argument on this and bail should be set

14   today.

15             May I respond just briefly, if your Honor is

16   interested?

17             THE COURT:  Yes.

18             MS. MACEDONIO:  The defense is not conceding that all

19   of these things must be put in place.  Rather, what we're

20   trying to do is offer up some alternatives for the Court if

21   your Honor is uncomfortable, but we're not conceding that

22   Mr. Esposito should essentially be at the MCC, as the

23   government suggests.  As your Honor queried from the

24   government, there's no certainty that illegal messages aren't

25   passed from the MCC.  There's no certainty that people at the

1    MCC don't have cell phones.

2         I think, quite frankly, the package that we've

3    presented to the Court is more than enough, but it certainly

4    doesn't mean that we are conceding that he should be in an

5    environment that is essentially the MCC, and therefore, you

6    should put him there.  That's not what we're saying at all.

7         The government talks about his rank in the

8    organization and how that is so important, but they don't seem

9    to be able to clearly articulate what that is, if anything at

10   all, quite frankly, because on the day of his arrest, he was

11   simply a person of influence.  One week later, he was a

12   high-ranking member.  I don't know how that happened while he

13   was at the MCC, but their theory of who he is it seems to be

14   constantly in flux.

15        With regard to the 924(c) count, again, there is no

16   indication that any weapon was ever carried anywhere, so that

17   threat just seems to be exactly that, an empty threat.

18        With regard to the idea that the weapons are

19   indicative of his willingness or his ability to commit acts of

20   violence, they have the weapons.

21        With regard to money being able to assist him if he

22   decides to flee, they have the money.  Properties that are

23   owned in corporations, in the names of corporations can't

24   readily be liquidated, and in fact, we would be willing to hold

25   the deeds to those properties in an attorney's escrow account

1   to make sure that they couldn't be liquidated, unless the Court

2   said it was OK.

3        I think given everything that we've proffered, your

4   Honor is in a position to set a very restrictive bail to ensure

5   both the safety of the community and Mr. Esposito's return to

6   court.

7        THE COURT:  Thank you.  I think we've heard enough

8   argument.

9        The Court has reviewed the documentation notes

10  submitted, including the transcript of the previous hearing.  I

11  think that this hearing has indicated that there are items of

12  information that are important for the Court to have before it,

13  a package, that the defense has indicated that it can produce,

14  some form of inventory of Mr. Esposito's assets.

15       They've offered proposals regarding surveillance

16  cameras and possibly some form of security surveillance by

17  individuals, armed guards.  All of these are potential options

18  that ought to be explored before the Court sets a package,

19  because the answers to some of those questions could influence

20  what the Court may deem to be appropriate conditions.

21       What I am inclined to do is to give the parties time

22  to collect the information that we've talked about, review it,

23  consult with one another, and see whether a package can be

24  forged with those elements, and if not, we can come back in a

25  few days, and at that point the Court can determine what might

1    be the appropriate conditions for bail.

2         Why don't we adjourn for one week.  That should be

3    sufficient for the parties to have time to develop answers to

4    these questions and to consider possibilities and have some

5    gauge on productive discussions.

6         Let's adjourn until Monday of the following week.

7    That's February 5, in the afternoon, at 2:00.

8         Is that day suitable for the government?

9         MR. LENOW:  Yes, your Honor.

10        Just to be clear, I assume this is the case, we assume

11   there will be a stay of the magistrate court bail conditions

12   pending your Honor's resolution of this matter?

13        THE COURT:  Yes.

14        MR. LENOW:  The other point is, in terms of the

15   information that we think would be necessary and helpful for

16   the government and the Court to make an assessment of the

17   finances, we understand that what we're talking about here

18   would just be this information about all corporations;

19   structures similar to corporations, like trusts; members of

20   corporations of those bodies; any restrictions on the release

21   of assets; encumbrances; and then in addition to that, the

22   disclosure of finances in the form of tax returns and that sort

23   of thing.

24        THE COURT:  And the value of any such properties.

25        MR. LENOW:  Also the location amount of any cash

1  assets of those that were seized.  Also, I guess, corporation

2  property and personal property that has a significant value,

3  cash, gold, jewels, that sort of thing.

4          THE COURT:  Yes, that's all encompassed in the

5  inventory we're talking about.

6          MR. LENOW:  And real estate, Judge.

7          THE COURT:  Yes.

8          MR. LENOW:  Thank you very much.

9          THE COURT:  Ms. Macedonio, anything else?

10          MS. MACEDONIO:  No.  Thank you, your Honor.

11          (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT C

RECEIVE

FEB 0 5 2018

CHAMBERS OF
ALVIN K. HELLERSTEIN
U.S.D.J.

U.S. Department of Justice

United States Attorney
Southern District of New York

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

February 5, 2018

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/6/18

**BY ECF**
The Honorable Alvin K. Hellerstein
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

So ordered,
2-6/18

Re: *United States* v. *Joseph Cammarano, et al.*, 18 Cr. 015 (AKH)

Dear Judge Hellerstein:

The Government respectfully submits this letter, jointly with defendant Joseph Cammarano, Jr, to propose the following bail conditions for the Court's consideration, to ensure the safety of the community and the defendant's appearance in Court:

1) A $4,000,000 bond, secured by the properties located at (i) 3 Glenwood Court, Glen Cove, New York, and (ii) 543 Meeker Avenue, Brooklyn, New York.

2) The bond shall be co-signed by three financially responsible persons approved by the Government.

3) The defendant shall be subject to home incarceration enforced by electronic monitoring.

4) The defendant shall install a video security system at his home (the "Security System"), with the following specifications:

   a. The Security System shall include cameras that continuously monitor the front door, rear entrance, and garage of his home;

   b. Designated law enforcement agents shall have real-time access to the Security System;

   c. All video footage shall be retained and provided to designated law enforcement agents on the first of every month;

   d. Only law enforcement agents shall have access to the password and settings for the Security System.

5) The defendant shall submit a list of visitors to the Government for approval, and no one shall be allowed to enter or exit the defendant's home unless they are on the visitor list, or unless otherwise approved by the Government.

February 5, 2018
Page 2

6) The defendant shall not use any cellular telephone or other electronic communication device.

7) The defendant's travel is restricted to the Southern and Eastern Districts of New York.

8) The defendant shall surrender his passport to Pretrial Services, and shall not make an application for any new travel documents.

9) The defendant shall be subject to strict Pretrial supervision.

10) The defendant shall not possess any firearms, destructive devices, or other weapons.

11) The defendant shall have no contact with any co-defendants unless in the presence of counsel.

12) The defendant shall have no contact with any known witnesses or victims. This provision does not limit the ability of third parties assisting in the preparation of the defendant's defense, such as counsel or investigators, from contacting known victims or witnesses.

13) The defendant shall not be released until all conditions of release have been met.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

By: /s/_____
Jason M. Swergold / Jessica Greenwood
Assistant United States Attorneys
(212) 637-1023 / 1090

cc:   Elizabeth Macedonio, Esq. (counsel for Joseph Cammarano, Jr.)

# EXHIBIT D

ORIGINAL

DOCKET No. 18cr14

DEFENDANT Vincent Esposito

AUSA Jason Swergold

☐_____ INTERPRETER NEEDED

DEF.'S COUNSEL Flora Edwards
☑ RETAINED  ☐ FEDERAL DEFENDERS  ☐ CJA  ☐ PRESENTMENT ONLY

☐ DEPENDANT WAIVES PRETRIAL REPORT

☐ Rule 5  ☑ Rule 9  ☐ Rule 5(c)(3)  ☐ Detention Hrg.

☐ Other: _____

DATE OF ARREST 1/10/18          ☐ VOL. SURR.
TIME OF ARREST 6-6:30am        ☐ ON WRIT
TIME OF PRESENTMENT 5:40pm

## BAIL DISPOSITION

                                                                    ☐ SEE SEP. ORDER
☐ DETENTION ON CONSENT W/O PREJUDICE     ☐ DETENTION: RISK OF FLIGHT/DANGER  ☐ SEE TRANSCRIPT
☐ DETENTION HEARING SCHEDULED FOR: _____
☐ AGREED CONDITIONS OF RELEASE
☐ DEF. RELEASED ON OWN RECOGNIZANCE
☑ $6 million      PRB  ☑ 3      FRP
☑ SECURED BY $_____ CASH/PROPERTY: home on E. 77th St. Manhattan
☑ TRAVEL RESTRICTED TO SDNY/EDNY/_____
☐ TEMPORARY ADDITIONAL TRAVEL UPON CONSENT OF AUSA & APPROVAL OF PRETRIAL SERVICES
☑ SURRENDER TRAVEL DOCUMENTS (& NO NEW APPLICATIONS)

☑ PRETRIAL SUPERVISION:  ☐ REGULAR  ☑ STRICT  ☐ AS DIRECTED BY PRETRIAL SERVICES
☐ DRUG TESTING/TREATMT AS DIRECTED BY PTS  ☐ MENTAL HEALTH EVAL/TREATMT AS DIRECTED BY PTS
☐ DEF. TO SUBMIT TO URINALYSIS; IF POSITIVE, ADD CONDITION OF DRUG TESTING/TREATMENT

☑ HOME INCARCERATION  ☐ HOME DETENTION  ☐ CURFEW  ☑ ELECTRONIC MONITORING  ☐ GPS
☑ DEF. TO PAY ALL OF PART OF COST OF LOCATION MONITORING, AS DETERMINED BY PRETRIAL SERVICES

☐ DEF. TO CONTINUE OR SEEK EMPLOYMENT  [OR]  ☐ DEF. TO CONTINUE OR START EDUCATION PROGRAM
☑ DEF. NOT TO POSSESS FIREARM/DESTRUCTIVE DEVICE/OTHER WEAPON

☑ DEF. TO BE DETAINED UNTIL ALL CONDITIONS ARE MET
☐ DEF. TO BE RELEASED ON OWN SIGNATURE, PLUS THE FOLLOWING CONDITIONS: _____
_____ ; REMAINING CONDITIONS TO BE MET BY: _____

## ADDITIONAL CONDITIONS/ADDITIONAL PROCEEDINGS/COMMENTS:

Defendant to have no contact with co-defendants except in presence of counsel. Defendant to have no contact with known victims or witnesses.

☑ DEF. ARRAIGNED; PLEADS NOT GUILTY          ☑ CONFERENCE BEFORE D.J. ON 1/26/18
☐ DEF. WAIVES INDICTMENT
☑ SPEEDY TRIAL TIME EXCLUDED UNDER 18 U.S.C. § 3161(h)(7) UNTIL 1/26/18

For Rule 5(c)(3) Cases:
☐ IDENTITY HEARING WAIVED               ☐ DEFENDANT TO BE REMOVED
☐ PRELIMINARY HEARING IN SDNY WAIVED    ☐ CONTROL DATE FOR REMOVAL: _____

PRELIMINARY HEARING DATE: _____     ☐ ON DEFENDANT'S CONSENT

DATE: 1/10/18

UNITED STATES MAGISTRATE JUDGE, S.D.N.Y.

# EXHIBIT E

REDACTED

# EXHIBIT F

REDACTED

# EXHIBIT G

**REDACTED**

# EXHIBIT H

REDACTED

# EXHIBIT I

Oscar Cragwell
410 East 6th Street, #7-1
New York, NY 10009
+1 (917) 406-0816
oscar.cragwell@gmail.com

February 5, 2018

Honorable Victor Marrero
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

**RE: Character Letter on Behalf of Vincent Esposito**

Dear Judge Marrero:

I am writing in support of Vincent Esposito with whom I have been acquainted for over 30+ years. Having attended Bard College with his elder sister, Lucia Esposito, I first met Vincent on campus during a family visit; from that first meeting, it was clear to me that the bond that exists between and among the Esposito family is one that is typified by love, caring and support.

After obtaining an MBA from Columbia University, I spent much of my professional career in the banking industry, but it is worth noting that I also have a Master's degree from the Silberman School of Social Work at Hunter College. For the past five years, I have been counseling patients and while I recognize that the charges alleged against Vincent are of a serious nature and that he will appear in your court to argue for bail, I feel a strong responsibility to present my honest assessment of Vincent Esposito's outstanding character traits. In my estimation, Vincent's probity, intelligence, kindness, and, most importantly, his commitment to his family, all significantly recommend him and, therefore, merit the highest consideration.

Vincent's relationship to his family is exemplary: he has always been a stalwart champion of his sisters and their myriad endeavors. Whether with sound professional advice or reasoned emotional support, Vincent has consistently been a source of comfort—Lucia and Carmella couldn't ask for a better, more ardent brother. With regard to his mother, Vincent's personal strength buoyed her spirt throughout her battle with lung cancer and continues to do so now as she enters her ninetieth decade. Vincent has also been a lifelong resident of the Upper Eastside community; Manhattan is the only home he has ever known. In my estimation, the ties Vincent has to his family and community supersede all else in his life and are a meaningful deterrent to flight from the jurisdiction. I am confident that Vincent is exactly the type of person who will argue persuasively in court to exonerate himself from these charges in order protect his own reputation and that of his family.

In short, the attributes that, in my opinion, most definitively recommend Vincent's character include his judgment, sensitivity and integrity, coupled with his strong ties to the community and an abiding love for and need to protect his family. Consequently, I wholeheartedly and without reservation recommend that Vincent be granted bail and allowed to return to his family. If you have any questions, please do not hesitate to contact me at (917) 406-0816 or oscar.cragwell@gmail.com.

Respectfully yours,

Oscar Cragwell

# EXHIBIT J

Lucia Esposito
136 Waverly Place #8D
New York, NY 10014

Hon. Victor Marrero
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

February 5, 2018

Dear Judge Marrero:

I am writing on behalf of my brother, Vincent Esposito. My brother is 15 months younger and my sister is 3 and a half years younger than myself. We are not only close in age but also share a very close family bond and have many of the same friends, since we all attended the same Catholic grammar and high schools. My siblings have dinner every night with our 83-year-old mother. I join my siblings and mother for a family dinner each Sunday, as we honor this tradition started by our grandparents since our youth.

Vincent lives with our mother and is her primary care taker. He takes her to each of her medical appointments and is the point person with each of her doctors. Even though my mother is a lung cancer survivor she still needs continual monitoring. I have never known another adult child who has the level of affection and care that he shows towards our aging mother. He has resided in the same Upper East Side home for the past 35+ years.

He is also known to be helpful and charitable. Just one example of his generosity is multiple Code Blue evenings, he has donated much needed clothes, sneakers, toiletries and food to All Angels Church, to assist with emergency shelter for 50 homeless men and women. His kindness and generosity are unparalleled.

Prior to his detainment we would speak daily and see each other several times a week. My brother poses no risk of flight. His family (2 sisters and mother) is too important to him and he would not put us in jeopardy nor take a risk of never seeing us again.

I fully understand the charges that are alleged but I know my brother is not capable of them. He is not the person the government is claiming him to be. To put it simply you cannot put a square peg into a round hole no matter how much the prosecution wants it to be. I hope I have conveyed to you the gentle and caring soul that he is. He is an extraordinary son, brother, friend, human being and gentleman.

Respectfully yours,

*Lucia Esposito*
Lucia Esposito

# EXHIBIT K

Carmella Esposito
67 East 77 Street
New York, NY 10075


Hon. Victor Marrero
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

February 4, 2018

Dear Judge Marrero:

My name is Carmella Esposito and I am writing to respectfully request that my
brother, Vincent Esposito, be granted bail.

Vincent is a very filial son. He is immensely dedicated to our 83-year-old mother and
is her primary care taker. Vincent drives her to doctor appointments and meets
with her doctors (pulmonologist, oncologist, cardiologist, orthopedist, neurologist
and internist) to discuss her medications, conditions, and restrictions and needed
course of action for her to follow. He is the main contact person with regards to her
medicine and needed tests to maintain and monitor her health.
Since our mom does not leave the house without one of her children by her side,
Vincent has taken on the responsibility of grocery shopping as well as preparing
many meals since our mom cannot stand for very long due to severe osteoarthritis
and is in need of a knee replacement. On any given week, he delivers left over home
cooked meals to homeless individuals, who sleep on the steps of St. Jean Baptiste
Church beneath the overhang that protects them from the elements. These
individuals appear truly grateful and appreciative for the hot food.

Vincent is reliable, dependable, and trustworthy and would not jeopardize our
family nor our security for any benefit to him. There is no flight risk. In his 50 years,
he only traveled outside of the country once to attend a high school friends'
wedding. With his incarceration on 1/10/18, this is the longest period of time,
which my mom has gone without seeing him. Although she has been approved for
visitation at MCC, the traveling, walking, and due process of visitors is not a
situation, which we think she can endure. For these reasons alone, I implore you to
return him to our home, so he can care for my mom, and prepare adequately for the
serious charges against him.

He is a loving son, a brother, and my best friend.

Respectfully,

Carmella Esposito
Carmella Esposito

# EXHIBIT L

February 5, 2018

Christopher Dillon, D.D.S.
28 Knollwood Road
Upper Saddle River, NJ 07458
(516) 770-2652

Honorable Victor Marrero
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Dear Judge Marrero:

My name is Christopher Dillon. I am a husband, a father of three, and a practicing Dentist here in New York City. I attended Loyola High school where I met Vincent Esposito and we have remained close friends for the past thirty five plus years. I understand Vincent will be appearing before you and applying for bail and I fully recognize the seriousness of the charges.

Through our years of friendship I have only known Vincent to be a very kind, generous and loyal friend. Whenever I have needed something, he has always unconditionally offered to help. Vincent friendship, integrity, and dependability are second to none. Recently, when I told Vincent I would be needing a hip replacement, he immediately responded with a sincere desire to help. He was integral in the care of his mother who had orthopedic surgery and offered to research surgeons and to even facilitate a conversation between his mother's surgeon and myself to assist with finding me a referral. All of this was in the spirit of helping me and genuine friendship.

Vincent is the more devoted to his family than anyone I have known, in particular as it pertains to his mother. He appreciates family and family relationships above everything. When my mother grew ill and needed to move to a nursing home, the empathy and care Vincent showed me was amazing. Every time I speak with him, he asks me about my mother's care and condition, and how he can help. Because of Vincent's tremendous love and attachment to his family and ties to the home he has been living in for thirty five years, I am sure he is not a flight risk. For the above reasons, I ask you to grant bail for Vincent Esposito.

Thank you for your consideration and time.

Respectfully,

Christopher Dillon, D.D.S.

# EXHIBIT M

*Challenge. Inspire. Transform.*



February 4, 2018

Hon. Victor Marrero
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Sent via email to einhorn@jeffreylichtman.com

Dear Judge Marrero,

Please know that Vincent Esposito graduated Loyola School, a high school in Manhattan, in 1985. I have known him since that time.

I understand that Vincent has been charged with serious crimes and will appear before you to argue for bail.

Vincent has remained in strong contact with a number of our graduates, who are all successful professionals and upstanding citizens. They speak highly of who Vincent is. I have interacted with Vincent at a number of social occasions and have found him to be a kind and soft spoken person.

Vincent truly cares for his immediate family and hopes to be reunited with them at home, a home he has lived in for his entire life.

Regards,

Tony Oroszlany '87
President

# EXHIBIT N

*Donald N. Summers, M.D.*
*DIM(CV) F.A.C.P., F.A.C.C., F.C.C.P., F.A.C.A.*

re. Vincent Esposito
DoB 7.22.67

7608 SEVENTH AVENUE - BROOKLYN, N.Y. 11209
718 808-2858
718 808-2920
FAX # 718 921-0519

2.5.18

To Hon. Victor Marrero

Vincent Esposito is known to me for many years. He has always been most respectful and pleasant and has spoken with politeness and most softly.

He has medical problems evaluated at several hospitals in N/C (MT Sinai Med-Center, and Weill/Cornell Med Center) and evaluation will be required lifelong as well as comparison with prior studies.

Mr. Esposito has been very concerned and most helpful to his mother for the treatment of a very serious ailment which has immobilized her and is a threat to life. He has shown his gratitude for my services with holiday gifts and friendly calls. He has lived in N/C all of his life and has always responded to phone calls regarding medical issues.

Donald N. Summers

# EXHIBIT O

3900 Moorpark Avenue
Apartment 149
San Jose, California 95117

6 February 2018

Honorable Victor Marrero
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Dear Judge Marrero:

I am writing on behalf of Vincent Esposito whom I have known for 35 years, since we were classmates at Loyola High School. By way of background, I was born and raised in New York City, the youngest of 5 siblings. My father was a partner at Sullivan & Cromwell; my mother worked several years in the Education Department of the Bronx Zoo. I have a Master's degree in Biology. Since late 2015, I have lived in California.

I know Vincent has been charged with very serious offenses and is to appear before you for a bail hearing. I appreciate the opportunity to provide you with a more nuanced, fuller picture about the person and valued friend I know which I hope may be of assistance when considering bail. People often get painted with broad brushstrokes, and, for better or worse, language is powerful; hence, when someone is labeled a Mafioso, as I read in the New York headlines and news stories as well as the complaint, it instantly conjures images and thoughts of a sinister and dangerous monster. I hope I can shed some light on Vincent, the real person.

I will attempt to articulate what his friendship has meant to me. Vincent has been so generous in his time and concern for me that I feel a sense of embarrassment, as I would never be able to return in kind the same degree of energy and concern. The care, concern and friendship he and his family have shown me has been so complete and unconditional that I feel utterly un-deserving of such generosity. Of course, valued friendships are not a scoring match.

During my mother's long illness with terminal cancer, Vincent routinely called me to ask how my mother was doing. I was greatly impressed and touched by this because it is an awkward and difficult call to make that takes a certain degree of courage that many people, myself included, cannot always muster. Although other people asked about my mother's health, he was the only friend who called me regularly to specifically ask about her. He was incredibly empathic during this time and after her death in January 2011. He would invite me

out and we would discuss what it means to lose a parent. I talked to him freely about the loss, pain, depression I experienced and he offered console and advice. No matter what might be going on his own life or how busy he was, Vincent always found time for me. I am terrible at calling friends and family but that did not dissuade Vincent from calling me daily for many years to say hello and see how I was doing.

Vincent's concern for my welfare is remarkable. I have a tendency to take life seriously and am easily bothered by life's annoyances; he related that he was once that way, but learned a while back after a period of adversity not to take life so hard and seriously. If you saw Vincent, you would not know this about him, because he often maintains a protective façade. However, the real Vincent is surprisingly quite sensitive, very caring, with a deep concern for his friends, family, and neighbors. He is also bright, and extremely funny.

After my mother's death, I needed a storage facility for items I inherited from the Estate. Vincent helped me, as at that time he was co-owner of a self-storage facility in Bloomfield, NJ. At a later date, when I was thinking of moving to another apartment, Vincent told me that he was renovating a building uptown into apartments if I was interested. I did not want to be so far uptown and so he helped, once again, by putting me in touch with his friend who was a real estate agent.

When I was in the hospital, Vincent was the first person to visit me. He asked what I needed and returned the next day with clothes and other essentials. On many occasions, he had bought me groceries, food and litter for my cats, and other needed items while I was unable to do so for myself, due to health issues.

Like any close friend, Vincent was concerned about my overall well-being from my health, to my need to find a job, to my financial health and lack of frugality. Unlike me, he is an active hands-on investor who I would hear making calls to his broker to give instructions on orders for him and his family members. He gave me some general advice, including questions to ask my financial advisor (for instance, about fees etc.).

Vincent is intelligent and has a wide breadth of knowledge including health, medicine, business, real estate, and investing. I was impressed with his business acumen, as that is something for which I have no penchant or aptitude. He has a keen eye for real estate and property values and it was his ken to notice properties and size them up as to possible sale value and potential development opportunity. I know he has owned properties in both New York and New Jersey.

On several occasions I went to dinner with his family. I saw, first hand, the way he treats his mother from assisting her walking, to continuously making sure she is comfortable. I also know that he takes his mother to medical appointments and is intimately involved with her medical well-being. Often a strong bond between mother and son exists, but the bond between Vincent and his mother is of an order of magnitude higher and is extraordinary and inextricable. This in-itself is an ironclad reason Vincent is not a flight risk. Considering his

mother's advanced age and health, it seems punitive to keep him incarcerated, since any assertions of he being a flight risk are tenuous at best and are without basis or merit. He would not be the cause of his family losing their financial assets by way of forfeited bail. He values his mother and sisters above all else and would not flee causing them serious financial damage.

Not only is he not an international-traveler, he is not even a national traveler, rarely leaving the local greater metro area. He applied for a passport in 2010 for the one and only time he travelled overseas and even then he was hard-pressed to go and required much encouragement. That was in 2010 to go to the wedding of our common close friend, in Italy. Vincent is intelligent, but he is not worldly in the sense of being a world-traveler; to the contrary, colloquially-speaking, he is a homebody.

There are few certainties in life, but it is highly improbable and unthinkable that Vincent would be a flight risk. Because more than anything, Vincent has been always inextricably connected to his mother, foremost, and his sisters.

Respectfully yours,

Peter Thayer

# EXHIBIT P

John Cassarini
35511 Del Rey
Dana Point, California 92624
(917) 750-5031

Hon. Victor Marrero
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

February 4, 2018


Dear Judge Marrero:

My name is John Cassarini and I am a father of five and have been a Portfolio
Manager on Wall Street for twenty years. I first met Vincent Esposito in
September 1981 when we both attended The Loyola School in Manhattan. His
sister, Lucia, was my classmate and he is a year younger, but we developed a
friendship, which has grown steadily throughout the ensuing thirty-seven
years.

Throughout the next thirty-seven years, I have known Vincent to be a kind,
generous and responsible person who has been a wonderful friend to me, my
family and fellow friends. My many positive experiences are too many to
include in a letter, but I will highlight a few examples of his genuine
friendship and kindness. The night my mother called to inform me that my
father had entered a terminal coma and would soon pass, Vincent dropped what
he was doing and drove over two hours to console my family. He stayed the
night, in uncomfortable sleeping arrangements, reliving every photo my mother
had of my father and was cheerful and kind during the worst day of our lives.
The following day, he came to the hospital to pay his respects and tactfully
left an hour before my father passed. Only a person of strong family ties and
a responsible loving friend would endure such a depressing chain of events. I
will always remember the kindness and love he shared during a very difficult
period. A few weeks later, my family welcomed newborn twins to the world. The
boys were born in California; I lived in New York at the time, and was
planning to make the trip with my three young children. Vincent, knowing I
was still mourning the loss of my father, once again dropped everything he
was doing and came to California for ten days. He acted as cook, babysitter,
chauffer and my man Godfrey for the entire trip. When he wasn't teaching my
son to throw a ball, he was doing the grocery shopping, cooking and then
consoling me with regards to how my newborn twins would never see their
grandfather. Vincent did all acts with a smile on his face and never seemed
to tire. His sense of family, generosity and decency is unparalleled. These
are moments and acts of kindness in life one does not ever forget.

I was a Managing Director at Lehman Brothers when the firm filed for
bankruptcy, an event that cost me the majority of my net worth. It was a very
emotional night and staff returned to the office to pick up belongings.
Vincent drove me to the office and waited in his car (I forget how long I
took but I wasn't quick) as I packed up my personal belongings and then
stayed with me as I had dinner to cheer me up. The depths of his kindness and
decency to my family and me are limited by my words. His actions throughout
the decades are much louder. It is a man of this caliber who I selected to be
godparent to my son.

Vincent has lived at home (the same home for over thirty-five years) his **entire** life with his sister, Carmella, and his mother. He rarely leaves New York for an extended period of time. His ties to his family, all whom live in New York are very strong — they are inseparable. Throughout the years, I have gone to dinner with his family as well as dine in their home, more than fifty times. I can firmly attest to the closeness and love they all share. It is impossible for me to imagine any scenario where he would leave his mother. I recall an afternoon where we were in downtown Manhattan, looking at a possible real estate investment, and Vincent suddenly said we have to go uptown, which seemed odd given the traffic and our plans. Vincents' mother had a doctor's appointment *less than a block away from her home*, but Vincent felt such responsibility to his family to interrupt his day to travel uptown and attend the appointment with her.

Although I understand Vincent has been charged with serious crimes; knowing him and his family and their strong loving bond, I would assess the chance of flight risk as zero.

As mentioned earlier, I can cite numerous more examples of his responsibility, kindness, strong demeanor and sense of family. This is the Vincent Esposito I have known to respect and love for the past thirty-seven years.


Respectfully,


John Cassarini

# EXHIBIT Q



**Craig Antell, DO, FAAPMR**
**Director of Ambulatory Orthopaedic Rehabilitation**
**NYU LANGONE PRESTON ROBERT TISCH CENTER FOR MEN'S HEALTH**
555 Madison Ave 2nd FL
New York, NY 10022
Phone: 646-754-2000
Fax: 646-754-29690

Hon. Victor Marrero
United States District Judge
Souhern District of New York
500 Pearl Street
New York, New York 10007

February 5, 2018

You Honor,

I have known Mr. Vincent Esposito for the past decade as both his physician and his friend. Throughout this time period we have forged a strong friendship built on mutual respect and a passion for helping others.

As a father of two sons, I am always impressed by Vincent's interest in how the boys are doing in school, and how my older son is progressing with his sports activities. During the time of his Bar Mitzvah, Vincent and I discussed how best to write the speech which I was to give as to incorporate all the important life lessons my son would need to learn.

Amongst them, most importantly, was to always strive to be the best one can in life and remember to always hold your head up high even in the face of adversity and hardship. This is not the mindset of a person who should be considered a flight risk; I truly believe Vincent is the polar opposite of such a person.

I am aware of the serious charges of which Vincent has been accused and I was surprised to read such in the newspaper. This is not the Vincent I have known for the past decade. The man I know has always been cordial, polite, and helpful to others.

I will never forget the time an elderly patient missed her Access-A- Ride from the office. The patient came back up with their walker and we called Access-A-Ride to pick her up. Unfortunately, the wait was going to be well over an hour or two. I offered to call a car service to help; however, she was scared to be transported outside of the Access-A- Ride.

Vincent happened to be out at the front desk and struck up a conversation with my other patient, and they left in the elevator. Much to my surprise when I left two hours later to go home, they were still downstairs in the office building waiting together for the transportation to

arrive.

Vincent had never met this lady before and likely never saw her again. Regardless, he took hours out of his day to sit with a nervous elderly lady and offer support.

I am no stranger to hardship, and the past few years have been extremely difficult for my family and me on many fronts. I have had many low times and invariably have had to count on the emotional support of family and friends, among whom Vincent counts prominently.

Never once was he too busy to hear me out, never once was he dismissive of my woes, and he always reinforced the point to never give up - things can only get better. I now know I will be that crutch for Vincent in the upcoming months.

Vincent has been a Manhattanite his entire life and has established strong roots on the Upper East Side of Manhattan. He maintains a close circle of family and friends, and for as long as I have known him has been gainfully employed full time.


Respectfully yours,

Dr. Craig Antell.


I